# Exhibit 2



**Planet Depos**
We Make It *Happen*™

# Transcript of Thomas Credelle

**Date:** December 19, 2023
**Case:** SVV Technology Innovations Inc. -v- Acer Inc.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF TEXAS

WACO DIVISION


SVV TECHNOLOGY      )
INNOVATIONS, INC., )
                    ) C.A. No. 6:22:cv-00639-ADA
    Plaintiff,      ) C.A. No. 6:22-cv-00640-ADA
                    ) C.A. No. 6:22-cv-00641-ADA
vs.                 )
                    )
ACER, INC.,         )
                    )
    Defendants.     )
_____)




REPORTER'S TRANSCRIPT

V I D E O   D E P O S I T I O N

THOMAS CREDELLE,



TUESDAY, DECEMBER 19, 2023

REMOTE VIDEO TELECONFERENCE



9:10 a.m. PST

to

4:58 p.m. PST


Stenographically Reported by:
Burgundy B. Ryan, RPR,
CSR No. 11373
Job No. 518966
Pages 1-219

A P P E A R A N C E S

ALL PARTIES ATTENDING REMOTELY


ON BEHALF OF THE PLAINTIFF:

      KATZ PLLC
      By:  ROBERT D. KATZ, ESQUIRE
      6060 N. Central Expressway, Suite 560
      Dallas, Texas 75206
      214-865-8000
      rkatz@katzfirm.com


ON BEHALF OF THE DEFENDANT:

      TECHKNOWLEDGE LAW GROUP LLP
      By:  JERRY CHEN, Esquire
      20660 Stevens Creek Boulevard, Suite 381
      Cupertino, California 95014
      650-517-5200
      jchen@tklg-llp.com


ALSO PRESENT:

      Daniel Esparza, Planet Depos technician

      Mylene Santiano, Planet Depos videographer

THE VIDEOGRAPHER:  We're going off the record.  The time is 10:17.

(Recess.)

THE VIDEOGRAPHER:  We are back on the record.  The time is 10:29.

By MR. CHEN:

Q.  Mr. Credelle, about how many hours have you worked on the Acer matter?

A.  I -- I -- I don't recall, but actually I did check at the break that I was first engaged by SVV in January of this year.  Time flies.  I said six months, it's been closer to twelve.  And over that time frame I worked on both projects and I don't know the split.  I don't exactly know how many hours I worked.

Q.  Could you provide an estimate even for both together?

A.  Certainly more than 100.  I -- I don't know anymore than that.  That is just a rough guess but something like that.

Q.  All right.  Looking back at Exhibit 1, which is your opening expert report.

A.  Okay.

Q.  Looking at section 4 which is titled "My Understanding of the Relevant Legal Principles."

A.    Okay.

Q.    Did you draft this section of your report?

A.    No.

Q.    Are you a lawyer?

A.    No.

Q.    Do you have any legal training?

A.    Not -- not formal.  Maybe -- maybe through all the patents I have on my own and the work I've done over the past 15 years I -- I understand a lot of the principles but I never had formal training as a lawyer.

Q.    Okay.  Do you have any specialized legal training in the field of patent law?

A.    No.

Q.    Looking at paragraphs 43 to 44 -- okay.  In paragraphs 43 and 44 you recite your understanding of direct infringement.

      Do you see that?

A.    Yes.

Q.    Do you have any expertise on the legal requirements of direct infringement?

A.    Other than what I say here, it's my understanding that that is what it means by direct infringement.

Q.   Other than what is recited, do you have any specialized expertise on the legal requirement of direct infringement?

A.   I would have to say no direct legal training in the subject.

Q.   Okay.  Did you do any case law research on the legal requirements of direct infringement?

A.   No, I did not.

Q.   Do you have any specialized training on how to determine whether direct infringement is legally satisfied?

A.   I guess I would have to say no to that.

Q.   Looking at paragraphs 44 to 47 -- sorry -- 45 to 47, there you recite your understanding of indirect infringement; correct?

A.   Yes.  Let me just read it quickly.

Q.   Sure.

A.   Okay.  That -- it's my understanding of what a direct infringement and contributory infringement is.

Q.   All right.  You say that indirect infringement can include induced infringement and contributory infringement; correct?

A.   Yes, that is what I say.

Q.   And do you have any expertise on the legal

requirements of induced infringement?

A. No legal training. It's just my understanding of what the words mean.

Q. Did you do any case law research about the legal requirements of induced infringement?

A. I did not.

Q. Do you have any specialized training on how to determine whether induced infringement is legally satisfied?

A. No specialized training other than just my experience.

Q. Do you have any expertise on the legal requirements of contributory infringement?

A. No legal training per se.

Q. Do you have -- did you do any case law research regarding contributory infringement?

A. I did not.

Q. Do you have any specialized training on how to determine whether contributory infringement is legally satisfied?

A. No -- no specific legal training on that subject.

Q. Do you have expertise on the legal requirements of notice for the purposes of infringement?

A.   I'm sorry, say that again.                    10:35:46

Q.   Do you have any expertise on the legal        10:35:48
requirements of notice for the purposes of         10:35:50
infringement?                                      10:35:54

A.   Notice?  What do you mean by notice?  I'm     10:35:56
not -- maybe I'm misunderstanding but can you say  10:36:10
that another way.                                  10:36:13

Q.   Notice of infringement?                       10:36:15

A.   I guess -- I guess not, no legal training.    10:36:22
I'm trying to see where it even says that word.  Is 10:36:24
that in paragraph -- where is that?  I don't see   10:36:28
that in my report.                                 10:36:44

Q.   Let me try to find the right section.  I'll   10:36:46
find the right section and come back to this.       10:37:32

A.   All right.  I just did a search of the        10:37:34
document, I didn't see anything up until something  10:37:36
unrelated, I think, but go ahead.                  10:37:42

Q.   Do you have any expertise in corporate        10:37:52
law?                                               10:37:54

A.   Corporate law?  When you say "expertise,"     10:37:56
formal training, no, but when I was with            10:38:00
Clairvoyante, I was VP of engineering and worked    10:38:03
extremely close with our corporate counsel on issues 10:38:07
that related to our IP development and contracts    10:38:10
with our -- with respect to customers.  So I'm      10:38:14

certainly aware of some of the aspects but no formal training.

Q.   Do you have any specialized legal training for determining whether a parent corporation is legally responsible for the acts of its subsidiary?

A.   I do not.

Q.   Do you have any expertise on the legal requirements of vicarious liability under an alter ego theory?

A.   I would have to say no to that.

Q.   Did you do any case law research on this issue?

A.   No.

Q.   Okay.  And do you have any specialized training on how to determine whether vicarious liability under an alter ego theory is legally satisfied?

A.   If there is some comments in my report about that, I would have to read them.  I don't even think that came up.  So at this point I would say I don't have any specialized knowledge about that topic.

Q.   Do you have any expertise on the legal requirements of vicarious liability under an agency

theory?

A.   Same answer, I do not have any specialized training in that field.

Q.   And you didn't do any case law research on this issue; correct?

A.   That is correct.

Q.   And you don't have any specialized legal training or specialized training on how to determine whether vicarious liability under an agency theory is legally satisfied; correct?

A.   That would be correct.

Q.   The next section of your report, section 5, is titled "Background of the Patents-in-Suit."

Do you see that?

A.   Yes.

Q.   Does this section describe what was known at the time of the alleged invention of the SVV patents?

A.   That was my intent, to frame my comments relevant to the 2009 time frame.

Q.   Is this information that a person of ordinary skill in the art would know when reading the other patents?

A.   I think it's representative of what a person of skill in the art would understand with the

definition that I put forth in my report.

Q. In the first subsection it has the heading "LCD Backlights."

A. Yes.

Q. Do you see that? What does that section describe?

A. It describes --

Q. You can take a moment to review it, if you need to.

A. Yeah, I'm scanning through it, make sure I remember what I said.

So -- so this -- yeah, this section I break it into several components, as you note, a general description of LCD backlights, the types, some of the key components that are used in typical backlights, especially focusing on edge-lit backlights since that is the subject of most of the patents, so examples of how light can be extracted from light guide plates, some examples of how prism sheets operate depending on where they are and how they are organized into a backlight stack up, some comments about reflectors and their purpose, some comments about quantum dot films.

Again, quantum dot films were in the early stages of development at the time frame of these

10:41:08
10:41:23
10:41:26
10:41:27
10:41:28
10:41:31
10:41:33
10:41:34
10:41:36
10:41:36
10:41:39
10:42:05
10:42:07
10:42:12
10:42:16
10:42:20
10:42:23
10:42:26
10:42:30
10:42:37
10:42:40
10:42:47
10:42:53
10:42:59
10:43:02

need?

THE WITNESS: Let's do 45 minutes. Let's see it's 11:30, quarter after 12.

MR. CHEN: Okay. Sounds good.

THE WITNESS: Okay.

THE VIDEOGRAPHER: We're going off the record. The time is 11:36.

(Lunch recess.)

THE VIDEOGRAPHER: The time is 12:21. We are back on the record.

By MR. CHEN:

Q.   Great. Mr. Credelle, do you recall that we were talking earlier about the issue of legal notice?

A.   Yes.

MR. CHEN: Okay. Could we pull up Exhibit 1 again?

IT TECHNICIAN: Please stand by.

By MR. CHEN:

Q.   Mr. Credelle, I want to refer you to paragraphs 146 and 166 of your report.

A.   Okay. I'm on 146.

Q.   Yeah, let me get there myself.

Okay. Do you see in paragraph 146 you say, "Accordingly, it is my opinion that Acer was

11:36:35
11:36:35
11:36:37
11:36:40
11:36:41
11:36:43
11:36:44
12:17:21
12:21:12
12:21:14
12:21:18
12:21:18
12:21:23
12:21:29
12:21:32
12:21:33
12:21:39
12:21:42
12:22:35
12:22:35
12:22:41
12:22:49
12:22:52
12:23:02
12:23:12

provided actual notice of the asserted patents on the dates set forth below?"

A. Yes, I see that.

Q. And then if we go to paragraph 140 -- 166, you say in the first sentence, "In addition, it is my understanding that Acer indirectly, since at the least the date when Acer was on notice of its infringement under 271B."

Do you see that?

A. Yes.

Q. Okay. Do you have any expertise on the legal requirements of notice for the purposes of infringement?

A. No.

Q. Okay. Did you do any case law research on the legal requirements of notice?

A. No. Notice is a notice. I just assumed it meant notice so I didn't do any further studying.

Q. Okay. And do you have any specialized training how to determine whether notice is legally satisfied?

A. I do not.

Q. Okay. Thank you. Okay. Let's go back to page 27 of your report.

A. Okay.

Q. And we are on section C. It's called "The Familial Relationship Involving U.S. Patent 9,256,007."

Mr. Credelle -- sorry.

A. Yeah.

Q. Okay. All right. Mr. Credelle, did you read the SVV asserted patents?

A. I'm sorry, did I read the patents?

Q. Yes.

A. Yes.

Q. Okay. And you are aware that many of the patents share the same specification; correct?

A. Correct.

Q. In paragraph 69, you use the '007 patent as a way of organizing a number of the SVV asserted patents; correct?

A. Yes.

Q. Are you saying that all of those patents listed in paragraph 69 share the same specification?

A. No, it's -- I mean, I don't recall in detail but it's not what I'm saying here. Just there is some relationship which I tried to indicate on the next page. Whether the specification is the same, I forget.

benefit.

Q. Okay. And they also do not expressly state that one of the benefits is improved light distribution versus viewing angle; correct?

A. Not -- not in so many words, no, it does not.

Q. Okay. Let's look at section 8 which is titled "Patent Strength Indications."

A. Okay.

Q. In paragraph 110 and I guess 114, you are discussing an evaluation of patent strength based on the service called innography.

Do you see that?

A. Yes.

Q. Okay. Do you have any specialized training in evaluating patent strength?

A. I'd have to say yes, I have done a lot of patent evaluation in my early consulting career. I don't think you go to school for that necessarily but you evaluate patents against some goal to determine the value of a patent. I did that quite extensively in the beginning phases of my consulting practice so I have done such analysis personally. I've never used the software that -- called patent strength which is a probably more automated way to

13:22:17
13:22:18
13:22:21
13:22:22
13:22:25
13:22:28
13:22:28
13:23:17
13:23:23
13:23:37
13:23:52
13:24:00
13:24:03
13:24:03
13:24:05
13:24:07
13:24:13
13:24:19
13:24:24
13:24:26
13:24:31
13:24:37
13:24:40
13:24:44
13:24:50

do what I did manually.

Q.   So you've never used the innography software before your work on this case?

A.   Yes.  I'm not familiar with that particular tool other than I understand the process that they use.  So I evaluate the results of their study.  I didn't dig into all the factors in their software.

Q.   I see.  You mention you have experience in evaluating patent strength in the past.  Can you describe that in a little more detail?

A.   Yes.  When I -- I first started doing patent related consulting, I worked for two or three different companies who had portfolios of patents that they were considering purchasing.

Q.   Uh-huh.

A.   And I was assigned the job of evaluating as best I could -- these were display related patents obviously -- the potential value of these patents and what they could be in rank order, these patent estates, and provide a report to the client.

Q.   How did you evaluate the strength of a patent?

A.   Several factors.  Somewhat similar to the way patent strength works, I -- I believe, is to look to see the number of citations of a patent, to

see who has referred to this patent. I looked at the -- technology itself was the main -- my main thrust was to look at the claims of the patent and the described technology and to make some assessment of how that technology could be used against products that might be manufactured or going to be manufactured. So it was a combination of factors.

The primary tool I used was -- I would have to say it's more of a technical evaluation, but I did look at other factors that would indicate there is a lot of interest in this patent, if there is a lot of companies citing it in their inventions. If there are technical papers, you know, I would look at those to see what was described. So I -- I -- I can't claim my process was the same or even as sophisticated perhaps as what could be done today with a computer, but I believe the net results were valid and used by my clients to make decisions about whether they would say move forward on a purchase or maybe pass.

Q. Would you say the thrust of your evaluation is evaluating the technology described in the patent and the coverage of the claims?

A. I would say that's -- that's fair.

Q. Okay. Do you know whether the innography

software tool evaluates the technology and the

coverage of the claims?

A.   I didn't dig in -- I didn't have time to dig into the details of that particular process but I know they have maps that they generate to indicate, you know, the strength of a patent in a certain area, number of patents in that area, who is filing in that area, what companies are involved. So I -- I understand those.  I don't know how they actually do the technical evaluation or the fits on the claim to -- to a category like the patents.  I don't recall how they do that or if they do that.

Q.   Do you have any specialized training in patent rating systems like the innography software?

A.   Well, I'm certainly not a programmer.  I haven't written any algorithms of this type.  My algorithms are more how I look at technology in patents and make my own kind of grading system and assessment that, you know, I can then document and provide to a client so they can make an informed decision about the value of certain patents.  But I don't have experience, you know, creating algorithms that would do that automatically.

Q.   And you mentioned that you didn't use the

innography tool until your work on these SVV matters; correct?

A.   That's correct, I -- I had not used that tool before.

Q.   What made you decide to use the innography tool in this context?

A.   That was a decision made prior to my detailed involvement so I -- I can't say when and how it was -- it was chosen as a tool but it was not commissioned by me.

Q.   Did you run the patent numbers through the innography tool yourself?

A.   As -- as I said in my report, I reviewed the rankings, I did not run -- I did not run the software.

Q.   Okay.  How did you choose the 50th percentile as being a cutoff between patents that are strong and patents that I guess are not strong?

A.   It's halfway.  No real -- I -- I can't say more than that.

Q.   Okay.  Do you know what is it halfway of?

A.   Well it's the patent strength indicator number and so a high number is better than a low number and at some point you make a cutoff.  I

didn't really go into the details on this analysis.

Q. Do you know --

A. Just the results.

Q. I see. Do you know what is the scale for the patent strength number?

A. It's -- it's in the reports. I forget how they -- they gave some examples I don't recall at the moment. Obviously if you have a 100 rating, it's probably a super patent and nobody has -- in a new field and nobody has any IP that is like it and it's highly valuable to end customers. But that's all built into their algorithmic system.

Q. Other than the patent numbers identified in your report, did you run any other patents through the innography system?

A. No, I did not.

Q. Okay.

A. It may have been done by others in this case but I didn't personally see any other results.

Q. And you didn't see any of the results; right?

A. I saw the results for what's in my report but if there is other -- if they ran other cites, I

didn't see those.  I don't know if they did.

Q.    Okay.  Looking at paragraph 112 again, you determined that a ranking of above 50 in the patent strength percentile range means that it is a strong patent; correct?

A.    Yeah.  I indicate that they are strong because they are above 50 percentile.  If they were below 50 percentile, I would have had a different opinion.

Q.    Okay.  You also said that the rankings indicate the presence of objective indicia supporting a determination of nonobvious and provide an indicator of industry praise for the asserted patents.

Could you please explain how the patent strength ranking indicates the presence of objective indicia supporting a determination of nonobviousness?

A.    So again this is in the details of the -- of the system, the software.  Thinking of examples of how they do such determinations and look for -- as I said earlier, if there is published papers or promos for certain characteristics, they -- the software looks for those.  I don't know their scale or how they actually, you know, set that up and

CERTIFICATE OF STENOGRAPHIC REPORTER


I, BURGUNDY B. RYAN, a Certified Shorthand Reporter, hereby certify that the witness in the foregoing deposition,

THOMAS CREDELLE,

was by me duly sworn to tell the truth, the whole truth, and nothing but the truth, in the within-entitled cause; that said deposition was taken at the time and place therein named; that the testimony of said witness was stenographically reported by me, a disinterested person, and was thereafter transcribed into typewriting.

I further certify that I am not of counsel or attorney for either or any of the parties to said deposition, nor in any way interested in the outcome of the cause named in said caption.


DATED:  Tuesday, January 2, 2024.


_____
Burgundy B. Ryan, CSR No. 11373, RPR



# Planet Depos
## We Make It *Happen*™

# Transcript of Thomas Credelle, Volume II

**Date:** December 27, 2023
**Case:** SVV Technology Innovations Inc. -v- Acer Inc.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF TEXAS

WACO DIVISION


SVV TECHNOLOGY INNOVATIONS )
INC., )
                 )
         Plaintiff, )
                 ) No. 6:22-cv-00639-ADA
      vs. ) No. 6:22-cv-00640-ADA
                 ) No. 6:22-cv-00641-ADA
ACER INC., )
                 )
         Defendant. )
_____)


VIDEO DEPOSITION OF THOMAS CREDELLE

VOLUME II

DECEMBER 27, 2023

CONDUCTED VIA VIDEOCONFERENCE


Pages 220 - 393

Job No. 519587

Reported by

Cynthia J. Vega, RMR, RDR, CSR 6640, CCRR 95

REMOTE APPEARANCES

For the Plaintiff:

KATZ PLLC

By:  Robert D. Katz, Esq.

6060 North Central Expressway, Suite 560

Dallas, Texas  75206

(214) 865-8000

rkatz@katzfirm.com


For the Defendant:

TECHKNOWLEDGE LAW GROUP LLP

By:  Jerry Chen, Esq.

20660 Stevens Creek Boulevard, Suite 381

Cupertino, California  95014

(650) 517-5200

jchen@tklg-llp.com


The Technician:

Daniel Esparza


The Videographer:

Mylene Santiano

* * * * *

The remote video deposition of Thomas Credelle, Volume II, a Witness herein, located in the City of Powell Butte, State of Oregon, taken on behalf of Defendant, on Wednesday, December 27, 2023, beginning at the hour of 9:01 a.m. Pacific Standard Time, remotely before Cynthia J. Vega, CSR No. 6640, located in the City of Carlsbad, County of San Diego, State of California.

            The witness will now be sworn.


                     THOMAS CREDELLE,

Witness herein, being first duly sworn, testifies as

follows:


                      EXAMINATION

BY MR. CHEN:

     Q.   Good morning, Mr. Credelle.

     A.   Good morning.

     Q.   So we're going to continue with your

opening infringement report.  This was marked as

Exhibit 1 during your first day of deposition.

          Do you have a copy of that handy?

     A.   Yes, I do.  I have a copy open.

     Q.   Okay.  Great.

          Could the technician please put Exhibit 1

up on the screen.

          THE TECHNICIAN:  Please stand by.

BY MR. CHEN:

     Q.   Mr. Credelle, do you see the -- your

opening expert report up on the screen?

     A.   Yes, I do.

     Q.   Okay.  Great.  All right.  Let's go to

paragraph 157.

And you recall on your first day of deposition you testified that you're not a lawyer; correct?

A.   Yes, that's correct.

Q.   And you don't have any formal legal training; correct?

A.   That is correct.

Q.   Do you have any expertise on the legal requirements of infringement under section 271(g) of the patent code?

A.   271(g), is that what you said?

Q.   Yes.

A.   I understand the description, but I don't have any legal training, if that's the question.

Q.   And did you do any case law research on the legal requirements of infringement under 271(g) of the patent code?

A.   No, I did not.

Q.   Do you have any specialized training on how to determine whether infringement under 271(g) is legally satisfied?

A.   Not in detail, no.

Q.   Okay.  Last week you testified that you had visited SVVTI in September of 2023; correct?

A.   Yes.

Q.   And you also stated that you started working with SVVTI in about January of 2023; correct?

A.   Correct.

Q.   Is that when you first reviewed the SVVTI patents?

A.   Most likely.

Q.   When you say -- what do you mean by "most likely"?

A.   That's my usual procedure when I retain things, even beforehand actually, is to review the patents.  So I don't remember exactly what day I reviewed the patents.

Q.   But it was after you started your engagement on these matters; correct?

A.   It could have preceded by some period of time to review the patents in the case where I'm being considered as the expert.

Q.   Okay.  But it was in connection with your engagement on these matters; correct?

A.   That would be correct.

Q.   Had you ever heard of the SVVTI asserted patents before your work on these matters?

A.   No, I don't believe I ever have.

Q.   Did you know of the company SVVTI before

I declare under the penalty of perjury under the laws of the State of California, United States of America, that the foregoing is true and correct; that I have read my deposition and have made the necessary corrections, additions or changes to my answers that I deem necessary.

Dated: _____

_____

Thomas Credelle

REPORTER'S CERTIFICATE

I, Cynthia J. Vega, a Certified Shorthand Reporter for the State of California, do hereby certify:

That the witness in the foregoing remote deposition was by me duly sworn remotely; that the remote deposition was then taken before me at the time and place herein set forth; that the testimony and proceedings were reported by me stenographically and were transcribed through computerized transcription under my direction; and the foregoing is a true and correct record of the testimony and proceedings taken at that time.

I further certify that I am not of counsel or attorney for either or any of the parties in the foregoing proceeding and caption named or in any way interested in the outcome of the cause in said caption.

IN WITNESS WHEREOF, I have subscribed my name this 8th day of January, 2024.

Reading and Signing was requested.

_____

Cynthia J. Vega, CSR No. 6640