# Exhibit 3 to Chen Declaration



# Transcript of Thomas Credelle

**Date:** December 19, 2023
**Case:** SVV Technology Innovations Inc. -v- Acer Inc.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF TEXAS

WACO DIVISION


SVV TECHNOLOGY     )
INNOVATIONS, INC., )
                   ) C.A. No. 6:22:cv-00639-ADA
    Plaintiff,     ) C.A. No. 6:22-cv-00640-ADA
                   ) C.A. No. 6:22-cv-00641-ADA
vs.                )
                   )
ACER, INC.,        )
                   )
    Defendants.    )
_____)


REPORTER'S TRANSCRIPT

V I D E O   D E P O S I T I O N

THOMAS CREDELLE,


TUESDAY, DECEMBER 19, 2023

REMOTE VIDEO TELECONFERENCE


9:10 a.m. PST

to

4:58 p.m. PST


Stenographically Reported by:
Burgundy B. Ryan, RPR,
CSR No. 11373
Job No. 518966
Pages 1-219

A P P E A R A N C E S

ALL PARTIES ATTENDING REMOTELY


ON BEHALF OF THE PLAINTIFF:

      KATZ PLLC
      By:  ROBERT D. KATZ, ESQUIRE
      6060 N. Central Expressway, Suite 560
      Dallas, Texas 75206
      214-865-8000
      rkatz@katzfirm.com


ON BEHALF OF THE DEFENDANT:

      TECHKNOWLEDGE LAW GROUP LLP
      By:  JERRY CHEN, Esquire
      20660 Stevens Creek Boulevard, Suite 381
      Cupertino, California 95014
      650-517-5200
      jchen@tklg-llp.com


ALSO PRESENT:

      Daniel Esparza, Planet Depos technician

      Mylene Santiano, Planet Depos videographer

A.   Well as far as I know, yes, for the accused products that are in my report, there is -- there are tear-down results for all of those products.  If you're asking me if there were some other products, I know for example there were Acer's products, they're obviously not in this report, that I reviewed but I can't recall any reports that anything that was left out.

Q.   Did you perform the tear-downs?

A.   For the most part, no.  As I say, once I went to Sacramento to -- to examine the tear-downs, some additional tests were run while I was there but for the most part the tear-downs had already been taken care of and documented.

Q.   When you say "for the most part, no," were there some products where you performed the tear-downs yourself?

A.   No, I -- I didn't personally take apart these units but I inspected the parts on a number of the -- of the models where I had questions about the data and suggested or -- or verified if I had any misunderstandings or, you know, clarified some of the results that I had seen in the reports so -- or the data sets.  So that was primarily what I had done.

THE VIDEOGRAPHER: We're going off the record. The time is 10:17.

(Recess.)

THE VIDEOGRAPHER: We are back on the record. The time is 10:29.

By MR. CHEN:

Q. Mr. Credelle, about how many hours have you worked on the Acer matter?

A. I -- I -- I don't recall, but actually I did check at the break that I was first engaged by SVV in January of this year. Time flies. I said six months, it's been closer to twelve. And over that time frame I worked on both projects and I don't know the split. I don't exactly know how many hours I worked.

Q. Could you provide an estimate even for both together?

A. Certainly more than 100. I -- I don't know anymore than that. That is just a rough guess but something like that.

Q. All right. Looking back at Exhibit 1, which is your opening expert report.

A. Okay.

Q. Looking at section 4 which is titled "My Understanding of the Relevant Legal Principles."

do what I did manually.

Q.    So you've never used the innography software before your work on this case?

A.    Yes.  I'm not familiar with that particular tool other than I understand the process that they use.  So I evaluate the results of their study.  I didn't dig into all the factors in their software.

Q.    I see.  You mention you have experience in evaluating patent strength in the past.  Can you describe that in a little more detail?

A.    Yes.  When I -- I first started doing patent related consulting, I worked for two or three different companies who had portfolios of patents that they were considering purchasing.

Q.    Uh-huh.

A.    And I was assigned the job of evaluating as best I could -- these were display related patents obviously -- the potential value of these patents and what they could be in rank order, these patent estates, and provide a report to the client.

Q.    How did you evaluate the strength of a patent?

A.    Several factors.  Somewhat similar to the way patent strength works, I -- I believe, is to look to see the number of citations of a patent, to

software tool evaluates the technology and the
coverage of the claims?

A.    I didn't dig in -- I didn't have time to
dig into the details of that particular process but
I know they have maps that they generate to
indicate, you know, the strength of a patent in a
certain area, number of patents in that area, who is
filing in that area, what companies are involved.
So I -- I understand those.  I don't know how they
actually do the technical evaluation or the fits on
the claim to -- to a category like the patents.  I
don't recall how they do that or if they do that.

Q.    Do you have any specialized training in
patent rating systems like the innography
software?

A.    Well, I'm certainly not a programmer.  I
haven't written any algorithms of this type.  My
algorithms are more how I look at technology in
patents and make my own kind of grading system and
assessment that, you know, I can then document and
provide to a client so they can make an informed
decision about the value of certain patents.  But I
don't have experience, you know, creating algorithms
that would do that automatically.

Q.    And you mentioned that you didn't use the

13:28:32
13:28:35
13:28:40
13:28:42
13:28:46
13:28:49
13:28:52
13:28:55
13:28:59
13:29:03
13:29:07
13:29:13
13:29:20
13:29:23
13:29:27
13:29:29
13:29:32
13:29:37
13:29:39
13:29:44
13:29:48
13:29:53
13:30:00
13:30:05
13:30:09

innography tool until your work on these SVV matters; correct?

A. That's correct, I -- I had not used that tool before.

Q. What made you decide to use the innography tool in this context?

A. That was a decision made prior to my detailed involvement so I -- I can't say when and how it was -- it was chosen as a tool but it was not commissioned by me.

Q. Did you run the patent numbers through the innography tool yourself?

A. As -- as I said in my report, I reviewed the rankings, I did not run -- I did not run the software.

Q. Okay. How did you choose the 50th percentile as being a cutoff between patents that are strong and patents that I guess are not strong?

A. It's halfway. No real -- I -- I can't say more than that.

Q. Okay. Do you know what is it halfway of?

A. Well it's the patent strength indicator number and so a high number is better than a low number and at some point you make a cutoff. I

Q.    So SVV did the actual tear-down and took the pictures; right?

A.    Yeah.  As far as I know it was only SVV personnel, but it could have been some additional help but they -- they were responsible for the tear-down.

Q.    Okay.  Were you present when the pictures were being taken?

A.    I wasn't present when these photographs were taken, no.  They were done before my visit.

Q.    Okay. Okay.  Looking at paragraph 212, in this one you're referring to the planar waveguide or light guide plate and you stated that it's formed by a thin optically transmissive plastic sheet having a planar shape with a rectangular outline.

Do you see that?

A.    Yes.

Q.    Do you know how the light guide plate was manufactured?

A.    This particular -- in detail, there are two or three ways to make light guide plates. Generally, they are either cast or rolled depending on the thickness.  So this one is kind of in between thickness, I think this was two to three millimeters.  So it could have been a cast sheet or

CERTIFICATE OF STENOGRAPHIC REPORTER


I, BURGUNDY B. RYAN, a Certified Shorthand Reporter, hereby certify that the witness in the foregoing deposition,

THOMAS CREDELLE,

was by me duly sworn to tell the truth, the whole truth, and nothing but the truth, in the within-entitled cause; that said deposition was taken at the time and place therein named; that the testimony of said witness was stenographically reported by me, a disinterested person, and was thereafter transcribed into typewriting.

I further certify that I am not of counsel or attorney for either or any of the parties to said deposition, nor in any way interested in the outcome of the cause named in said caption.


DATED:  Tuesday, January 2, 2024.


_____
Burgundy B. Ryan, CSR No. 11373, RPR