IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF TEXAS

WACO DIVISION

SVV TECHNOLOGY INNOVATIONS   )(

INC.,                        )(

    PLAINTIFF,               )(   CIVIL ACTION NO.

                             )(   6:22-CV-640-ADA

VS.                          )(   WACO, TEXAS

                             )(

ACER INC.,                   )(   JUNE 3, 2024

    DEFENDANT.               )(   8:22 A.M.

JURY TRIAL TRANSCRIPT

BEFORE THE HONORABLE ALAN D ALBRIGHT

UNITED STATES DISTRICT JUDGE

FOR THE PLAINTIFF:        Mr. Warren J. McCarty, III
                          Mr. R. Seth Reich, Jr.
                          Mr. Daniel R. Pearson
                          Ms. Aisha M. Haley
                          Mr. Bjorn A. Blomquist
                          Caldwell Cassady & Curry PC
                          2121 N. Pearl Street
                          Suite 1200
                          Dallas, TX 75201

                          Mr. Robert Katz
                          Katz Law PLLC
                          6060 N. Central Expressway
                          Suite 560
                          Dallas, TX 75206

```
FOR THE DEFENDANT:          Mr. Jerry Chen
                            Mr. Craig Kaufman
                            TechKnowledge Law Group LLP
                            20660 Stevens Creek Boulevard
                            Suite 381
                            Cupertino, CA 95014

                            Mr. Eric H. Findlay
                            Findlay Craft PC
                            7270 Crosswater Avenue
                            Suite B
                            Tyler, TX 75703


COURT REPORTER:             Ms. Shelly Holmes, CSR, TCRR
                            Official Court Reporter
                            Honorable Robert W. Schroeder III
                            United States District Judge
                            Eastern District of Texas
                            Texarkana Division
                            500 North State Line Avenue
                            Texarkana, Texas 75501
                            shelly_holmes@txed.uscourts.gov


(Proceedings recorded by mechanical stenography, transcript
produced on a CAT system.)
```

P R O C E E D I N G S

(Jury out.)

COURT SECURITY OFFICER:  All rise.

THE COURT:  Good morning, everyone.  You may be seated.  I'm ready to take up any issues.

MR. REICH:  Your Honor, Seth Reich for SVV.

We have some issues with Defendant's opening slides.

THE COURT:  Just hand them up.

I have Slide 1.19.

MR. REICH:  Your Honor, 1.19, yeah, there is an argument regarding light trapping.

THE COURT:  Overruled.

What else?

MR. REICH:  If we go to --

THE COURT:  This is -- this is argument, right?  This is opening argument.  This is an argument.  There's an argument over light trapping.  It's an argument.  That's the way it works.

MR. REICH:  Yes, Your Honor.

THE COURT:  If these -- if these are the objections, I'm just going to overrule all of them right now.  It's an argument.  By 10:03, no one on the jury will remember anything any of you said at the end of your opening argument.  I'd like to think they would, but they

won't.  I promise you.

I would -- if you like, at 11:00 o'clock, we can ask the jury to hold up their hands and say, who remembers the words "light trapping" during the opening argument? And if anyone says yes, I will give you $1 million.  Do you want to do that?

MR. REICH:  I probably won't take that bet, Your Honor.

THE COURT:  What -- what serious objections do you have to the slides?

MR. REICH:  The only concern was the MILs, Your Honor, but we get your instructions there.  And I guess to the extent the evidence comes in and we think there's a MIL violation, we'll object with the witnesses.

THE COURT:  Okay.  Anything else on the slides?

MR. FINDLAY:  Not from the defense, Your Honor.

MR. MCCARTY:  Not from the Plaintiff.

THE COURT:  Any other issues to take up?

MR. KAUFMAN:  Your Honor, Craig Kaufman for the Acer.

We had an objection to part of a series of their -- their substantive exhibits.  They have a series of exhibits that are a combination of photographs of the accused products, which, assuming they lay a foundation, will be fine.  But they also include some computer images

with text and we contend that those are hearsay, and because -- because the same type of pictures appear in 30-odd exhibits, we thought it would be more efficient to address it now than in front of the jury.

THE COURT:  If you can give me an example.

MR. KAUFMAN:  May I approach, Your Honor?

THE COURT:  Sure.

MR. KAUFMAN:  So PTX-285, Page 11, is what I'm going to hand up to Your Honor so you can sort of see what I'm talking about here.

THE COURT:  I think this is a slide that will win the case.  I mean, when -- don't you think the jury is going to look at this and they're going to -- half the jury will say, wow, that is a -- I have absolutely no idea what this is.

So what -- what is it on the slide that you are unhappy with?

MR. KAUFMAN:  We're unhappy with the -- the graph, sort of the -- on the upper left-hand side, you've got sort of an arced graph.  Part of the -- one of the claim limitations is a cylindrical lens.  They're presumably going to use this to try to show the cylindrical nature.  This one is cylindrical.  There are ones that are not.

THE COURT:  And we know what I would do if I were you on those.  I would cross-examine and say, gosh, in the

slide, it's cylindrical, but it's not.  But I think you said there's something about hearsay.

MR. KAUFMAN:  Yeah.

THE COURT:  And I don't know what that means.

MR. KAUFMAN:  Yeah, we -- we contend that the -- the drawing was created out of court by unknown means.  It's a -- a -- conveying information, but not -- yeah, with some words.

THE COURT:  We may have gone to different evidence classes.  I'm going to overrule that.

MR. KAUFMAN:  Thank you, Your Honor.

THE COURT:  Anything else?

MR. MCCARTY:  Nothing from the Plaintiff, Your Honor.

MR. KAUFMAN:  Nothing from Defendant, Your Honor.

THE COURT:  Very good.

So by the way, though, if you need to object, this is prophylactic only.  If you are unhappy with your slides during trial and you want to object, object, and I'll rule on them when they -- when they move to admit them, because this certainly doesn't preserve your record.

So -- and I know everyone is worried about when you're in front of judges, how they react.  I -- I think you absolutely need to protect your clients' rights.  I'm never offended.  I've had lawyers tell me, after they

didn't object, well, we thought you'd be -- you all need to object to whatever you need to object to, and that's your job. I'll rule on them. That's my job. And I don't want someone thinking, oh, we can't say anything that'll make him unhappy.

There are lots of things you can do to make me unhappy, but that's not one of them. You have to do that to protect your client.

Anything else to take up?

MR. MCCARTY: Not from the Plaintiff.

THE COURT: Are all the jurors here?

What we'll do is this, we will -- now, I'm told that before I got here, you asked the clerks about -- one side or the other wanted to use 15 of their minutes of trial time in their opening; is that correct?

MR. FINDLAY: Not -- not us, Your Honor.

MR. MCCARTY: Not from the Plaintiff, Your Honor.

THE COURT: Okay. Okay. Then I -- okay. Very good.

Okay. As soon as they're all here, I'll let you know, and you'll have a couple of minutes warning. If -- if it's close to 9:00, we'll just start at 9:00, but if they get here sooner and we can get started sooner -- typically, we'll go today until about 5:30 or 6:00. So you know what I tell the jurors, when they get here, I always

tell them at the beginning of the trial that we can go from 8:30 to 6:00 and be done this week or we can go shorter hours.  They always want to go the longer hours, and so they're blaming me for being here early and going late and not you all, because they're invested and wanting to -- to get through the trial as well.

So those are typically speaking.

Also, we'll shoot for Wednesday, either after -- probably after court to do the charge conference.

This doesn't need to be on the record.

(Off-the-record discussion.)

THE COURT:  So as soon as the jurors are here, I look forward to your opening arguments.

COURT SECURITY OFFICER:  All rise.

(Recess.)

COURT SECURITY OFFICER:  All rise.

THE COURT:  Please remain standing for the jury.

(Jury in.)

THE COURT:  You may be seated.

Will you call the case, please.

COURTROOM DEPUTY:  The Court calls 6:22-cv-639 SVV Technology Innovations Incorporated versus Acer Incorporated.  Case called for a jury trial proceeding. Excuse me, 640, not 639.  Pardon me.

THE COURT:  If the Plaintiff's counsel would stand

up and introduce yourself and remind everyone who you are, and everyone who is at your table and anyone that is seated nearby that they might want to know.

MR. MCCARTY: Yes, Your Honor.

Again, this is Warren McCarty on behalf of the Plaintiff SVV Technology Innovations Inc. With me today is going to be my colleague Aisha Haley; my colleague, Seth Reich; my colleague, Daniel Pearson; my colleague, Robert Katz; several other people you'll get to meet; and importantly, my client Dr. Sergiy Vasylyev. Thank you.

THE COURT: Thank you.

Counsel?

MR. FINDLAY: Thank you, Your Honor. Good morning, ladies and gentlemen. It's nice to see you again. My name is Eric Findlay. I'm proud to represent Acer.

Let me first introduce our corporate representative, Ms. Kate Shang. She couldn't be there Thursday, but she's here today for the trial and will be here all week. And then the two attorneys assisting me trying the case, Mr. Craig Kaufman, Mr. Jerry Chen, and we look forward to presenting the case.

And thank you, Your Honor.

THE COURT: Pleasure.

Ladies and gentlemen of the jury, let me introduce myself to you formally. My name is Alan Albright. I'm a

United States district judge. I've served as a federal judge since 2018.

I very much appreciate your service here today. I strongly believe -- I practiced law for 40 years now, and so I am a big believer in juries after having presided over a number of juries. My faith in you all even grows each time.

I know you work hard and you pay attention, and you have a great benefit in this case, I think, that the lawyers -- I know the lawyers. They're very good. They're -- they're actually exceptional. Their case will be interesting.

You're going to hear a lot about technical matters, which means we'll have expert witnesses coming in to help you understand things. And the only thing you need to -- for us is patience. I have a lot less of it now than I did six years ago, but since this is your first trial, you should still have a hundred percent of the patience God gave you for -- for trial.

So one quick reminder, you're about to hear the opening arguments from both parties. These are just arguments. They're not evidence. The evidence in the case will not begin until the Plaintiff calls their first witness, and that person is sworn in.

Do you intend to give your opening argument after

theirs?

MR. FINDLAY:  Yes, Your Honor, I do.

THE COURT:  Very good.

Counsel?

MR. MCCARTY:  Thank you.

Your Honor, could I get a five-minute reminder?

THE COURT:  Sure.

MR. MCCARTY:  Thank you.

May I proceed?

THE COURT:  Please.

MR. MCCARTY:  Good morning, ladies and gentlemen.

I want to start off by thanking you once again. This is an incredibly important day, an incredibly important week for my client.  It's taken a long time to get here, and we can't thank you enough for taking your week out of your busy lives to sit and listen to this case and make a determination at the end of it.

I had a few minutes to visit with you last week. I'm sure it was like drinking through a fire hose during jury selection.  Just to reorient y'all, my name is Warren McCarty.  I'm from Dallas.  I live there with my wife, Haley.  She's a nurse.  I have three little kids.  And what I do for a living is help amazing companies like SVV protect a right in trying in our Constitution.  The right in trying in our Constitution is patented innovations.

So let's just start right there.  I know you didn't show up for a history lesson, but let's start with the Constitution.

If I could get my slides, please.

In the original text of the Constitution, the founders expressly granted Congress the right to promote the progress of science and useful arts by securing for limited times to authors and inventors the exclusive right to their respective writings and discoveries.

This language is commonly referred to as the intellectual property, or the IP, clause.  And it reflects a fundamental bargain that has sparked innovation and has made this country the guiding light for technological progress for hundreds of years.

So I said bargain.  What do I mean -- what do I mean by that?  Well, so our system asks our best and our brightest to do something pretty unusual.  It asks them to tell the world about and let others use their most valuable ideas and inventions.

But in exchange, the inventors, the researchers and the scientists, get an exclusive right over those ideas and inventions for a limited time.  That's the exchange.  And that exclusive right is embodied in these right here.  These are U.S. patents.  And these are the four U.S. patents that the Patent and Trademark Office in the United

States granted to SVV for the technology that you're going to learn about in this case.

And we're going to get to that shortly.

So I've introduced myself. You've introduced yourself a little bit. It's time that I introduce my client, SVV.

I'm very proud to represent SVV Technology Innovations Inc. in this case. This is their logo. Perfect for a company that specializes in light. It's kind of a sun there.

So what does it mean exactly to be in the business of light? You might be thinking of light bulbs that you go buy in Walmart or Amazon to put in your lamps at home. You know, be thinking about commercial lighting. There's these ornate pendants up here with circular fluorescent lights on the inside. You might be thinking about the sunlight. We're in Texas, middle of summer now, that sidewalk is going to get pretty hot when you go back outside after the afternoon sun. Those are all good examples.

But what SVV does is a little more high-tech. They specialize in harnessing the power of light across a wide range of applications, and that's kind of the neat thing about light is it -- it can be used in all sorts of applications. So think about, on the one hand, way over here, solar energy. You might -- you might see solar

panels on people's homes or hear about solar energy as a -- as a -- as a form of energy and electricity.

On the other hand, you might hear about fiber optic cables.  That's actually using light to transmit data between houses and -- and businesses, and everything in between.

Now, SVV's expertise is in all these types of lighting technologies.  You'll hear that they sell products under the brand name Lucent Optics.  Some of the companies' products include different types of films, different types of lighting solutions.

Now, what these products all have in common is that they are highly, highly optimized to make the absolute most use of the light that you have.  In the light business, efficiency is the name of the game.

So one of the companies' products -- I'll give you an example.  If you see that one with the hand underneath the film there, let's say, you know, you're a large company, maybe you have a big -- a big building, right?  You spend a fortune every year on lighting that building with your fluorescent lights and your lamps and so forth.  Maybe you want to save on your energy bill, so you draw the curtains and get a lot of the natural light in the building.  What does that do in the summertime?  That jacks that electricity bill up because you're running that AC

unit all summer trying to cool the house down or cool the building down.

Well, the Daylighting Fabric that SVV works on does something really cool to solve that problem.  So the dark room in my example here -- let's say it's a doctor's office.  There's a single window with light shining through, and that's about the light you're going to get in that window from a typical window.

So, you know, you can imagine you have some lamps in there, you need to get some lighting installed in the ceiling.  If you put SVV's film, their Daylighting Fabric on that window, no other additions, look at what happens. The same amount of light, the same window, the same room, and a completely different look.  Here's what happened, is that fabric takes the same amount of light and efficiently spreads it out to make a uniform, bright room.

So SVV is expert in many types of lighting technologies, not just the products we saw.  But what we're going to focus today and during this week on is SVV's work in lighting components that are used in computer electronics, consumer electronics, and, in particular, these screens that we see all around the courtroom, these type of monitors.

Now, like some of the great innovative companies in our country, SVV got its start in a garage.  This is the

original shop where SVV started building its business some 25 years ago.  They converted their garage into a lab and were hard at work.  This big device was kind of an early prototype for over here, a solar energy product that they were working on that I mentioned before.  It's actually called a solar concentrator.  You're going to hear all about that later today.

Now, you've heard me say SVV over and over.  You might be wondering what those letters stand for.  They're actually the initials of the founder of the company, Dr. Vasylyev.

So, again, Dr. Vasylyev, would you please stand up.

This is the founder and CEO of the company, and he is the inventor on the patents-in-suit.  You're going to hear his testimony.  He's going to take that stand, look you in the eye, and tell the story.

You can be seated.

Dr. Vasylyev has a remarkable story to tell.  He's one of those people who you might read about in textbooks in ten years and never get the chance to meet.  It's one of the reasons I'm thrilled with the opportunity to present this case because I can't wait for you to hear his testimony.

Dr. Vasylyev has a Ph.D. in physics and a Ph.D. in

math.  He is what's known as an astrophysicist, and he is truly an expert in light and optics.  His life story is something else.  You're going to hear in detail about his brilliance, his hard work, his life's work, and you're going to hear about the great strides the company made.

They went from that garage to this laboratory building that they have now.  They've graduated from that little solar concentrator to a robust product portfolio and an amazing business.  They aren't unknown anymore either. They're not that little garage company.

In fact, you'll hear that some of the biggest most well-funded institutions in our country today, like the Department of Energy, the National Science Foundation, have all gotten behind the work of Dr. Vasylyev and his company. They have provided research grants, partnered with Dr. Vasylyev and his company to perform research and develop lighting solutions to tackle some of the biggest challenges that these institutions face today.

Now, you're also going to hear and learn some interesting things about light itself.  There's going to be some technology here.  I know not everyone raised their hand as the techie in the room when we did jury selection, but we're going to try and teach you all the ins and outs of it.  And by the end, hopefully you guys are the experts in light.

One of the things that you're going to learn about light that I thought was really cool is that it's reversible.  So in the early days, when Dr. Vasylyev was working on that solar concentrator, which is all about bringing light in, in a way, he was also working on how to bring light out, how to push it out because it's reversible.  It goes in and out.

And he had a breakthrough during that time that led to him creating the most efficient solution for lighting up those screens that we see all around this courtroom.  And that breakthrough is at the core of the innovation in this case.

That's the reason we're here today.  So these are the four patents at issue in the case.  You'll learn about these a lot, too.  There's a patent number assigned to each one of these.  And to make it easy, we'll focus on those last three numbers of each of the four patents.  So we have the '135, the '191, the '397, and the '205.

And you'll see there's information on the patents that we'll walk through, including, you know, when they were originally applied for.  You see some dates highlighted there in the 2009-2011 range.  So these ideas dated back to that time period.

I mentioned earlier, there's that exclusive right that he gets for a limited time period.  That's about 20

years in the patent logs these days.

All right. So let's talk about these inventions. To do that, let's go back in time.

Remember those TVs in the '80s and '90s that you probably had in your house? Some of you, maybe. I remember the day my parents lugged this one home to our house. This is a Mitsubishi CK2607R. This is the one I had in my house. The screen was 26 inches wide. It was probably 2 feet deep, and it weighed about a thousand pounds. State-of-the-art at the time, not so much anymore, right? We got a Mitsubishi because there was a Mitsubishi plant down the road from where I grew up.

You probably haven't seen too many screens like this if you walk through Best Buy or you're shopping on Amazon anymore. They don't look like this, right? Where did the industry go? We all know. Thinner. Everything went from these big bulky boxes to the thin screens that we're used to seeing today.

So how did we go from big screens to thin screens? The answer intersects right through SVV because the answer is light.

Here's the thing. You can't just ditch decades of cathode ray TV technology to a new LED technology and expect there not to be road bumps. Initial attempts that go into that thin model over the years were met with mixed

results.  There were problems initially.  Hotspots, inefficiency, glares, there was cost issues, tons of LEDs, the evidence is going to show, and that's where SVV's technology comes in -- their patents come in.

You're going to learn that Dr. Vasylyev designed an incredibly efficient, slim, elegant way to spread that harsh blue light we saw on the last screen in just the right way to make it perfect for the modern screens.  It's called a waveguide.

We're going to walk through that.  There are some figures in these patents that I'm showing right here that kind of depict how this works in a pretty simple way. Remember what I said earlier, the aim is to make the most efficient use of light.  Remember that dark room that turned light by just putting that film on there?  Same light, right?  But you're making the most efficient use of that.  And that's exactly what the patents teach.

So when that LED light comes in, you organize it just right.  It's called collimation.  You collimate it just right so that that nice brilliant glow comes across the screen and it's pleasing to the eye and you can make your monitor attractive to buyers.

So SVV's patents also improved upon technology called quantum dots, which you may have heard of.  That's kind of a newer technology.  Just to give you a preview of

what a quantum dot is, they're these little mini nanoparticles that go inside the TVs and when you shine them with blue light, like the LED light, they shine brilliantly.  So look at this.  I think these are really cool.

So inside each one of these vials are millions of nanoparticles, nanoparticles like smaller than a human hair, right?  It's just absolutely tiny.  You're going to hear all about that.

There's millions of those in there.  Basically when that light hits it, there's a reaction, and it spits out pure red light, pure green light, et cetera.

Now, remember in jury selection when Judge Manske asked y'all if you'd heard of Acer, and I don't know if y'all raised your hands, but there were a lot of hands that shot up.  It's a household name.  It's a big company.

It's not the only household name you're going to hear about in this trial.  You're going to hear this name. I'm sure many of y'all know Samsung, you might have some of their products.  They make some screens, too.  You're going to hear how Samsung took a license to these patents in this case, paid for the right to use SVV's patented technology, ███████████████████████████████.  They did the right thing and took a license.

Now, remember the patent applications were filed

back in 2009, 2010, 2011, the evidence will show that years later, after SVV put those patents on file at the Patent Office, Dr. Vasylyev started to see Acer products in the market that were exhibiting features or hallmarks of his invention, right, they were real thin, efficient.  So he got his hands on one and went to his lab, with his researchers, opened it up.  He was interested how did they solve some of these same challenges that I was working on?

When he bought that product and started studying it, opened it up, the evidence is going to show in this case that when he looked under the hood, it looked familiar, the technology in there.  It was his technology.  It was SVV's patented technology that was in that -- in that Acer product.

This is the first one that he cut open.  It's the Acer AG -- XG gaming monitor.  And some of his images and data I've put on the screen here.  And on the right, we'll walk all through these.  Those are that waveguide that we talked about from the patent earlier -- on the earlier slide that directs that light.

Do you know, Dr. Vasylyev, he's not a lawyer.  This case is actually his first time in a courtroom in a technology dispute.  He had to seek out help for next steps.  He had an attorney send Acer a letter to let them know you're using my patents.  That's right here.  That was

back in 2021.

And what he did is he listed the patents at issue in the case. He identified some products like that one I've got highlighted there at the bottom in red, that's that product on the previous screen he had to cut open.

Now, in response, and if you look -- sorry, if you look up at the top, it's to Acer America. And in response to this message, something a little unusual happened to Dr. Vasylyev. It got rerouted to someone in Taiwan. And in response, you hear basically two things. First is that, for future reference, talk to the parent company in Taiwan. And can you give us more information? Specifically, can you tell us, Acer, the technical details about Acer's own products.

Now, on that first point, we'll see if Acer is going to walk that -- that point back at trial, but on the second one, now, that wasn't going to be cheap. That wasn't going to be easy, that wasn't going to be quick, because it was important to SVV, however, it got to work. So they spent the better part of a year collecting all the data they could, buying up all the Acer products they could, investigating them, researching them, collecting the data, doing all the work. Cataloging all that. You'll see it's big binders of data. Purchased dozens of these products, hundreds of charts they got together. And just

to make sure they were protected, they got their patent case on file here before sharing all that information back to Acer.  And Acer has now had that information for a long time.

So what do all these infringing Acer products look like?  You can see some of them on the screen here.  We believe the evidence will show that these Acer monitors infringe across the four SVV patents that are at issue in this case, and we'll walk through them, we'll show you what they look like on the inside, and we're going to show you infringement.  And you'll learn that putting -- after putting SVV's technology in these monitors, Acer, through its subsidiary, sold and offered to sell them here in the United States, which constitutes direct patent infringement under the patent laws.

So Acer uses this multinational supply chain to get its products shipped into the U.S.  You'd need a degree in corporate law or something to kind of piece through all of this so I'm going to try and cut to the chase.  The first one is Acer Inc. at the top.  They own everything.  And at the bottom is a small subsidiary called Acer America that sells the products here in the United States.

So what I'm going to do, just to cut to the chase, I'm going to put up a board here and try to walk through how this all works really quickly so that we can use that

later in the trial.

So in this box I've labeled Acer, I'll highlight first the overarching parent company, which is Acer Inc., from Taiwan.

Now, in order to operate in the United States, get access to that U.S. customer base, the Taiwanese Acer, the parent company, has that small subsidiary operating here called Acer America.

Thank you.

Now, this green box, everything inside it is Acer Inc., owned by Acer Inc.  So because Acer America is a wholly owned subsidiary, it goes in the box.

Now, there's a contract that we're going to talk about called supply agreement.  That supply agreement says that Acer America is going to sell those products on Acer Inc.'s behalf.  But Acer doesn't actually make all these products themselves.  I think I mentioned that in jury selection.  It turns out that instead, they design them, and then they have a third party called an ODM actually manufacture those products.  Typically, those are located mostly in China.

So I'm going to put ODM outside of the Acer box to indicate that is the device manufacturer for these products.

Now, that ODM makes those products for Acer Inc.,

and gives them to Acer America.

What happens next, right?  The ODMs send them to Acer America.  Once Acer America has them, they're now in the U.S., they can sell them to customers like you and me.

So that transaction is going to look pretty familiar.  So the monitor gets sold in America.  In exchange, you pay for the monitor, financial transaction.

Now, as I mentioned before, Acer America is a subsidiary of Acer Inc., right?  But it's not just a -- like a related company or something like that.  It's a wholly owned subsidiary.  That means that Acer Inc., owns everything of Acer America, 100 percent; a hundred percent ownership structure.

So what that means that Acer Inc.'s -- that is Acer Inc.'s money.

All right.  With that background, let's talk about patent infringement.  Remember our discussion during jury selection, right?  Patents are kind of like deeds to property.  But how does it work?  Remember when I mentioned you can't run to the Patent Office when you find someone misusing your invention.  You can't call a hotline or there's no patent police, nothing like that.

The answer to, well, how does it work, is right here, you're looking at it.  You come into the court, you look the jury in the eye, and you tell them your testimony,

and you prove to them they're infringing your patents.

Now, not to say that getting this far is easy. It takes years. But that is why we're here today. And my client, SVV, is so, so grateful for the chance.

Now, the law says that whoever without authority makes, uses, offers to sell, or sells any patented invention within the United States or imports into the United States any patented invention during the term of the patent infringes the patent.

We're going to be focusing on some of these offers to sell, sale, and importation. We're going to focus on the acts highlighted here throughout the case. And that's called direct infringement.

Now, there's another type of infringement called indirect infringement. That's at issue, too, and we think the evidence is going to show that Acer Inc. is inducing Acer America to infringe, to make those sales.

Remember that supply agreement I talked about? So two forms of infringement, the evidence will show that both are met.

So we got our belt on with their direct infringement. And we've got our suspenders on for their indirect infringement.

Now, you're probably asking yourselves, sounds like a lot. How are we -- how are we going to get through

it?  Well, we brought some folks to help piece all the puzzle pieces together.

THE COURT:  Counsel, you have five minutes.

MR. MCCARTY:  Thank you.

To help you sort through all this, we've brought an expert in monitors and displays, Mr. Tom Credelle.

Mr. Credelle, could you please stand up.

I'm calling Mr. Credelle an expert for a reason. He's devoted his career to research, development, and product engineering for flat panel displays, for products just like this.  And he's got a master's from MIT, he's worked with GE, worked with Apple, that sort of thing. He's got lots of experience.

So what he did is he looked through all the evidence, painstakingly, go through limitation by limitation of those patent claims to ensure that there was patent infringement, and he's going to explain his opinions to you so that you can understand it better.

Now, after Mr. Credelle explains how Acer does both infringements, direct and indirect, then we know that Acer is required to pay a reasonable royalty to SVV.

The patent law says that upon a finding for the claimant, that's SVV, the Court shall award the damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made by

the invention -- made of the invention by the infringer.

It's kind of a mouthful. But what's clear in this language is that the royalty that Acer would owe for its infringement must be based on Acer's use of the invention.

It's kind of a complicated thing to figure out, so we'll need to quantify exactly what a royalty would be that matches how Acer uses SVV's technology.

So we're going to bring someone to help you break that down, too, and we have Dr. Matthew Farber.

Matthew Farber, will you please stand up.

Dr. Farber -- thank you.

Dr. Farber is a patent valuation expert. He's going to provide opinions regarding that appropriate level of damages. And he's going to walk you through step by step how Acer is benefitting from the use of SVV's patented technology and show you just how to calculate that reasonable royalty.

Now, he performed a sophisticated test called a regression analysis. I didn't know what that was when I first heard it, but I've learned about it. And what it does is it statistically hones in on exactly how much money Acer makes by putting SVV's technology inside those products versus other competing technologies. So he does the math on that and is going to help you understand it.

What he's going to explain is that the data

confirms that Acer makes an extra $18 on every one of these displays when they use SVV's technology versus other technology.

He's going to explain that the parties would have negotiated over that $18, and the evidence will show that the parties would have agreed to split it, and that SVV would have gotten approximately $5.91 of that total 18, and Acer would have kept the rest.

Now, Acer sold a lot of these products during this time, approximately $1.265 million.  So when you do the math, according to patent laws, you've got $5.91 per product.  And 1.2 million products and the reasonable royalty, Dr. Farber will explain to you, is approximately $7.4 million.

So we've covered a lot.  Thank you for your patience.  It's now Mr. Findlay's turn to come up and tell his -- his client's side of the story.

I don't know all that he's going to say, but if it's anything like jury selection, he's going to come up and say everything Mr. McCarty said I disagree with.  That's his right.  He can say that.  He has the right to.

What Acer does not have the right to do is take SVV's technology, put it inside their products, infringe the patents, and not pay a fair royalty.  That's not their right.

They're going to say they don't infringe, right? They're going to say the facts don't support infringement. Well, we're going to show you it does.  They're going to say, well, even if we do infringe, we don't think it should be that much money.  We think we want what Samsung paid, but we don't want to pay that much money, we want to slice and dice that Samsung deal up, get it reeled down to maybe just pennies on the dollar, and, sure, we'll pay that.

And then if that doesn't work, they're going to say, well, actually the Patent Office got it wrong, and all these patents are invalid.  All claims of all four patents, they're just -- they're invalid.

They're entitled to make those defenses, but I want you guys to keep one thing in mind.  Don't check your common sense at the door, okay?  A lot of this is common sense.  Your job is to judge the credibility of the witnesses and the evidence, and we think if you do just that, it's going to be an easy choice.

I thank you for your attention and for your service.  We look forward to presenting this evidence to you.

Thank you.

THE COURT:  Thank you, sir.

MR. FINDLAY:  Thank you, Your Honor.

Just one second, folks.

Your Honor, may I please have a five-minute warning as well?

THE COURT:  You bet.

MR. FINDLAY:  May it please the Court.

May I proceed?

THE COURT:  Yes, sir.

MR. FINDLAY:  Thank you.

Good morning again, ladies and gentlemen.  And it's good to see you again.

Mr. McCarty is right about one thing, we don't infringe, and we will show that to you.  And as I said on Thursday, we are happy to be here.  We've been waiting a long day for our day in court because we believe we've been falsely accused of infringement.  And we don't infringe these patents, and we'll prove that to you.  And I'm going to highlight some of that evidence for you here today.

This is kind of the rest of the story.  And I don't know if any of you remember Paul Harvey and The Rest of the Story, the radio show he used to do.  I remember driving around with my dad.  And if you recall that, Paul Harvey would basically tell you a story about a person, or he might tell you about a historical event, and then he'd tell you something else about it that you didn't know, perhaps.  And it changed your whole perception.  And then he'd say in that really distinctive voice:  And now you

know the rest of the story.

This is our opportunity to give you the rest of the story, ladies and gentlemen. We have to wait for the Plaintiffs to go, but then we get to tell our story. And I would just ask, as I think Judge Manske mentioned last week, as I think Judge Albright will instruct you, to hold your conclusions until you hear the rest of the story.

Start a little bit, tell you about Acer. We were founded in 1976. We're one of the world's top, what you call, information and communication technologies companies, presence in more than 160 countries, including right here in the United States. Acer America is our California headquarters.

And you might have not have known this, we have an office right down the road in Temple, where we employ a couple hundred people. I'm not sure what the point of that all was, but I really don't disagree with anything that Mr. McCarty put up here. That's in a general sense how the company is structured, if you will, the formation.

From a very practical standpoint, it's probably similar to almost any manufacturer of these devices nowadays. That's how it's kind of done. That's the supply chain. That's how they organize.

We started in 1976. Around 1981, we had our first successful product, something called the Micro-Professor,

which was kind of a teaching tool for teaching microelectronics control technology.  By the mid-'90s, we were recognized as one of the emerging players in this market, and we're proud of all that we've accomplished.

Acer, today, sells a whole host of products.  We design them, we market them, we supply them, everything from computers, laptops, tablets, desktops, to even -- and I'll confess I didn't know about this, ebikes, little scooters and things you can ride around on.

And I think it's fair to say that we view ourselves as kind of the Ford or Chevy in this industry.  If you want to spend a lot of money on a laptop, you can buy a Samsung or you can buy an Apple, perhaps.  We're kind of more the Ford, the Chevy.  We're not the Mercedes-Benz.  We're not the Cadillac.  Good, basic products for a good, fair price; and we're proud to offer that to consumers.

We also have received a number of awards throughout the years.  We're proud of those, as well, ladies and gentlemen.  You'll hear more about those later on during the trial from Ms. Shang and other Acer representatives who will be here to talk about you.

And I also want to talk about something important.  The evidence will show that we respect -- that Acer respects the United States patent system.  We spend millions of dollars every year on research and development.

We employ hundreds of engineers, hard-working folks, and we have thousands of our own patents, which cover a whole host of products, including monitors.  We respect the intellectual property system in this country.

And, equally important, if not more important for today's purposes, we respect other people's intellectual property.  And I want to walk through this because I think the evidence will show a very different story than what you just heard from SVV's counsel.

Yes, we got a letter from them on January 22nd, 2021, claiming, without any evidence, without any backup, just saying here's a bunch of patents, you're infringing. We responded.  Seven days later, we sent a response.  And we simply said, we got your letter.  That's fine.  Can you give us some more information?  We asked, can you please provide us more information, such as claim charts for us to evaluate?

Claim charts are really common in this -- in this area, ladies and gentlemen.  Basically it's when somebody thinks somebody might be infringing on their patents, they'll take a patent, they'll take an exemplary claim, and they'll what we call map it to the product.  They'll say, well, here's what the claim elements are and here's where I think your products are infringing it.  That's what we were asking for.  Let's have more information.  Let's sit down.

Let's talk.

We heard nothing more for 18 months.  They didn't respond.  Not a peep out of them until they filed a lawsuit without another further word 18 months later.  As my kids would say, we got ghosted.  We figured they had just decided that we don't infringe.  We figured they decided we were -- they were wrong about those accusations.  So we heard nothing else.

And what I found really telling was Thursday in voir dire, you may remember Mr. McCarty was talking to you, and when we started out -- and we have the transcript from that -- he said:  So imagine the homeowner or a landowner has got a plot of land outside of town, the oil company comes in, parks their truck on the landowner's land, and starts digging for oil.

And then he said:  Let's say the landowner, the homeowner -- who he's trying to suggest is SVV -- tries to communicate or negotiate with the oil company, calls them up and asks them to move that sort of thing.

And then he said:  And after a year or two, there's no progress -- suggesting to you, I think, I would submit, that they negotiated with us for a long time, and we just thumbed our noses at them or said, no, we're not interested in talking to you.  -- that the evidence will show is just flat-out false, with all due respect, ladies

and gentlemen.  We reached out.  We responded.  We said let's talk.  They ignored us.

Talk a little bit about Dr. Vasylyev and SVV, and you've heard some of this from their counsel.

This company and Dr. Vasylyev are solar experts, basically, ladies and gentlemen.  You'll see the SVV little quip there.  It talks about experience in solar energy utilization and environmental protection.  Lucent Optics -- Lucent Optics is what he does business as.  The sign says it all there:  Disruptive solar energy and lighting innovations.

That's his website.  Those are his words.

Dr. Vasylyev himself is in the optics and solar business, that space.  That's where he's been his whole career.  This is from his LinkedIn page.  LinkedIn is like a Facebook for business, if you will.  Here he lists all of his experience.  There isn't anything in any of that experience that had anything to do with computer monitors.  Nothing, ladies and gentlemen.

No one ever suggested that he was a computer monitor expert or that his patents read on computer monitors until they came here to court asking for millions and millions of dollars.  That is what the evidence will show.

Dr. Vasylyev, I have no doubt, is a very smart

man, but he has no education involving the design or manufacture of monitors. He's never designed or sold monitors. Business experience is not related to computer monitors in any way. He has a master's in physics. And as you heard, he has a Ph.D. in physics and mathematics.

And we asked him -- you know, the Ph.D., the height of your education, what was your dissertation about? To get a Ph.D., you do a dissertation, and that helps you get your doctorate. And he testified it was about the study of celestial bodies, like astroids, space stuff.

And, again, don't get me wrong. I love the space stuff. I'm a space geek. I was one of the people with the ridiculous-looking glasses looking at the eclipse a couple of months ago. But it has nothing obviously to do with computer monitors, folks. I think we can agree on that.

And the evidence will show that these four patents, they probably contain thousands of words in there. You can word search those, because we did it a number of times. The word "computer" or the word "monitor" or the word "computer monitor" doesn't appear in any of those patents not one time. It was never suggested that they touched upon or read upon computer monitors until they came to court asking Acer to pay millions of dollars.

These benefits that you just heard Mr. McCarty talk about, improved brightness, angle, thickness, things

such as that, those patents don't mention any of those benefits -- of those alleged benefits.  No one suggested these patents has those benefits until they came into court here and are asking you to award millions of dollars.

So -- and let me give you a little bit of an example of how we don't think any of these patents are geared towards computer monitors.

The '135, light collimation.  You heard Mr. McCarty talk about this.  Light collimation is a beam of light or other electromagnetic radiation that has parallel rails -- rays -- excuse me -- spreads minimally. An example is a laser.  A laser pointer, if you will, has that -- has that characteristic.  It's a narrow beam.

This little diagram here shows that light at the top spreads out wide.  When it's collimated, it's smaller than a narrow beam.  But think about it, that really doesn't make sense for computer monitors.  For a computer monitor, you don't want a narrow beam of light, you want a wide beam of light.  You want to be able to stand at an angle and still see the monitor.  You want it to have co-workers gather around a monitor, and they can all see it.  We would submit it has nothing to do with this sort of light collimation that the '135 talks about.

The '397 talks about something called optical windows that you'll see in the claims.  And what it

basically does is teach that these interruptions in the surfaces -- it's called a corrugated surface -- and the experts will explain this to you in much greater detail, that that changes the amount of light input and output through those interruptions.

Again, ladies and gentlemen, we would submit that's not applicable and doesn't make a whole lot of sense for monitors. For monitors, you want a uniform light source. You might adjust the brightness up and down, depending on the ambient light in the room, but you want a uniform source of light, not fluctuations. So we don't think there's any applicability.

These last two are the light trapping patents, the '191 and the '205. And I'm not making up that word. You can see the word in the title of the patents. So what is light trapping all about? Dr. Vasylyev has told us what light trapping is all about. This is actually from his website again, Lucent Optics.

And he says light trapping is employed in virtually every solar module in order to enhance light capture and absorption by the cells. And he shows the diagram of the sun coming down with solar energy harnessing apparatus.

Before this case, before they were here asking for millions of dollars, no one ever suggested that these

patents read on computer monitors.  Obviously, light trapping doesn't make sense for a computer monitor, does it?  You want light out of the monitor, not held within the monitor.

So why are we here then?  Mr. McCarty talked about patents as being a kind of a bargain, and I don't necessarily disagree with that.  This is from the patent video that I think you got to see Thursday after we parted ways.  And it says that a patent sets limits on the rights of an inventor, and that the patent system works because the inventor is required to describe the invention in clear and specific terms so that the public knows what the boundaries of the invention are.

And you recall at voir dire, and I think also earlier today, Mr. McCarty suggested that we are somehow trespassing on their land, that we're taking and using their invention.  It simply isn't the case, and I want to try to use a little diagram to -- to express that.

Think of that house as SVV's property.  That's their property.  They're entitled to it.  The neighbor puts up an oil derrick in Mr. McCarty's analogy, but the oil derrick isn't on their property.

What's happened is that SVV is expanding -- expanding the boundaries of these patents beyond what they were intended for, to cover computer monitors.  So they've

moved their fence, and they're now claiming they own additional property, and they're waving their hand claiming infringement, infringement, and running down to court here and asking for millions of dollars. We don't think that's right. We don't think that's the bargain that was made, and we think the evidence will prove that to you, ladies and gentlemen.

Talk a little bit about infringement and invalidity, and I would point out I don't think Mr. McCarty really gave you any sort of preview as what the evidence will show. I want to take a moment to do that.

The patent video that you saw also said it's important that we provide a chance for someone who is accused of infringement to challenge the patent in court, that that's our right to do, and that's what we're here doing.

We will prove to you and the evidence will show that all of these patents, they're not about computer monitors primarily, and I think you'll see that very clearly throughout the case, and that they are invalid and infringed. They deal with old technology that they're trying to expand the boundaries of their patent to cover things it was never intended and to cover things that were already in what you heard the video call the prior art. That is what we believe the evidence will show.

And let's walk through just a little bit.

The '135 patent has a priority date of 2009.  You will hear evidence and you'll hear our experts talk about a piece of prior art that came before the '135 patent called Kunimochi 2.  And it anticipates and invalidates, that means it contains all the elements of the '135 patent in that patent which came before; and if it came before, it invalidates.  And you'll hear our expert, Dr. Zane Coleman, talk about this in great detail.

The '397, similarly, that Kunimochi 2 reference and another publication that was discovered, the Kobayashi, these make obvious, if you will, the '397 patent.  What that means -- and you'll hear Judge Albright give you the instructions -- that if two pieces of prior art together, or three pieces of prior art together, render obvious the alleged invention in the patent, it's invalid.  And we think the evidence will prove that to you.

For the '205, this had to do with the quantum dots that you heard Mr. McCarty talk about.  Well, this Coe-Sullivan patent you'll hear more about it, Mr. Coe-Sullivan is pretty much the recognized inventor of the quantum dots.  His patent, plus the Kunimochi, renders the '205 obvious.  And, again, these came before SVV's patent, before Dr. Vasylyev's patent.

And, finally, the '191, again, Coe-Sullivan,

Kunimochi, and a new piece of prior art called Dubrow -- from 2008, that you'll hear about -- all before the priority date of the '191 patent.

And a key thing to remember, ladies and gentlemen, is that none of these pieces of prior art that I just talked about quickly, and that Mr. Coleman will talk to you more about, none of these pieces of prior art were in front of the Patent and Trademark Office when these patents were prosecuted, when Dr. Vasylyev's patents were prosecuted.

So we're not even suggesting that they made a mistake somehow. The Patent Office didn't have this information in front of it, and we think the evidence will show that had they, they would have made a different decision.

Let me talk to you a little bit now about non-infringement. This is the instruction that I think you'll get from Judge Albright, that if a device is missing even one limitation or element of a claim, it does not infringe. And I think a good example of this is, let's imagine you had a patent that covers a soccer ball. We have to look at the elements of that patent. What are the elements of the claim of a soccer ball? Well, it's a ball, it's made of leather, it's stitched together, filled with air, and it's round.

Now, imagine somebody comes up and invents the

football, and the owner of the soccer ball patent wants to sue the manufacturer of the football for infringement. Well, we have to look and see, does the football meet the limitations of the soccer ball?  It is a ball, we agree with that.  It's made of leather, check.  It's stitched together, yes.  It's filled with air, but, what, it's oblong.  It's not completely round like the soccer ball. Therefore, it does not infringe.

Those are the instructions -- the sort of instructions I think you'll hear from Judge Albright.  And we will prove to you that we do not meet the elements of these claims.

And I'd like to run through them briefly with you.

And I would point out that Mr. McCarty, I don't think he put up any of the claims of any of these patents, ladies and gentlemen, in his opening statement.  But that's how you decide infringement.

One of the example claims of the '135 patent says this:  Configured to extract at least some light propagated in the optically transmissive plate towards the reflective surface.  This basically requires that the light guide be configured or designed to extract light out the back, towards the reflective sheet, the back of the monitor.  We would submit that doesn't make any sense and we don't do that because that's the wrong direction for the light to

go.  Who would want to configure for a monitor light to head towards the back?  You want it to head towards the front.  It's not infringed.  We think the evidence will be very clear on that.

The '397 patent, again, the claim, you didn't see anything about a claim from Mr. McCarty.  The '397 requires a corrugated surface, that little jagged, pyramid-looking surface with a highly transparent optical windows.  That bottom image is a picture of one of the monitors of ours they took apart, and you can see it has the prisms.  It doesn't have any of these optical windows, ladies and gentlemen.  They simply are not there.  It's not infringed.

Now, what I think you'll hear, what I think you'll hear their expert come up and say, Dr. Credelle, he'll say something like, well, you know, with manufacturing tolerances, you can't make the point completely pointy.  You can't make it absolutely sharp, that at some microscopic level you could look at that and see a flat surface, and, ah-ha, I'm going to say that's the optical window in the claim.

We don't think that carries any weight, ladies and gentlemen.  We would submit that doesn't meet common sense.  That would be like suggesting that there's a skylight or something at the top of the great pyramid in Egypt, that just doesn't make sense, and that's not what the evidence

will show.

The '191 patent, the claim requires something called discrete cavities formed in the LGP surface.  And let me take a moment and explain that a little bit.

The LGP is a light guide plate, and you'll hear a lot more about that; and these are edge-lit backlights, meaning the lights on the light guide plate are on the side, and they shine light in through the plate.  On the bottom, we put little indentations or little disruptions.  They're actually made with the laser beam, and the purpose of that is to create some space, a little hole, if you will, where when the light is shown in from the sides, it helps move the light up and out towards the front of the -- out towards the front of the monitor.

We don't have what the claim calls the discrete cavities.  These images below are these kind of microscopic images of what we have on the bottom of our light plate.  They are disruptions, yes, but they're not these deep, discrete sort of cavities.

And I think their own expert will agree with this.  I think Dr. Credelle will tell you that how he envisions what these discrete cavities look like -- he said imagine it sort of like a tea cup or coffee cup with a discrete edge and then a cavity or a space underneath it.

That's not what we have; therefore, we don't

infringe the claim.

Lastly, the '205 patent, one of the example claims says:  A planar array of lenses distributed over an area of the photoresponsive layer.

In our displays, the array of lenses is under the alleged photoresponsive layer, ladies and gentlemen.  And we will prove that to you.

The image that you see on the left is actually a picture SVV took when they broke down one of our monitors.  And you can see the green arrow going to the left is the array of lenses, and then to the right in the diagram, it's that thick area there.

The photoresponsive layer is highlighted, and it's pointing to that sheet in the picture between the forefinger and thumb of the person holding it, and it's corresponded by the blue on the right-hand side.  But you can see that the way we do it, the way we manufacture these, our array of lenses underneath the photoresponsive layer.  The claim specifically says just the opposite.  If you don't do that, you don't infringe.

And I think it's telling, that with the evidence that you -- in his opening statements, excuse me, Mr. McCarty didn't show you any of these -- the claim language, ladies and gentlemen.  We will, and we will show you that we simply do not infringe.

Damages.  I want to talk just a little bit about damages.  We don't infringe these patents, and we think we'll prove to you they have nothing to do with solar, they're not about computer monitors, and they're invalid, and -- and they're not infringed.

He talked about Samsung took a license.  Yes, Samsung took a license.  The evidence will show that Samsung decided not to -- not to stand up for their day in court like we are.

But you will also hear that Samsung, basically -- that SVV, I think the evidence will show is talking kind of out of both sides of their mouth.  You just heard him tout the Samsung agreement, that this somehow proves their patents are legitimate or something.  Actually, their expert will tell you to disregard the Samsung agreement when it comes to damages.  They're talking out of both sides of their mouths with the Samsung agreement.

We don't infringe these patents, ladies and gentlemen.  They are invalid, and they never had anything to do with computer monitors.  No one ever suggested they did have anything to do with computer monitors until they came to court and started demanding millions and millions of dollars.

Thank you for your time and your attention, and we look forward to presenting this case to you during the

course of the week.

Thank you.

Thank you, Your Honor.

THE COURT:  Thank you, sir.

You may call your first witness, please.

MR. MCCARTY:  Your Honor, before we do that, I'd like to invoke the Rule.

THE COURT:  Okay.

MR. MCCARTY:  Your Honor, Plaintiff calls Dr. Vasylyev.

(Witness sworn.)

MR. MCCARTY:  May I proceed, Your Honor?

DR. SERGIY VASYLYEV, PLAINTIFF'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. MCCARTY:

Q.  Good morning.

A.  Good morning.

Q.  Would you please introduce yourself to the jury.

A.  Sure.  My name is Sergiy Vasylyev.

Q.  Are you a Dr. Vasylyev?

A.  Yes, I have a Ph.D. in physics and mathematics.

Q.  And what is your role in this case, sir?

A.  So I'm here to testify about the company and my technologies.  So I'm the founder and CEO of SVV Technology Innovations; or SVV, for short.  And I'm also an

inventor -- the inventor on the patents in this case.

Q.   And where is SVV based?

A.   We're located in Sacramento, California.

Q.   Is that accent of yours from Sacramento?

A.   Not at all, of course.  So I was born in Eastern Europe, so this is where my accent comes from.  So I'll try to speak slowly so you can understand me better.

Q.   Are you a U.S. citizen?

A.   Yes, I am.

Q.   For many, many years?

A.   For close to 20 years now.

Q.   And you were here during opening statements just now with Mr. Findlay, correct?

A.   Yes.

Q.   Did you hear him seem to suggest that your company only does solar energy?

A.   Yes, I've heard him to say that.

Q.   Is that a mischaracterization of your technology?

A.   That is total mischaracterization.

Q.   Thank you.

     What kind of company is SVV?

A.   So SVV is an innovation company.  So it does a lot of technologies and projects.  So we focus on projects like lighting -- like commercial lighting, including, like, LED lighting panels, for example, to send bigger projects,

including energy, like solar energy that is used to process light that is received from the sun.

Q. You mentioned some projects involving LED panels and LED lighting, correct?

A. Correct.

Q. Not just solar energy?

A. That's exactly right.

Q. As the founder and CEO of SVV, are you more on the technical side or on the crunching the numbers/book side?

A. Yeah, obviously, as the CEO, I have a significant role in business life of the company, but my real passion is in -- in the technologies.

Q. And when did you create SVV?

A. So SVV was created in the year 2000, about 26 years ago.

Q. 24 years ago?

A. 24. My apology, yeah.

Q. And who are SVV's customers?

A. So it varies based on the project. So some of our past customers, for example, included Corning, AcuityBrands, OptoGlo, and others.

Q. Did you bring some slides to help the jury understand your testimony?

A. Yes, sir.

Q. Okay. What are you showing on the screen here?

A.   So this is our office in Sacramento, California.

Q.   And that title, or that logo at the top, Lucent, is different than SVV.  Can you explain that?

A.   Yes, sure.  So Lucent Optics is basically a d/b/a, or doing business as, name for SVV.  So when I started my company 24 years ago, it was just me, so I just named it after my initials.  But over time, I wanted to create a brand that would be better recognizable by the customers and suppliers and would be more memorizable.  And, also, "lucent" means glowing with light.

Q.   And what are those logos on the top right?

A.   So these are some of our customers that I mentioned, like Corning and AcuityBrands.

Q.   And has your company won any awards in the industry?

A.   Yes, we have.  And I've just shown a couple on the bottom.

Q.   What's that one down there that says TechConnect National Innovation Award?

A.   TechConnect, for example, recognizes technologists that have potential to make big impacts on specific industries.

Q.   Are these some of your companies' products?

A.   Oh, yeah.  So on the left, for example, this is our solar energy appliance.  What's unique about it is that it generates both heat and electricity from the free energy of the sun.  And what you see on the left -- I'm sorry, in the

middle is our daylight-redirecting window film.  And it's unique in the way that you just showed during the opening statement how it works.

So when you apply it to the window, it takes the sunlight, redirects it deep into the space; so you can have a brighter room, and you can also save money for paying less for energy.

And on the right, that's our -- another product that is called flexible LED lighting panel.  So it's the world's first flexible and also industry's thinnest lighting panel of this type.

Q.  And that one on the right there, is that a solar energy product?

A.  No, it's completely opposite.  It's a lighting panel that's used to emit light.

Q.  And it uses LED light, right?

A.  It does.

Q.  Does SVV work in collaboration with utilities and government entities?

A.  Yes, we do it quite a lot.

Q.  What are you showing on the screen here?

A.  So here are some of the examples of the governmental entities that we have partnered with.

For example, the United States Department of Energy, National Science Foundation, the California Energy

Commission, and others.

Q.  Can you give us an example, just quick one, maybe, the -- the Department of Energy.  That's a big -- big entity.  Will you talk about some of your work that you've done with them?

A.  Sure.  So one particular project -- project with them included the development of our ultra-thin and flexible LED lighting panel, and also the technology that is used to make it.  So we proposed to use this technology to replace old and outdated fluorescent features, and the Department of Energy liked our technology.  So they found it innovative, found it very promising, and they decided to fund this project so we can start producing these panels.

Q.  Okay.  Now, we've learned about SVV, the company.  Can we learn just a bit about you personally?

A.  Absolutely.

Q.  How old a man are you?

A.  I'm 55.

Q.  Married, got any kids?

A.  Yes, I have a wife and two sons.  They're ages 23 and 28.

Q.  What does your wife do?

A.  Well, she also has a scientific background, so this is how we basically met.  We had physics class together.  She also worked as a school teacher.  And besides raising our

kids, she also is helping to run the company, mostly on the administrative side.

Q.   And what about your sons, are they following in dad's footsteps and becoming scientists?

A.   Yeah.  So, for example, my older son is getting his Ph.D. in astrophysics at University of California in Berkeley.  And my younger son is getting his master's in technology management from University of California in Santa Barbara.

Q.   Those two boys give you guys any grandchildren yet?

A.   Not yet, but my wife keeps her fingers crossed that this will happen soon.

Q.   And where do you live?

A.   I live in Elk Grove, so it's just small town south of Sacramento.

Q.   Did you grow up there?

A.   No.  As I said, I was born in Eastern Europe, so I legally immigrated here in 1999; so my wife and I and our older son, who was just a baby.  And after about several years, we have become U.S. citizens.

Q.   When you were growing up in what's modern-day Ukraine, what did your parents do?

A.   My parents were also scientists.  So they both studied astrophysics.  My father eventually became a university professor, and my mother became an engineer.

Q.   Were you wealthy growing up?

A.   Not at all.  And so at that time, in that place where I lived, so there was little money, and the government hold and controlled pretty much everything.

So just to give an example, that for the most part of my childhood, we couldn't even afford to ever dine out.  So -- and it wasn't until much later when my -- well after my -- both of my parents obtained their Ph.D.s, we only occasionally started being able to go to a restaurant.

Q.   What did you want to be when you grew up when you were a little kid?

A.   I just want to be -- wanted to be a great scientist, just like my dad.

Q.   What are you showing on the screen here?

A.   So this is my dad and me when I was just a -- you know, when I was a boy, and only about, like, two years old here.  So we're just inspecting a small telescope.

Q.   Is it safe to assume that you shared his passion for studying lights and physics?

A.   Absolutely.  So I shared his passion in physics and also in light, and especially in innovative ways of managing light and using that light.

Q.   We went through your degrees in opening.  Can you remind the jury what your -- what your education is?

A.   Sure.  So I have a master's of science in physics and

astronomy, and I also have a Ph.D. in physics and mathematics.

Q.  During your schooling, your Ph.D. programs, did you develop a specialty?

A.  Yes, so I became an expert in light.

Q.  Is that specialty limited to solar energy?

A.  No, the applications are very wide and broad.

Q.  So tell us, what does lights and optics encompass?

A.  Yes, so light is actually a very big field of science and technology.  So when people think about light, they can think about, like, daylight that they receive from the sun, or they can think of a light bulb.  But the reality is that light is much more complicated.  It's essentially a blend of, like, science, engineering, optics, and so on.

Q.  So here's the big question, what is light?

A.  Yeah.  So light can be described as a wave of electromagnetic energy moving from one place to another.

Q.  Are all light waves the same?

A.  No.  And that's actually how we perceive the light, the colors of the light.

Q.  What are you showing here?

A.  So I'm showing here is that the color of light is determined by the wavelengths.  So you have, like, longer wavelengths here on the bottom that give you those, like, reds and oranges.  At the same time, like, shorter

wavelengths produce light -- these blue and violet colors.

Q.  Are all electromagnetic waves those like -- they are visible on the screen -- that you can see with your human eye?

A.  Well, the actual light is much more complicated.  So I gave this example just for the simplicity to explain the basic concept.  But in reality, light is a complex mixture of different -- many, many different waves and different wavelengths.

Q.  And what are you showing here on the screen?

A.  So this is just a broad spectrum.

Q.  Now, we've been looking at light as sort of a single wave.  Are you ready to show the jury how light behaves in some way?

A.  I'll be more than happy to.

Q.  Okay.  So first, once the light is emitted from a light source, does it continue to go on forever?

A.  Yeah, that's one of the fundamental properties of light is that once emitted, it can propagate long distances along straight lines until it hits an obstacle, for example.

Q.  What do you mean by "obstacle"?

A.  Well, a good example would be an object that reflects light.  So, for example, you have a surface that is shiny and smooth, just like a glass, for example.  So in this case, light will just bounce off it at the same angle.

Q.   Is there a hypertechnical name in science for where light bounces off?

A.   No.   Actually, mirror would be a good word for this.

Q.   And so what are you showing here now?   It's a little different than reflection.

A.   Right.   So it's another fascinating property of light called refraction.   It's where it bends when it passes through a boundary between two transparent media.

Q.   And what makes the light wave band or refract in that way?

A.   So what makes it bend is that it changes its speed when passing from one medium to another.

Q.   And doesn't all light move at the speed of light?

A.   Well, it does, but the thing is that the speed of light can be different in different media.   For example, the speed of light in air is different than the speed of light in water.

Q.   Is a lens a common device for refraction?

A.   That is a very perfect example.

Q.   Is there another behavior of light that relates to reflection and refraction that you want to talk about?

A.   Yeah, that's yet another fascinating property and behavior of light that is called the total internal reflection; or TIR, in short.

Q.   Can you describe what TIR, or total internal

reflection, is?

A.   Sure.   So when, for example, light hits a boundary of an object from the inside, and this object is transparent, that at some point, it can reflect entirely back into the -- this medium.   And that is called the total internal reflection.

Q.   So what's going on here?

A.   So what we're seeing here is that when the angle of light entering the surface approaches a certain critical angle called the critical angle of the total internal reflection, so it no longer bends into the other medium, but it actually reflects back.

Q.   If we keep moving the beam in that same direction, is it going to refract or reflect?

A.   It is going to still undergo the total internal reflection.

Q.   Thank you.

Now, obviously, those are just some of the basics. How are these concepts used in applications?

A.   There are actually many, many ways how to use these concepts, but a couple of different applications that would be important to point out include light collection and light emitting application.

Q.   So when I think of collecting light and emitting light, I think about them as complete opposites.   So can you make

sense of that for us?

A.   Sure.   So the applications are different, but the cool thing about light is that it is -- its path is reversible. So basically, what it means is that the same principles can be applied whether you want to collect light or emit light.

Q.   Thank you.

Now, after you were done with your studies, what was your first application of some of these light management tools that you became an expert in?

A.   Yeah, so my initial passion was to develop light -- light collection applications for light.

Q.   And I think we saw some early documents from your company that mentioned solar energy.   Does that refer to that?

A.   Yes.

Q.   Okay.   Tell me about your transition to the United States.

A.   So we moved here in 1999, as I mentioned with my wife and our younger boy who was just a baby.

Q.   And was that difficult leaving your home country?

A.   It was -- yeah.   It was very difficult.   We had to leave all of our extended families and also friends, et cetera.

Q.   What were you looking for by moving here?

A.   I would say American dream.

Q.   Okay.   What does that mean to you?

A.   Well, for me to live in a place where I could raise my family in a safe neighborhood, where my children can get a good -- good education, where there is a freedom.   It's just very important.   Where I could continue to innovate in my scientific fields, where I could create new technologies and new products that could improve other businesses and people's lives.

Q.   Did you want to own your own business?

A.   Yes.

Q.   So after you moved to the United States, did you start your business, SVV?

A.   Very shortly after I came to the United States.

Q.   And did you hit it big right away?

A.   Not at all.   So, in fact, that's when all of the hardest work, actually, was just the beginning.

Q.   Were you able to make enough money at SVV right away, or did you have to take on some other jobs?

A.   No.   Initially, I had to support the company besides providing for my family.   So I actually had to find other jobs.

Q.   What other jobs did you take in addition to starting SVV?

A.   Yeah.   One of the jobs that I took was at the Sacramento County sheriff's department.

Q.   So what did you do with them?

A.   So the Sacramento sheriff's department wanted me to fix their computerized emergency dispatch system, which was broken, not functioning, and was causing a lot of officer and public safety concerns at the time.

Q.   Were you able to fix their system for them?

A.   Yes, that project was a success, full success.

Q.   Now, while you were working at the sheriff's department, did you have time left over in the evenings for SVV?

A.   No, actually, not during the daytime hours.  So I had to work late nights, oftentimes sleeping less, because I, you know, continued to develop my technologies in which I had my passion.

Q.   And what was your first big achievement for SVV at the time?

A.   For example, we developed cutting-edge solar collector system.

Q.   What are we seeing here?

A.   So on the left, you can see me holding our solar concentrator, like a big prototype.  And on -- that I invented and developed.  And also on the right, you can see my father and I in front of a smaller version of this concentrator during testing.  So -- and this concentrator is called the slat-array concentrator, and it goes after

our name, it's known in the field of solar energy.

Q.  I can tell by the passion, were these the early days at SVV?

A.  It was in the mid-2000s.

Q.  Now, did the solar concentrator design receive some recognition?

A.  Yes.  So it received some write-ups in magazines.  And, also, we wrote some scientific papers about it and some other -- and other researchers also referenced to our research, our papers.  We also received -- we also obtained two patents and also received some other recognitions and awards.

Q.  What's on the screen here?

A.  So this is one of the regional magazines that wrote articles about our achievements.

Q.  Is this another one?

A.  Yes.

Q.  What was notable about your original solar concentrator idea?

A.  It was unique in many ways.  So it -- a lot -- we enabled it to manage light much more efficiently than in previous designs.

Q.  How did you design the solar concentrator?

A.  So we spent years iterating, experimenting, and designing the systems.  So we also used sophisticated

computer-based tools, which are called optical model lentils, and, more specifically, optical ray tracing tools.

Q.   Can you show us what that looks like?

A.   Sure.  So this is just an example of visualization of an optical ray tracing tool being used.  So you can see thousands and thousands of simulated light rays going through our system.

Q.   Is this another example of optical modelling?

A.   Yes, and this refers to -- particularly to a light-collecting application.

Q.   Now, is this optical modelling that y'all are doing in the early days, like is shown on the screen here, are those only used to model intaking light and solar application, stuff like that?

A.   No, remember, I talked to you about the reversibility of light, so basically the same principles can be used for illuminating -- designing illumination devices.

Q.   And did you discover -- or what did you discover as it relates to applying your innovations and studies to the emission of light?

A.   Yes.  So we discovered that we can use the same or similar designs that we have invented and developed to actually create a better and more innovative and better-performing backlights and displays.

Q.   Does that refer to your LED side of the business?

A.  Yes, that's referring to our LED side of the research.

Q.  And does that refer to the inventions that we're in court for here today?

A.  Yes, exactly.

Q.  Can you start walking through your inventions?

A.  Absolutely.

Q.  Great.

Now, when you were first starting research on the display side of your company, what did the display technology look like?

A.  Well, at the time, the, like, televisions and monitors were bulky and unsightly, and they -- some of them looked just like you can see on the left on this slide.  So, yeah, that's -- that's how they basically -- and they were very thick.  So bulkiness was a hallmark of that technology.

Q.  And what made those screens so bulky?

A.  Several things.  So for one, they required complex and bulky light sources.  And, second, they also were employing complex and bulky optical systems to actually redirect and project -- project light towards the screen.

Q.  So how did those older systems work?

A.  Yes.  So like you can see here, so they had, like, a light source, and they had the different optical components to actually take that light, mix it somehow, and then direct towards the screen so you can see images on it.

Q.   And at some point, did the industry move away from those older bulky systems towards LEDs?

A.   Right.  So at one point, the industry started using LEDs as the light sources for these backlights.

Q.   So what is an LED?

A.   LED stands for light-emitting diode.  And so essentially, you can think of a very small and very powerful source of light in a very tiny form factor.

Q.   What are you kind of showing in the cartoon version on the screen?

A.   Yeah.  So one way -- previously, the LEDs were implemented in these displays was in the way of, like, rows and columns of these LEDs, and that provided a backlight for the screen.

Q.   Did using LED monitors like this cause any problems?

A.   Yes.  There were lots of them.

Q.   Can you give us an example?

A.   Sure.  So, for example, since each LED represents a very small and powerful light source, so when you have them illuminating into the screen, so you could see this, like, hotspots, or very bright areas; and there would be, like, a darker areas around it -- around this brighter spot.  So that would be very unwanted fact for the displays.

Q.   Can you explain why the introduction of LEDs would lead to things like hotspots?

A.   Yeah, so I -- as I just said, so the -- the LEDs are very bright and very powerful.  So -- and they essentially shine through the screen, right into your eyes.  And so, obviously, you need to do something to mitigate that effect.

Q.   So what were some solutions in the industry?

A.   So some of the solutions -- actually, the approach was, like, twofold.  On one hand, the designers of these LED displays started using, like, very thick and -- a number of thick and expensive optical components to actually diffuse the light.  And on the other hand, they also had to maintain a significant distance between the LEDs and the screen to completely get rid of the hotspot.

        And, essentially, that defeated the purposes of the LEDs because they just are so small and that, technically, could allow you to make thinner displays; but they could not because of all these difficulties.  And, also, it would add in all these layers, essentially kill the efficiency.

Q.   Did your patented lighting technologies help solve this problem?

A.   Yes, it did.

Q.   So what did you do?

        THE COURT:  Counsel, let's try to find a good place to break.

MR. MCCARTY: That'd be great. That'd be great. Thank you.

THE COURT: Ladies and gentlemen of the jury, we're going to take a morning recess of about 10 or 15 minutes. I have a couple of instructions for you that after the first time I tell them I'm just going to say, please remember my instructions, but they are the following:

One is when you're not in the courtroom and you're either in the jury room or when you go home, you may not talk about the evidence in this case. You'll get to do that when you begin to deliberate on Friday. But until then, you can't. You can talk about anything else that you want, but not about the case or the witnesses or the evidence.

Number two, my sons who are in college tell me there's social media. I'm unfamiliar with it personally; but, apparently, there is such a thing. I'm not saying you can't go on social media if that's something that you do. But you can't post anything about the trial while we're in trial.

And, number three, the technology we're talking about is interesting. You met good lawyers. You may feel like, gosh, it would help me to research and find out about this. The lawyers are very confident that over the course

of the week they will put on sufficient evidence for you to decide the case.  So please don't do any independent research about anything related to the case or the people involved until after you finish your deliberations on Friday.

After this, I'll just say, please remember my instructions, but I had to tell you what they were first.

So we'll stand in recess for 10 or 15 minutes.

COURT SECURITY OFFICER:  All rise.

(Jury out.)

THE COURT:  You may be seated.

You may step down.

Is there anything we need to take up?

MR. MCCARTY:  Not anything from the Plaintiff.

I correct myself.

THE COURT:  Sure.

MR. MCCARTY:  We have a very short demonstrative with the witness for the next session.  So with Your Honor's permission, we'd set it up just in front of the jury box there.  It's just a small panel for him to display some of the components.

THE COURT:  Well, as long as we make sure that we have a microphone that he can use so that Shelly can hear you, that would be fine.

MR. MCCARTY:  Thank you.

THE COURT:  And we have a guest star court reporter this week.  We've traded out for one week, and -- and her judge told me to be nice to her and to treat her well, and I told him she would be so grateful to get back to Texarkana after spending a week with me, that he would be grateful.

So thank you, Shelly, for being here.

We'll start again in a few minutes.

COURT SECURITY OFFICER:  All rise.

(Recess.)

COURT SECURITY OFFICER:  All rise.

THE COURT:  Please remain standing for the jury.

(Jury in.)

THE COURT:  You may be seated.

Thank you.

MR. MCCARTY:  May I proceed?

THE COURT:  Please.

MR. MCCARTY:  Dr. Vasylyev, you may return to the witness stand.

Careful around there.

Q.  (By Mr. McCarty)  Welcome back.

So to reorient where we were, we were talking about going from full backlit LEDs and moving to edge-lit LEDs; is that right?

A.  Yes.

Q.   All right.  So what did you do to solve the problems with glare, et cetera?

A.   Yeah, I took an approach which is called edge-lit lighting.

Q.   And what is that?

A.   So in this case, I used a thin strip of LEDs and placed those LEDs along just one edge of the display screen.

Q.   Okay.  But if there's only one strip of light in the back, how do you get light across the whole screen?  Why is there not, like, a gradient, or it's light on the bottom and dark on top?

A.   Yeah, and that sort of uniform, it just was initially a huge problem that we had to solve.

Q.   So what did you do?

A.   So I used a special optical layer that we called optical waveguide, and that was a -- waveguide was placed inside this screen.

Q.   And is that waveguide planar?

A.   It is planar.

Q.   What does that mean?

A.   So basically, it means flat.

Q.   Were you the first person to ever use a waveguide?

A.   No, I was not.

Q.   So tell us about your -- your waveguide and what was different about it.

A.   Yeah, so it was different in many ways.  It has -- had a very specific unique design.  For one, it has this parallel lenses on one side, and it also has a sort of pattern -- two-dimensional pattern of microstructures formed in the other side.  And these components were designed to work together to produce an efficient, very uniform glow from the display.

Q.   So let's start with your mention of microstructures. Can you describe the role of microstructures in the -- in the product?

A.   Right.  So you remember I was describing this total internal reflection.  This mechanism is used for light guide to spread light throughout.  But these microstructures are important because they're used to actually extract that light and cause this soft and glow uniform emission -- light emission.

Q.   And what is another aspect or feature of your waveguide?

A.   So another feature is that this microstructures are very small, for one.  And, second, they're also distributed over an area of the waveguide -- over the bottom surface in a very specific fashion.  And they're also separated from each other by smooth and planar portions of the surface.

Q.   So is that kind of what you're showing on the screen on the right here?

A.   Yeah, it is actually a picture from my patent.  So here, it shows that these microstructures are distributed over the -- the area -- the entire area of the waveguide.

Q.   And I think you mentioned it, but in between the microstructures, is it jagged and uneven, or is it flat?

A.   Yeah, so between them, the surface must be completely flat in order to work properly.

Q.   And what else did you pair with those microstructures?

A.   So I paired those microstructures with cylindrical lenses formed in the top surface.  And that's very important because that light that is extracted from the waveguide was directed towards those lenses so it can pass through the lenses, undergo refraction, and then it can be directed further towards the display screen.

Q.   Is that something called collimation?

A.   So the collimation is when these lenses are used to actually align the light better towards the screen.  That's very important because it allows it to increase brightness.

Q.   Can you show us how the waveguide would work using a figure from your patents?

A.   Sure.

Q.   So kind of what are -- what are you showing here on the left and on the right?

A.   So on the left, we -- it is like one of the pictures from my patent.  And so it shows it in three dimensions.

But on the right, it's like a side view that's used to better explain how it works.

So on the top, we have an LED light that I explained what the LEDs are, and it's shining light directly into an edge of that waveguide. And that waveguide carries that light, spreads it out where -- very evenly over the entire area of the waveguide. And then these microstructures are used to take that light and shine them towards the lenses; and then the lenses, in turn, align that light towards the screen.

Q. So let's slow that down a little bit, if you could.

Focusing on the two aspects we discussed earlier, where are the microstructures in this example?

A. So in this particular orientation that you see on the right, so microstructures are formed on the left -- in the left surface. So you can see this -- they're marked as No. 14.

Q. And the other aspect you discussed were the lenses. Where are those lenses at?

A. So lenses are shown on the right. So you can see them in, like, light blue color.

Q. And if we zoom in a little bit more, on that top portion where I've kind of blown it out, we focus on, I don't know, some of those particular rays that are coming right out of that LED and hitting that top surface.

Let me ask you this, why -- why is the light not exiting out towards the -- you know, the user of the screen at that angle there?

A.   Right.  So you remember I explained what the total internal reflection is?  So this is exactly the mechanism that is used here to hold that light and prevent it from exiting from the waveguide way too early, close to the LEDs.

Q.   And why is this a breakthrough?

A.   It's a breakthrough because, for one, it allows you to distribute that light very uniformly so that there are no hotspots.  And then also emitted directly towards the screen, also in the same uniform fashion, so that your entire screen can be made very thin because you no longer need that space in additional optical layers, at least in that quantity and that complexity.

Q.   Thank you.

Now, I see you've added a new layer in front called the quantum dots.  Does that refer to that -- those colorful vials I showed in opening?

A.   Yes, it uses those quantum dots.

Q.   And you didn't invent quantum dots, right?

A.   No, I did not.

Q.   How do your inventions pair with quantum dots and make them better, though?

A.   Right.   So the quantum dots are used here to further condition light that is emergent, that is exiting from the waveguide in a way that it enriches that light with better and fewer colors so you can see your screen in much better clarity.   It'll be brighter, and it'll also have much better color gamut.

Q.   What is a quantum dot, sir?

A.   So quantum dot is a very interesting part of -- type of particle, and its size is smaller.   It's called nanoparticle.   It's essentially thousands and thousands of times less than the thickness of the human hair.   So think of it.   And another unique aspect of the quantum dot is that it works such that it can absorb light, and almost instantly it can reemit that light in a different wavelength, in a different color.

Q.   You're showing different colors here, and how does that relate to the size of the dot?

A.   Yeah.   So the color of light that's emitted from the quantum dot is determined simply by the size.   So by turning the sides up and down, you can actually have this quantum dot to emit exactly the wavelengths, the exact color that you need.

Q.   And why did you remove the blue?   And explain what -- what's going on there.

A.   Yeah.   So the -- initially, if you would want to make

like RGB display, and this is the kind of displays that are currently on the market; like, you have three colors to produce any image in color that you need just by tuning the intensity of each color.

But there was a way to actually reduce the cost of the display because quantum dots are very, very expensive materials. They're very, you know, difficult to manufacture, especially the blue quantum dots.

So by removing the quantum dot, instead of using the blue LED that you can see on the right from the flashlight for illustration --

THE COURT: Sir, you might slow down just a little bit. Thank you.

THE WITNESS: Thank you.

Q. (By Mr. McCarty) And so you have the blue light and then you have a red and green quantum dot to make all three colors to get everything you need?

A. Yes. So you still have three colors and also -- and you can produce almost any color imaginable.

Q. Got it.

Now, were there other attempts before and after your waveguide that were trying to solve similar problems?

A. There were lots of attempts.

Q. Okay. What were the problems with some of those attempts? If you could walk us through.

A.   Yeah.   There were different ideas, and one of the ideas included, like, modifying the light guide in a way that on one surface it will have, like, a jagged -- like, the entire surface would be, like, structured and jagged.   And that would be used to actually take that light out from the light guide and direct it to the display.

One problem with that is that most of the light would come out in the area that was adjacent to the edge, to the LED.   So it would -- that part will be brighter while the opposite end would be darker, so -- which was not acceptable.

Q.   And what about on the right, you've added something in, I think it says prism.   It talks about that.

A.   Right.   So there were, like, other elements tried with these jagged surface waveguides.   So developers tried to add, like, prisms on top of the waveguide -- or light guide.   And, actually -- but the problem was that this prism sheets are not working light lenses.   So they're -- instead of, like, collimating light and making it -- directing it in ordered fashion, they're actually dispersing light, so -- and much of that light would be lost.

Q.   Thank you.

Did you bring an exemplary product of SVV that uses some of your breakthroughs?

A.   Yes, I did.

Q.   And could you show it to the jury?

A.   Sure.

MR. MCCARTY:   Your Honor, may the witness come off the witness stand and show the demonstrative?

THE COURT:   Yes, sir.

MR. MCCARTY:   Thank you.

Q.   (By Mr. McCarty)   Okay.   Now, if you want to just pull that up --

MR. FINDLAY:   Excuse me, Your Honor.   May I move where I can better see?

THE COURT:   Anywhere you want.

MR. FINDLAY:   Thank you.

Q.   (By Mr. McCarty)   Let's start with the basics.   What are we looking at?

A.   So we're looking at one of our products that involve some of our inventions related to waveguides and edge-lit waveguides.

So we have here LED screen -- strips on the edges of the waveguide.   And in between, this is what we have, it's a waveguide, it's a plastic sheet that's -- has a very unique structure, and it's used to actually emit light in a very uniform fashion.   So it's -- it's transparent, as you can see, there are no light sources whatsoever inside, but when I flip the switch, turn it on, it is becoming, like, a

very uniform bright and beautiful light source, and it still maintains its flexibility, and you can use it in many, many different ways.

Q.  So -- okay.  How does it light up like that?  Can you remind me, are there lights inside of that kind of clear plastic spot?

A.  There are no lights of any kind inside this plastic sheet, which actually is not just a plastic sheet, it's our optical waveguide, of our design.

Q.  And so where is the light coming in from then -- where are the light sources?

A.  The light sources are actually on these edges inside these strips.

Q.  So it's an edge-lit?

A.  It's an edge-lit design.

Q.  And so then what is it that's unique about the waveguide that makes it the uniform distributed light in this example?

A.  Yes.  So there are many unique features.  So it's the way these microstructures are distributed.  So they are designed according to this very special two-dimensional pattern that allows us to create a very uniform light emission, and it still maintains very flexible form.  So it's basically the world's first flexible lighting panel, and it's also the industry's thinnest.

Q.   Did you receive any recognition for this LED product?

A.   Yes.  For example, we have been recognized by -- so our product was recognized by the Illuminating Engineering Society as the important and -- unique and important advancement in the art and science of lighting.

Q.   Does this have anything to do with solar energy?

A.   No, it does not.

Q.   Now, is this product the same exact product that we saw for your waveguide patents that are at issue in the case?

A.   No.  It's -- it's different.  So it has some features of it, but not all of them.

Q.   Okay.  So what would this be used for if you were to go sell that one on the market?

A.   It would be used for many purposes, mostly for general lighting, like it could be used for replacing fluorescent fixtures in commercial buildings.  It can also be used for making architectural and decorative lighting panels and the like.

Q.   Thank you.  You can put it down.

          All right.  Now, how does your invention in this case improve brightness of LED displays?

A.   In several ways.  First of all, it does not waste any light, and that's very important.

          It also directs light and aligns it better towards the display and not sending it to nonfunctional direction.

So you can see a much brighter screen as a result.

MR. MCCARTY:  And I think maybe his microphone in his witness stand is turned off.  Can we get that turned on?  Trying to help Ms. Shelly.  There we go.

Q.  (By Mr. McCarty)  And tell me how does your invention allow for, like, a thinner bezel, for example?

And a bezel would be this around the edge, right?

A.  Right.  So it's one of the hallmarks of our technology.  So by using these lenses on the front, our light guide is able to hold light better in the -- in the waveguide and also allows light to be mixed better just in that area close to the LEDs.  So there are no -- no uniformities.  So you can actually make your bezel thinner and make the resulting product much more pleasant and useful.

Q.  And you probably heard me talk about efficiency with -- with light.  Can you talk about that and how your product helps make -- make the products more efficient?

A.  Right.  So the -- it is more material efficient because it uses fewer materials, so it's less expensive to make; and, also, because it does not waste light.  So you can basically either make the screen brighter using the same number of LEDs and using the same amount of energy; or, conversely, you can actually hold the -- the brightness at the same level, but you can reduce the number of LEDs and also reduce the amount of energy that you use to power this

display.

Q. Now, once you had these inventions, what did you do?

A. So I filed for patents.

Q. Why did you go and get your patents?

A. Well, because I wanted to protect my inventions so that nobody could take the technologies that I developed from me.

Q. Did you go hire a patent lawyer?

A. Yes. I hired attorneys for just initial filings, but after that, I just took over the process and proceeded on my own.

Q. And why did you handle that patent prosecution yourself?

A. Well, for one, it was extremely expensive. The patent attorneys are very expensive. And, second, I was hoping that I could do it myself; and I tried, and, actually, I succeeded in that.

Q. Now, in the spring of 2009, did you write and file at the Patent Office what's called a provisional patent application?

A. Yes, sir.

Q. And was that Provisional Application No. 61/214331?

A. Yes.

Q. Can you turn in your binder in front of you there, sir, to Tab 1.

A.   Yes.

Q.   Is that PTX-34?

A.   Yes, sir.

Q.   And is PTX-34 a copy of that provisional application that you filed?

A.   Yes, it is.

        MR. MCCARTY:   Your Honor, Plaintiff moves PTX-34 for admission into evidence.

        MR. FINDLAY:   No objection.

        THE COURT:   Admitted.

        MR. MCCARTY:   Mr. Diaz, could you please pull up PTX-34.   Thank you.

Q.   (By Mr. McCarty)   Now, this -- is this your initial provisional patent application that you wrote and filed, sir?

A.   Yes, it is.

Q.   And even back then, originally, did it discuss the structure of your waveguide that we just walked through?

A.   Yes.

        MR. MCCARTY:   Mr. Diaz, can you please turn to Figure 12.

Q.   (By Mr. McCarty)   Is that your waveguide there?

A.   Yes.

Q.   Thank you.

        And this was in your original filing?

A.   It was in my original filing.

Q.   Did you file another provisional shortly thereafter in March of 2010?

A.   Yes, I did.

Q.   Was that Provisional Application No. 61/339512?

A.   Yes, sir.

Q.   Can you turn in your tab -- in your binder to Tab 2.

A.   Yes.

Q.   Is that PTX-35?

A.   Yes, it is.

Q.   Is this a copy of that second provisional application that you wrote and submitted to the Patent Office?

A.   Yes, it is.

        MR. MCCARTY:   Your Honor, Plaintiff moves PTX-35 for admission into evidence.

        MR. FINDLAY:   No objection.

        THE COURT:   Admitted.

        MR. MCCARTY:   Mr. Diaz, can you please pull up PTX-35.   Thank you.

Q.   (By Mr. McCarty)   Why did you file a second provisional application?

A.   Because I wanted to add additional details and also expand on additional applications for the same invention.

Q.   Now, were these the only provisional applications you filed?

A.  No, I actually filed a lot more.

Q.  Was one of those additional applications No. 61/399552?

A.  Yes, sir.

Q.  And was that provisional filed shortly after that second one?

A.  Yes, a few months later.

Q.  Thank you --

A.  From that time.

Q.  Now, after you had put those patent filings in at the Patent Office, you planted your flag in the ground on the invention, were you now comfortable going out and trying to commercialize some of those lighting panels and waveguides into products in the market?

A.  Yes, at that point, yes.

Q.  And so what steps -- take yourself back to that time period.

    What steps were you taking with your company in this space?

A.  Yeah, I tried different -- different things.  So I went to trade shows.  I also tried to raise investments.  I also talked to manufacturers in different industries.

Q.  At that time, were you successful in breaking into that industry?

A.  Not quite.

Q.  Okay.  Why not?

A.   Well, one thing that I learned is that big companies are not oftentimes interested in talking to smaller companies bringing these ideas, and small companies like mine, for example.  So it was very difficult to get them interested in my inventions, even though the technology itself was proven work -- workable, it was very useful, and -- and high-performing.

Q.   Do you have any instances that come to mind back in that 2010 and 2011 time frame?

A.   Well, the companies I talked to?  Yeah, I talked to, like, 3M, for example.  Dow, Dupont, and Flextronics; and then others.

Q.   During this time, was the patent filing that you had put on still working its way through the patent system?

A.   Yes, it was.

Q.   Did you eventually receive some good news in June of 2014?

A.   Yes.

Q.   What happened in June of 2014, I guess almost five years after your first provisional application was filed?

A.   So the -- the first patent in this family was issued.

Q.   Please turn in your binder there to Tab 3, if you could.

A.   Okay.

Q.   Is that a copy of U.S. Patent 8,740,397?

A.   Yes, it is.

Q.   Is that PTX-6?

A.   Yes, sir.

Q.   Okay.

          MR. MCCARTY:   Your Honor, Plaintiff moves PTX-6 for admission into evidence.

          MR. FINDLAY:   No objection.

          THE COURT:   Be admitted.

Q.   (By Mr. McCarty)   Do you remember what it felt like knowing that the Patent Office had finally granted your patent, sir?

A.   Yeah, I felt very proud, and it was very satisfied -- satisfying to see, like, all this hard work having been paid up -- paid off.   And so, yeah, felt humbling and very proud of myself.

          MR. MCCARTY:   Mr. Diaz, could you put up that '397 patent.

Q.   (By Mr. McCarty)   If you zoom in on the top left there, is that your name up on the left?

A.   Yes, it is mine.

Q.   And what about those big numbers on the right, begins with 8, is that the patent number?

A.   That's the patent number, yeah.   And, typically, we -- because it's a mouthful, we, you know, usually refer to them by the last three digits, like '397.

Q.   Thank you.

And we'll -- we'll get through these a little bit later in the trial.

Did the Patent Office subsequently grant the other three patents at issue in this case?

A.   Yes, they did.

Q.   And did you feel the same sense of pride and accomplishment when those came through?

A.   Yes.  It was a big accomplishment.

Q.   Okay.  And are those later three patents U.S. Patent 10,797,191, 10,838,135, and 10,868,205?

A.   That is correct.

Q.   Can you flip through to Tabs 4 through 6, and just confirm that those are correct copies of those three patents, sir?

A.   Yes, sir.

MR. MCCARTY:  Your Honor, Plaintiff moves PTX-8, PTX-9, and PTX-10 for admission into evidence.

MR. FINDLAY:  No objection.

THE COURT:  Admitted.

MR. MCCARTY:  Mr. Diaz, would you mind pulling up PTX-9.

Q.   (By Mr. McCarty)  Sir, is this the cover page of another one of the patents in the case that's the '135 patent?

A.  Yes, sir, it is.

Q.  Okay.

MR. MCCARTY:  And if you go to the bottom of this page, Mr. Diaz.

Q.  (By Mr. McCarty)  Do you recognize this figure?

A.  Yes, this is exactly the figure that I showed on one of my -- some of my slides.

Q.  So how did it make you feel to see these -- these inventions actually printed in these granted patents?

A.  I really feel very proud of myself and my accomplishments.

Q.  Thank you.

Now, at some point in time, did you begin to suspect that other companies were -- were using your patented inventions?

A.  Yes.

Q.  How did you form that belief?

A.  Well, I kind of, like, started seeing, like, newer displays on the market, and these displays actually exhibited some hallmarks and some features that I would attribute it to be, you know, features or hallmarks that would be appropriate for my inventions.

Q.  And what did you -- what did you end up finding out?

A.  So, for example, they were becoming thinner, the displays were getting brighter, they were having thinner

bezels, they were becoming more efficient.

Q. So what were you looking for when you were looking at some of those products?

A. Yeah, so I was looking at the display brightness. I was also looking at how thick it was. I was just looking at the bezel and the efficiency and the power consumption and all those kind of things.

Q. So did you end up finding some products on the market and bringing them into your lab to take a look at?

A. Yes, sir.

Q. Okay. And did you, essentially, you know, open them up and look on the insides?

A. Yes, this is what I did.

Q. Okay. And so what did you find?

A. Yeah. I found that some of the companies manufacturing these displays were not using their own technology, but, actually, they started using my technology that I invented.

Q. Was Acer one of those companies, sir?

A. Yes, sir.

Q. Were Samsung and MSI two others?

A. Yes, sir.

Q. Okay. Now, have any companies licensed the four patents at issue in this case?

A. Yes, sir.

Q. Okay. Who are those two companies?

A.   Samsung and MSI, Micro-Star.

Q.   So let's start with Samsung.

     How did the Samsung license come to be?

A.   Well, I informed them on the -- these patents, and so eventually, they took a license.

Q.   And did you have to bring an infringement suit?

A.   Yes.

Q.   Okay.  Was that a difficult decision?

A.   It was extremely difficult decision because I've never, never -- I had never been involved, like, in a technology dispute like that, so it was completely foreign for me.

Q.   But did that matter that you had with Samsung resolve pretty quickly?

A.   Yes, it was very important for me and my company.

Q.   Within about a year?

A.   Yes, it was pretty, relatively, quick.

Q.   Did you have to go to trial with -- with that one?

A.   No, not at all.

Q.   Did Samsung pay to license your patents after having a look at your claim charts and your patents?

A.   Yes.

Q.   Let me ask you this, were you here -- you were sitting there during opening, right?

A.   Yes.

Q.   Yeah.  Did -- did you hear Mr. Findlay say that you were moving the fences on your patents, or something like that?

A.   Yes, I heard him saying that.

Q.   Okay.  Did you take that to suggest that your patents were on solar energy, not on monitors, or something like that?

A.   Yes.

Q.   Okay.  Sir, are you aware of whether Samsung is a solar energy company?

A.   No, I'm not aware.

Q.   Okay.  What about MSI, the other company who has taken a license to your patents in this case, are they -- are they a solar energy company?

A.   No, they're not, by any means.

Q.   Do those companies make monitors?

A.   Yes, they make monitors -- computer monitors.

Q.   Now, when you negotiated this -- actually, let me back up.

How did you feel signing on the dotted line with a company like Samsung after y'all had resolved that dispute within about a year?

A.   Yeah.  It was, like, a sense of great accomplishment; and, actually, very humbling to see that a big company like

Samsung recognized my ownership of those inventions, and they were willing to actually sign a licensing agreement.

Q.   Now, did you give Samsung a discount?

A.   Yes, I believe I gave them a huge discount.

Q.   Okay.  Why would you give Samsung a discount if y'all were negotiating that license?

A.   Well, essentially, I gave them, like, the first mover's advantage discount.  So, again, as I mentioned, that was the first instance that a big company like that expressed willingness to sign license to use my inventions.  And, also, I felt that Samsung is kind of, like, a unique company because they are in business of, like, making many kinds of products, like appliances and stuff like that.  So I thought it would be beneficial for my company to keep good relationships with them and potentially becoming partners.

Q.   You mentioned, I think, another agreement just now, which was with a company called MSI; is that right?

A.   Yes, sir.

Q.   Okay.  And is that Micro-Star?

A.   That's Micro-Star.

Q.   Okay.  Who's Micro-Star?

A.   It's a computer company.

Q.   Okay.  And did you enter into a license with them?

A.   Yes, sir.

Q. Is that around the same time?

A. Slightly later, yeah, but around the same -- same time. Yeah, it took about same time. So resolved relatively quickly.

Q. And did -- did the MSI dispute go -- go to a trial like this?

A. No. No, sir.

Q. Okay. And what did that resolve for?

A. So a big part of the agreement was the compensation for my -- for the right to use my inventions in the form of their own patents that MSI -- MSI assigned to SVV Technology Innovations.

Q. So you mentioned that some of that payment was in the form of MSI's patents.

Why would SVV accept as compensation for a license other companies' patents in an assignment?

A. Yeah, so they -- MSI had very valuable patents; and, also, we -- so I saw the value for the company in owning those patents.

Q. Is there anything that you recall about MSI's use of

your inventions in their products?

A.   Yes, sir.

Q.   And is MSI kind of a lower-end seller?

A.   Yes, they're low-end seller.  And from my understanding, they didn't really make -- you know, use of my technology to a large extent because the way it oftentimes works is that when you use my technology, it allows to save cost on manufacturing the displays.  And some companies just, you know, raise the prices or -- or keep them at the same level, but they reduce the manufacturing cost.  And the difference, they basically pocket the difference as a profit.

But the MSI, what they did, instead, they actually lowered the price of their projects -- of their products and were selling them for a lower price.  So they didn't really realize the value of this technology to the full extent.

Q.   Thank you.

All right.  Now, at some point, did you suspect that Acer was also using your technology?

A.   Yes, sir.

Q.   And did you come to that understanding in a similar fashion?

A.   Yes.  I disassembled their products.

Q.   Okay.  And did you perform an investigation into Acer's

products?

A.   Yes, sir.

Q.   Where was that done at?

A.   Where?

Q.   Yeah, where?

A.   It was roughly about the time when I was negotiating the license with Samsung.

Q.   Okay.  And during that investigation, what did that reveal once you started looking at Acer's products?

A.   Yes.  So basically, it revealed that Acer was also using my patented technology.

Q.   And what kind of products?

A.   In their computer monitors.

Q.   Did you initiate a patent suit right away?

A.   No, sir.

Q.   About how long did you know it would take to initiate a patent suit?

A.   Well, based on the experience with Samsung, I expected it to take about a year or so.

Q.   Can you tell me why something like that would take a year?

A.   Well, because there's a lot of work involved in initiating that lawsuit.

Q.   What kind of work?  Investigation?  Research?

A.   Yeah, investigation, you know, preparing all the

documents, yeah.

Q.  Did you authorize your attorney in the meantime to send a letter to Acer about the patents?

A.  Yes, that's what I did.

Q.  Okay.  Can you please turn in your binder to Tab 7.

A.  Sure.

Q.  Is -- is the document under Tab 7 that letter that you authorized your attorney to send out to Acer to put them on notice of your patents?

A.  Yes, it is.

MR. MCCARTY:  Your Honor, Plaintiff moves Joint Exhibit 1 for admission into evidence.

MR. FINDLAY:  No objection.

THE COURT:  Admitted.

MR. MCCARTY:  Mr. Diaz, can you put that Joint Exhibit 1 up.

Q.  (By Mr. McCarty)  All right.  Now, if you were still, I think you said, almost like a year away from being able to put something on file, why did you send this letter out to -- out to Acer?

A.  I wanted to, first of all, put them on notice regarding these patents -- my patents.

Q.  Okay.  And what's the point of that?

A.  Yeah.  So the point, it just says right there, so it's basically to engage in discussions regarding the amount of

damages appropriate to remedy Acer's use of the patents.

Q.   Now, is there a legal requirement in the patent laws that you were trying to follow, too?

A.   Yes.   So the law requires that I put the potential infringer on notice regarding the patents.

Q.   In connection with what, with the Samsung license?

A.   No, no.   It's -- in connection -- I mean, while I was negotiating the license with Samsung, yeah, it was important to do because -- actually, if I signed the license before I sent a letter, I was afraid that Acer would come back later and say that they didn't owe any money.

Q.   So you were being careful?

A.   Yes, I was just trying to be careful.

Q.   In looking at this letter here, who did this letter get sent out to, sir?

A.   So this letter was sent to Acer America.

Q.   And in that letter to Acer, were you careful to make sure that you listed the relevant patents at issue in the case?

A.   Yes, sir.

        MR. MCCARTY:   So, Mr. Diaz, if you could highlight that '397 patent.

Q.   (By Mr. McCarty)   Is that highlighted there?

A.   Yes, it is.

Q.   Is that one of the patents at issue in the case?

A.   Yes.

Q.   What about the '135 patent, did you list that one for them?

A.   Yes, sir.

Q.   And is that the second patent at issue in the case?

A.   Yes.

Q.   And the '191 patent, is that listed here, sir?

A.   Yes, it is.

Q.   And what about the '205 patent, did you list that one?

A.   Yes, sir.

Q.   Okay.  And did you also identify for Acer some exemplar products that they had that you believed to be infringing your patents?

A.   Yes, I did.

Q.   Why would you do that?

A.   Well, I basically wanted to get them up to speed so they can quickly confirm on their end that the patents -- patents are indeed being infringed.

Q.   So at the bottom there, what was the point of the letter, other than to make sure you were complying with those patent laws that you were talking about?  What was the point of the letter down there at the bottom?

A.   Yes.  So the point was basically to engage in discussions regarding the -- the amount of damages that

would be appropriate.

Q.  A license?

A.  Yeah.  For a license, yeah.

Q.  Did you keep a record of delivery so that you knew if and when that letter was delivered to Acer America?

A.  Yes, I was careful to keep that information.

Q.  Thank you.

Can you turn in your binder to the next tab.

A.  Yes.

Q.  Is that a record of delivery there?

A.  Yes, it is.

Q.  Okay.

MR. MCCARTY:  Your Honor, Plaintiff moves PTX-21 for admission into evidence.

MR. FINDLAY:  No objection.

THE COURT:  Admitted.

MR. MCCARTY:  Mr. Diaz, can we see 21, please.

Q.  (By Mr. McCarty)  Okay.  Did the Post Office confirm delivery of your letter to Acer America on January 26th, 2021, about four days later?

A.  Yes.  In this case, it was USPA -- USPS.

Q.  And so at that point, you were -- it was confirmed that Acer had received notice of the patents in this case?

A.  Yes.

Q.  Now, did Acer America write back?

A.   Well, yes and no.

Q.   Okay.  What do you mean by that?

A.   Well, basically, we did receive an answer, but it didn't come from Acer America.  Instead, it came from Acer Inc., which is a Taiwanese parent company.

Q.   Can you please turn in your binder to the next tab, which would be Tab 9.

A.   Yes, sir.

Q.   Is this a copy of that response that you got for the -- from the Taiwanese parent company?

A.   Yes, sir.

        MR. MCCARTY:  Your Honor, Plaintiff moves Joint Exhibit 2 for admission into evidence.

        MR. FINDLAY:  No objection.

        THE COURT:  Admitted.

        MR. MCCARTY:  Mr. Diaz, can we see that one.

Q.   (By Mr. McCarty)  Is this the email response that, actually, your attorney at the time received in connection with your outreach to Acer America?

A.   Yes, sir.

Q.   Okay.  And what's the date on this correspondence here?

A.   So it says January 29 of 2021.

Q.   And who responded?

A.   It was Ms. Peggy Yo.

Q.   And Ms. Yo states that she's from Acer HQ Legal.  We

have received your letter dated January 26th -- or 22nd, 2021, sent to our AAC office.  For future references, please send all correspondences to our HQ, as all patent disputes are taken care of by HQ.

Did I read that correctly?

A.  Yes, sir.

Q.  So what did you understand that to be referring to?

A.  So from that I understood that all of the infringement is handled by their HQ office.

Q.  Now, did Ms. Yo take you up on your offer to immediately talk damages?

A.  No.

Q.  What does Ms. Yo ask for instead?

A.  Well, instead, she was asking me to provide so-called claim charts.

Q.  And what is a claim chart?

A.  Well, a claim chart is like a specialized document that is used to map, like, different claims or different features of the claimed invention to particular features in the -- in the products.

Q.  Okay.  Now, did you eventually get those claim charts together and get them to Acer?

A.  Yes, sir.

Q.  Did it take some time?

A.  It took a while.

Q.   Okay.  Why would it take a long time?

A.   Well, because in order to produce these claim charts, we had to purchase all these products, disassemble them, analyze them very thoroughly, and then make sure that everything matches, and then document that in the form of claim charts.

Q.   And was that going to take a long time?

A.   It took months and months.

Q.   About how many products did you have to cut open?

A.   About 50.

Q.   50 --

A.   Yes.

Q.   -- products?  You had to buy them all off the shelves?

A.   Yes, sir.  It was a lot of work.

Q.   How many charts did you have to make?

A.   Over a hundred.

Q.   A lot of late nights?

A.   Yeah.  There was a lot of work involved, and mostly after hours, you know, sleepless nights oftentimes.  And I had to engage my engineers, so not only me just working.

Q.   Now, before you gave those claim charts back to the parent company that had responded to you, did you get your patent suit on file first?

A.   Yes, sir.

Q.   Why would you put your patent suit on file first?

A.  Well, because I wanted to protect myself.  So basically, at the time, it didn't -- I didn't -- I felt uneasy that -- and I felt that it would be safer for me to put -- put the patent case on file before I actually provided the -- right before I provided the claim charts.

Q.  Thank you, Your Honor -- or thank you, sir.

If you'd turn in your binder to Tab 10, please.

A.  Sure.

Q.  Okay.  Now, you mentioned going through a long process of investigating Acer's products, you said almost 50; putting together, like, a hundred claim charts during a matter of a year.

Do you recall that?

A.  Yes.

Q.  Okay.  Is the information in Tab 10 in your binder the results of some of that investigation, research, and study?

A.  Yes, it's just one example, right.

Q.  Okay.  And -- and is that PTX-319?

A.  Yes, it is.

Q.  Okay.

MR. MCCARTY:  Your Honor, Plaintiff moves PTX-319 for admission into evidence.

MR. FINDLAY:  I'm not entirely -- can you show me what that is, please?

MR. MCCARTY:  You should have the binder there.

MR. FINDLAY:  What tab?

MR. MCCARTY:  It's your products.

MR. FINDLAY:  No objection.  Thank you.

THE COURT:  Admitted.

MR. MCCARTY:  Mr. Diaz, can you put that up.

Q.  (By Mr. McCarty)  All right.  What are we seeing here, sir?

A.  So we see here a retail box.  So basically, here we're confirming that we received the right product.  So it shows that it is the right model number, the manufacturer is correct, it's Acer, Predator is the model, and it has this, like, numeric identifier, like, XB323U in this case.

Q.  So XB323U is, like, the model number?

A.  It's the model number, yes.

Q.  And is this the physical product that you see once you open up that box?

A.  Right.  So on the left, you see, like, the front and back of the monitor.

Q.  And what are you focusing in on now on the right there?

A.  On the right, so we're -- it's, like, a label on the backside.  So we are confirming that it is an Acer product, that it has the same model number, XB323U in it, the product was manufactured in May of 2021.

Q.  What are we looking at now?

A.  So we're doing additional confirmation, like, we have

taken out the -- the back collar and we are checking the display -- I'm sorry, the display panel.

Q.   More verification here?

A.   Yes, some more verification.

Q.   And if we zoom in looking at this one, what do you see here?

A.   So we're seeing here a label on the -- on the back of this display panel inside.

Q.   And is there some information there about the manufacturer or the ODM?

A.   Yes.  In this case, it's AU Optronics.

Q.   Is that one of those ODMs that you're aware of?

A.   Yes.

Q.   All right.  Now, what are we looking at?

A.   So we're looking at the -- the same product, but we're -- we just lifted out this front screen, the LCD screen.  And on the left, on the bottom, you can see the backlight.  That's the piece that actually generates that light that illuminates the screen.

Q.   And is this all happening in your own lab now?

A.   Yes, sir.

Q.   Okay.  And so can you walk us through the components here, like on that second photo when it's illuminated? What are we seeing?

A.   Yeah, so basically when the images are on, you're

seeing that -- all that backlight, all that panel actually emits light, and so it emits light towards the display screen.

Q. All right. So zooming in even further, what are we seeing here?

A. So what we're seeing here is the -- actually, the internal structure of the backlight itself. So we're just opening it up and seeing what layers it includes.

MR. MCCARTY: Your Honor, may I put this on the easel?

THE COURT: Sure.

Ladies and gentlemen, can you see -- all of you see what he's...

Q. (By Mr. McCarty) Okay. Can you hear me okay?

A. Yes, sir.

Q. All right. So this is on the inside of that computer monitor that we just looked at, right?

A. That is correct.

Q. Okay. So what is generally it that we're looking at here?

A. So we're looking at the so-called backlight, or backlight and assembly.

Q. Okay. So can we kind of walk through these components one by one?

A. Sure.

Q.   Okay.  So what's here at the bottom in the dark space?

A.   That's the back collar of the panel.

Q.   And then up here where it gets a little bit lighter, what's that now?

A.   That's the reflector layer.

Q.   And then the thicker layer right here, what's that?

A.   It's a waveguide.

Q.   Your waveguide?

A.   Yes, sir.

Q.   Okay.  And then what about up here, what's that next one?

A.   So that's the so-called quantum dot enhancement film, or QDEF, in short.

Q.   The one we talked about in opening?

A.   Yes, that includes quantum dots.

Q.   And what about this next one here?

A.   That's a diffuser layer.

Q.   And the next one?

A.   That's a composite prism sheet.

Q.   And the next one?

A.   That's yet another diffuser on top.

Q.   Thank you.

     Now, this looks pretty zoomed in.  What are we looking at here?

A.   Yeah, so it's like a magnified photograph taken under a

microscope of just a corner of that waveguide.  And you can see here that it -- on the top surface it has this, like, little ridges which are actually the -- the cylindrical lenses that are part of the -- our invention.

Q.  Those are those lenses that we talked about earlier --

A.  Yes.

Q.  -- from your patent?

A.  Yes, sir.

Q.  Okay.  And what are we looking at here, sir?

A.  So we're looking here at the back surface of the waveguide.  And, here, also at high magnification.  It's very high magnification taken under a microscope.  So here you can see these little microstructures distributed over the area of the -- of the waveguide.  And these are very tiny.  And, importantly, they're also separated from each other by this -- flat portions of the surface.

Q.  Thank you.

So back to the screen here.  What did I just put an arrow on?

A.  So this thicker piece is actually our optical -- planar optical waveguide.

Q.  And just like we saw in the blown-up slides --

A.  Yes.

Q.  -- what's on the top of that waveguide?

A.  So on the top of that waveguide, we have these parallel

lenses.

Q.   What's on the back of that waveguide?

A.   On the back of it are these microstructures.

Q.   What are you showing on the screen here now?

A.   So on this screen, we're seeing the same photographs on the top.  But below them, there are, like, even -- like, images of even much higher magnification which were taken using this highly specialized equipment which is called optical -- 3G optical profile.  And this allows it to actually see in three dimensions individual features that are as small as these lenses and these microstructures.

So on the left, we are seeing, like, an individual lens in 3D.  And on the right, on the bottom, we see the 3D image of an individual microstructure.

Q.   So are you actually using these instruments and using these tools to measure precisely exactly how those products work?

A.   Exactly.  That's what we did.

Q.   And you're doing this right in your lab?

A.   Yes, sir.

Q.   Now what are you showing?

A.   So I'm showing here on the bottom is the -- the results of that analysis using the 3D optical profiler so where we measure, like, the -- an image and measure, like, cross-sectional profiles.  We measure the sizes, we

measure, like, different characteristics, like, curvature of these lenses, and many other parameters.

Q. So you were doing this for, like, all 50 or so of those products?

A. Yes, sir. Exactly in the same manner.

Q. Thank you.

Now, on this next one here, what are we highlighting on this one?

A. So these are the actual LED sources that are used in this system. So it's an edge-lit system, as I explained before.

Q. So those are those little blue lights that go into the -- into the edge of your waveguide?

A. Exactly.

Q. Okay. Thank you.

Now, did you perform the same analysis across all the products that you had access to?

A. Yes, sir, that's what I did.

Q. And for all those product investigations, did you personally take the images, study the products, document the components, run the tests, run the microscopes and the software, do all those tools together?

A. Yes. I either did it myself or directed my engineers to perform these tasks. And, of course, I verified everything personally.

Q.  And for all those product investigations, did you catalog precisely the images, the data, the test results, in the same way that you did for the one that we just walked through?

A.  Yes, sir.

MR. MCCARTY:  Your Honor, Plaintiff moves PTX-285 through PTX-335 into evidence.

MR. FINDLAY:  No objection.

THE COURT:  Admitted.

Q.  (By Mr. McCarty)  Dr. Vasylyev, if the jury wants to go back and look at all those tests, all those images, all those products, did you also create a summary table that organizes that information to help the jury?

A.  Yes, sir.

Q.  Is that PTX-284?  I think it's Tab 11 in your binder, sir?

A.  Yes, it's PTX-284.

Q.  Okay.  And if you have a look at that document there, is that the summary table that goes through all those products and catalogs them nicely?

A.  Yes, sir, it is.

MR. MCCARTY:  Okay.  Your Honor, Plaintiff moves PTX-284 into evidence.

MR. FINDLAY:  No objection, Your Honor.

THE COURT:  Admitted.

MR. MCCARTY:  If you can pull up PTX-284, Pete.

Q.  (By Mr. McCarty)  Okay.  So this is that table that goes through all those products, sir?

A.  Yes, sir.

MR. MCCARTY:  And if you can scroll down just a little bit to 319 -- PTX-319.  On the table there, Mr. Diaz.  There you are.

Q.  (By Mr. McCarty)  And so the example one we just walked through, that's the Acer XB323U, correct?

A.  Yes, that's exactly the model of the monitor.

Q.  And that's this one right here?

A.  Yes, sir.

Q.  Is it fair to say that the investigation resulted in a lot of data? a lot of evidence? a lot of images?

A.  Yes, huge amount of data.

Q.  Is this just some of the data right here --

A.  Yes, sir.

Q.  -- that you gathered?

A.  Yes.

Q.  And these are all the test results and all that?

A.  Yes, sir.

Q.  Now, given your experience with the technology, the patents, the products, is it now time for you to offer infringement opinions in the case?

A.  No, that's not my role in this case.

Q.  So you're not going to go through the patent claims and compare them to the products, right?

A.  No, sir.

Q.  Okay.  Why aren't you going to be the one that does that?

A.  Well, first, I'm not an expert, like, in patent infringement analysis.  And, second, I was not allowed to see certain documents and certain pieces of information that's been part of this case.

Q.  From the Plaintiff's side, who is going to be helping the jury walk through the actual infringement case where you focus on the claims and you focus on the products?

A.  That would be Mr. Credelle.

Q.  Okay.  Now, given your experience with your own patents and with these products and researching them, are you going to help us calculate damages?

A.  No, sir, that's not my role in this case either.

Q.  So from Plaintiff's side, who will be explaining how much Acer owes in a royalty for its infringement?

A.  It would be Dr. Farber.

Q.  All right.  Thank you, sir.

     Do you normally wear a coat and tie to work?

A.  No, not at all.

Q.  Is this a new experience for you?

A.  Yes, it's a completely new experience.

Q.   I want to do one thing before I sit down, if I could.

MR. MCCARTY:  Mr. Diaz, can you pull up PTX-6, which is the '397 patent.

Q.   (By Mr. McCarty)  Dr. Vasylyev, is this the first patent that issued in this case?

A.   Yes, sir, it is.

Q.   If we zoom in the top right there, what's the date on the corner that the Patent Office issued that patent?

A.   It says June 3rd of 2014.

Q.   What day is today?

A.   It's June 1st of 2024.

Q.   It's June 3rd of 2024?

A.   June 3rd, 2024.

Q.   Sitting here today, there's a jury in the box, a courtroom full of lawyers, other personnel empaneled together, exactly 10 years after -- to the day after the United States granted you and your company the first patent at issue in this case.

Can you look at the jury and tell them how you feel.

A.   Well, it really feels humbling.  So we're all here for my small company, for all of the inventions that I made, like -- all of that research involved, like, more than 15 years ago and for all this, you know, patents in this case that started issuing, like, 10 years ago, it

really feels humbling.  And I'm really glad and thankful for this process to exist to protect my technologies, my inventions from being taken by others.

Q.  Thank you.

MR. MCCARTY:  I pass the witness, Your Honor.

MR. FINDLAY:  Cross-examination, Your Honor?

THE COURT:  Please.

MR. FINDLAY:  Thank you.

Can we approach, Your Honor?

Thank you, Your Honor.  May I proceed?

THE COURT:  Please.

                    CROSS-EXAMINATION

BY MR. FINDLAY:

Q.  Good morning, Dr. Vasylyev.

A.  Good morning.

Q.  You and I have never met formally, but you understand my name is Eric Findlay, and I represent -- one of the lawyers who represents Acer in this case, correct?

A.  Correct.

Q.  Sir, to file the complaint in this case, all you needed to do was draft the complaint and pay some money, you go down to the clerk's office, and you file the complaint, agreed?

A.  I disagree.

Q.  There's no patent police when you file a complaint for

patent infringement. Are you aware of that, sir?

A. No.

Q. You think there's patent police?

A. No, I don't.

Q. So you agree with me, there's no patent police when you file a complaint for patent infringement? Do you agree with that statement?

A. My understanding, that there is not, but I have no information about that.

Q. You're aware, are you not, sir, that all your lawyers had to do when they filed this complaint against my company was pay a filing fee and file the complaint -- we do it electronically these days -- with the court. Are you aware of that?

A. No, sir, I don't know how this process works exactly. I am not a lawyer myself.

Q. Fair enough.

You do understand, do you not, that just like you have a right to be sitting here today trying to tell the jury that you think we infringe your patents, we have every bit as equal a right to be here defending ourselves from those allegations, correct?

A. Yes, sir.

Q. We are entitled to our day in court, as well, correct?

A. That is correct.

Q.   And you understand we vehemently disagree with your assertions of infringement in this case, correct?

A.   That's my understanding.

Q.   You did not invent LED displays, correct, sir?

A.   That's correct.

Q.   You did not invent LCD displays, correct, sir?

A.   That is correct.

Q.   You did not invent quantum dots, correct?

A.   That is correct.

Q.   You did not invent edge-lit backlights, correct?

A.   That is correct.

Q.   You did not invent the use of light guide plates in backlights, correct?

A.   That is correct.

Q.   You did not invent the use of light-deflecting elements on the bottom surface of a light guide plate, correct?

A.   That is correct.

Q.   You did not invent the use of reflective sheets below the light guide plates, correct?

A.   Yes, sir.

Q.   You did not invent the concept or the idea of using prism sheets, also called light brightness enhancement filters, above the light guide plates and backlights, correct?

A.   Yes, sir.

Q.   Those were old things known -- I think they were invented and sold by 3M years ago, correct?

A.   Yes, sir.

Q.   You didn't invent the use of cylindrical lenses on the top surface of the light guide, did you, sir?

A.   I disagree.

Q.   You didn't invent backlight assemblies, correct?

A.   Yes, sir.

Q.   You didn't invent diffusers, correct?

A.   Yes, sir.

Q.   You didn't invent composite prism sheets, correct?

A.   Yes, sir.

Q.   You talked a little bit about Samsung.

     Are you aware that Samsung has a solar division within its company, sir?

A.   No, sir.

Q.   So if you -- if you found that out, you'd be surprised by that; is that fair?

A.   Yes.

Q.   Okay.

     MR. FINDLAY:  Can we pull up Vasylyev No. 1, please.  Dr. Vasylyev No. 1, pardon me.

Q.   (By Mr. Findlay)  You were here for opening statements, correct, sir?

A.   Yes, sir.

Q.  And I showed portions of this, and this is your LinkedIn page, correct?

A.  Would you guide me, please.  I'm not sure I'm looking at the right --

Q.  Let me see.  I'm not sure if I have -- let me give you that notebook then.

A.  Okay.

MR. FINDLAY:  May I have the notebook, please.

May I approach, Your Honor?

THE COURT:  Sure.

THE WITNESS:  Thank you.

MR. FINDLAY:  You're welcome.

Q.  (By Mr. Findlay)  Do you see that?

A.  Once again, what is the tab number?

Q.  I believe it's Tab 1.

A.  There's no Tab 1.  It starts with --

Q.  Well, can you look at it on the screen with me, sir?

A.  Yes, sir.

Q.  Do you recognize that?

A.  Yes, sir.

Q.  That's a picture of you, correct?

A.  Yes, sir.

Q.  Identifies you as president and CEO of Lucent Optics, correct?

A.  That is correct.

Q.   Okay.   This is a portion of your LinkedIn page, correct?

A.   It looks like it.

Q.   Okay.   You put that information there, right, sir?

A.   Right.

Q.   It's accurate, correct?

A.   If it is a portion -- the current portion of the LinkedIn page, then, yes.

Q.   Okay.

A.   Of course I put it.

Q.   Now, Lucent Optics is what you're doing business as under SVVTI; is that right?

A.   That is correct.

        MR. FINDLAY:   You can take that down.   Thank you.

Q.   (By Mr. Findlay)   When did you -- well, you founded SVVTI when?   When was that first founded, sir?

A.   In the year 2000.

Q.   Okay.   When did you start doing business as Lucent Optics?

A.   I don't remember exactly, but I think around, like, 2011 or '12.   Around that time.

Q.   And the business of SVVTI doing business as Lucent Optics is the research and development and information technology and environmental protection, correct?

A.   This is what it was initially when I started.

Q.   That's -- that's what you told the State of California that the business of SVV was, correct?  Research and development and information technology and environmental protection?

A.   Yes, sir.

Q.   Okay.  And then at some point, you started going by Lucent Optics, correct?

A.   That is correct.

Q.   That was your decision -- was -- was it you that chose the name Lucent Optics?

A.   Yes, sir.

Q.   Okay.  And you would agree with me, though, Lucent Optics -- and that word "Lucent" there has nothing to do with the Lucent Technologies that the jury may remember was spun out of AT&T years ago, does it?

A.   That's correct.  It's -- has nothing to do.

Q.   Totally separate, right?

A.   Yes, sir.

Q.   Did you choose the name Lucent because you hoped folks might get confused and think you had something to do with that -- that large American company?

A.   No, sir.  It has nothing -- had nothing to do with that.

Q.   Because you'd agree, if you -- if that was your intention, you would agree that wouldn't have been

appropriate, would it, sir?

A.   I disagree with that.

Q.   If you had intentionally chosen the word "Lucent" because you were hoping someone would confuse you or think you had something to do with the company Lucent Technologies, you would agree with me that would not have been appropriate, correct?

A.   No, sir.   And my company name was not Lucent.   Lucent Optics.

Q.   So was it just a coincidence that you happened to pick the name Lucent as your d/b/a, and that just happened to be associated with a large, successful United States corporation from years ago?

A.   It was a coincidence.

Q.   Complete coincidence?

A.   Yes, sir.

Q.   Okay.

        MR. FINDLAY:  Can we pull up Dr. Vasylyev No. 3, please.

Q.   (By Mr. Findlay)  And this is the Lucent Optics website, correct?

A.   That is correct.

Q.   And I'll represent to you this is live.  We are at your website live right now as it appears if somebody were to go on it, correct?

A.  Yes, sir.

MR. FINDLAY:  Can you scroll up a little bit.  Or scroll down, I guess it is.  Thank you.

Q.  (By Mr. Findlay)  And this highlights your work in cost-effective solar energy harvesting.  Did I read that correctly?

A.  Yes, sir, you did.

Q.  It highlights energy-efficient LED lighting; is that correct?

A.  Yes, sir.

Q.  And advanced daylighting components; is that correct?

A.  Yes, sir.

Q.  Okay.

MR. FINDLAY:  And if you scroll back.

Q.  (By Mr. Findlay)  If we move our mouse over products, we see four products identified there, correct?

A.  Yes, sir.

Q.  Something called a Daylighting Fabric.

Do you see that?

A.  Yes, I do.

Q.  Luminyl, did I pronounce that correctly?

A.  Yes, sir.

Q.  Okay.  We see something called a daylighting window film.

Do you see that?

A.   Yes, sir.

Q.   And a Panaglo daylighting window panel, correct?

A.   Yes, sir.

Q.   Those are the products that you're representing you're developing or selling; is that fair?

A.   Yes, sir.

Q.   Are these products actually for sole -- for sale anywhere right now, sir?

A.   No, sir.

        MR. FINDLAY:  Could you go to the "About" and click on that, please.  Well, there we go.

Q.   (By Mr. Findlay)  And the -- you see it says:  About Lucent Optics?

A.   That is correct.

Q.   And this is you telling the world what Lucent Optics is about, fair?

A.   Yes, sir.

Q.   And the first sentence there:  Lucent Optics is dedicated to creating impactful technology solutions for energy efficiency and renewable energy.  Our primary focus is optical technologies that enhance solar energy harvesting and save energy use -- used for lighting.

        Did I read that correctly?

A.   Yes, that is perfect.

Q.   And now if we look down at the management team, we see

yourself, correct?

A.   Yes, sir.

Q.   Who is Mr. Masalitin?  Did I pronounce that correctly?

A.   Yes, sir.

Q.   Who is he, sir?

A.   He is our director of engineering.

Q.   And how long has he worked for you?

A.   For more than 12 or 14 years.

Q.   Is he related to you in any fashion?

A.   No, sir.

Q.   And then the other, Dr. Viktor Vasylyev, that's your father, correct?

A.   That is correct.

Q.   And what role or capacity does he play in the company today, sir?

A.   He is our advisor -- our advisor in solar technologies, and also, like, science director.

Q.   And do you pay him a salary?

A.   Not currently.

Q.   Do you pay Mr. Masalitin a salary?

A.   Yes, sir.

Q.   And you pay yourself a salary, I assume?

A.   Yes, sir.

Q.   Okay.  Now, as to SVV and Lucent Optics -- and what would be better in your mind, should we refer to you and

your company as SVV or Lucent, what would you prefer so we don't get confused and so we're on the same page?

A.   SVV.

Q.   SVV.   Okay.   We'll call it SVV.

You are the sole corporate officer of SVV, correct?

A.   Yes, sir.

Q.   You are the -- if there's a board of directors, it's just you for SVV, right?

A.   That is correct.

Q.   You're the sole stockholder in SVV?

A.   Yes, sir.

Q.   And you make the financial decisions for the company, correct, sir?

A.   Yes.

Q.   It was your decision to file a lawsuit against my client, wasn't it, sir?

A.   That is correct.

Q.   And you decide in your company who gets paid what, right?

A.   Yes, sir.

Q.   You also mentioned, I think, when you were on direct that -- she's not listed here, but your wife, is that Ms. Tetyana?

A.   That's correct.

Q.  How do you pronounce her last name?  It's a little different than yours.

A.  Yes, sir.  Vasylyeva.

Q.  Vasylyeva.  And what does she do for the company again?

A.  She's doing administrative work and also helps with some experiments.

Q.  And the company offices are located in Sacramento?

A.  That is correct.

Q.  Okay.  Does she -- you said she was also, I think, in -- in the sciences.  Is she a -- does she have a teaching job someplace, was she a professor somewhere, or no?

A.  No, sir, she's no longer doing that.

Q.  Okay.

        MR. FINDLAY:  You can take that down now.

Q.  (By Mr. Findlay)  In opening statements, I was correct when I told the jury, was I not, sir, that your Ph.D., or the dissertation that you submitted for your Ph.D. was -- had to do with the study of celestial bodies, correct?

A.  That is correct.

Q.  Okay.  And, obviously, that -- your dissertation had nothing to do in connection with designing of computer monitors, correct?

A.  Yes, sir.

        MR. FINDLAY:  Can we pull back up Vasylyev 7, or

go to the LinkedIn website again and look at the experience listed there, please.

Q.   (By Mr. Findlay)  While they're pulling that up, let me ask you about some of the things you talked about at -- with your lawyer on direct.  If we go down to the senior team analyst lead when you were the IT head at -- in Sacramento, do you recall that?

A.   Yes, sir.

Q.   You had no responsibility or involvement in the designing of computer monitors, correct?

A.   That is correct.

Q.   When you were --

        MR. FINDLAY:  If you could scroll down, please.

Q.   (By Mr. Findlay)  The one at the top, the project director when you worked at the electromagnetic research facility, that had nothing to do with the design of computer monitors, correct, sir?

A.   That is correct.

Q.   And same with respect to -- it's blocked there, but when you were a research scientist back in Ukraine at the Institute of Radio Astronomy, that had nothing to do with computer monitors, correct, sir?

A.   Yes, sir.

        MR. FINDLAY:  Could I have the ELMO quickly.

        Thank you.  I'm not seeing anything on my screen.

Are you seeing anything on your screens, ladies and gentlemen?  That's fine, I can just hold it up.

Q.  (By Mr. Findlay)  Do you recall this slide that your lawyer showed in opening statements?

A.  Yes, sir.

Q.  Okay.  It talks about research grants, doesn't it?

A.  Yes, it does.

Q.  And it lists the United States Department of Energy, Office of Science, correct?

A.  Yes, sir.

Q.  National Science Foundation?

A.  Yes, sir.

Q.  And the California Energy Commission?

A.  Yes.

Q.  And something called S-M-U-D, SMUD kind of -- what does that stand for?

A.  It's Sacramento Municipal Utility District.  It's a local utility company in Sacramento.

Q.  Okay.  You've gotten governmental grants -- thank you.  You've got governmental grants from the United States Department of Energy, right?

A.  That is correct.

Q.  And you've gotten grants from the National Science Foundation.  That's what this slide is telling us, correct, sir?

A.   Yes, sir.

Q.   And the State of California has given you grants from the California Energy Commission, correct?

A.   Yes, sir.

Q.   And to be clear, when we're talking about government grants, we're talking about either U.S. taxpayers or California taxpayer dollars, correct?

A.   Yes, sir.

Q.   Do you know if you added up all the money that you've received from these grants, what it would total, Dr. Vasylyev, as you sit there right now?

A.   No, I don't know.

Q.   You have a guess?

A.   Several million dollars.

Q.   How about -- it's about -- just shy of $6 million, isn't it, sir?

A.   Okay.

Q.   That sound about right to you?

A.   It could be, but I don't have that number.

Q.   When did you get your first grant?

A.   I think it was more than 10 years ago, maybe even more than 15 years ago.

Q.   And how did this come about?  Did you just apply for these grants; or how did it happen, that thought, you know what, maybe I can get some government funding to help my

business?

A. Yes, sir. So there are different ways. So -- and there are different programs. So which specific program are you --

Q. Let's start with the -- it looks to me like the first one you got was from the Department of Energy. So what about the Department of Energy? How did you -- how were you able to get grants from them?

A. Yeah, first of all, it was not the first one, so just to clarify.

Q. What do you think was the first grant that you got, and from whom, sir?

A. It was in form of a contract. It was not a grant. It was contract with the Sacramento Municipal Utility District. So they administered the grant -- and they received the grant from the California Energy Commission, and they administered that grant. And they -- I was a subcontractor for them -- my company was subcontractor.

Q. Is it -- it's true, isn't it, that you wanted these monies, you wanted these taxpayer grants, in part, to supplement funding and to pursue your development of technologies and products, correct?

A. Yes, sir.

Q. Okay. But you just told us that despite getting nearly $6 million in U.S. taxpayers and California taxpayer money,

SVV doesn't sell any products right now; isn't that true, sir?

A.   It does not currently sell products.

Q.   So where did the money go?

A.   It went into the research and development and creating technologies.

Q.   Went into your pocket is where it went, Dr. Vasylyev, correct?

A.   That is wrong.

Q.   SVV is an S corp, correct, sir?

A.   Yes, sir.

Q.   Do you know what that means?  It's a flow-through, correct?

A.   Yes, sir.

Q.   Okay.  So these checks, some $6 million worth of checks, they were made out and the check probably said SVVTI, correct?

A.   This is not how it works.

Q.   What did the checks say, sir?

A.   It is not how it works.

Q.   That wasn't my question, sir.

I'm asking when you got the check, and we'll look -- we'll look at this further, in 2010, you got a check for $1 million -- you got a grant for $1 million from the DOE.  I'm asking when those monies were disbursed to

you, whether all at once, whether in part, what did the checks say?  Who was it made out to?

A.   It was made to SVV Technology Innovations.

Q.   And you're the sole shareholder?

A.   That is correct.

Q.   You make all the financial decisions?

A.   Yes, sir.

Q.   And it's a pass-through corporation, correct?

A.   Yes, sir.

THE COURT:  Are you at a place we can break?

MR. FINDLAY:  Certainly, sir.

THE COURT:  Ladies and gentlemen of the jury, we'll take our afternoon recess.  If you'll be back by about 1:15, we'll get started at 1:30.

Please remember my instructions not to discuss the case amongst yourselves.

COURT SECURITY OFFICER:  All rise.

(Jury out.)

THE COURT:  You may step down, sir.

You may be seated.

Is there anything we need to take up?

MR. FINDLAY:  Not for me, sir, Your Honor.

THE COURT:  Who will we have as a witness after this gentleman?

MR. MCCARTY:  When this witness leaves the stand,

the next witness Plaintiff will call is Mr. Thomas Credelle. He's right there. He's going to be our technical expert, and he'll be about two and a half hours of direct testimony.

THE COURT: Okay. And who will come -- assuming we finish today with cross, and we may or may not, who would the next witness be?

MR. MCCARTY: If there's a little time left over before we finish, we have a deposition that we can present.

THE COURT: That'd be great.

Just to be clear, is this the gentleman -- I assume because it's your client, is this the person you would designate to be the person -- I've said you had one person you can talk to?

MR. MCCARTY: This is our corporate representative.

THE COURT: Oh, okay. And the same will be true for the Defendant --

MR. FINDLAY: Yes, Your Honor.

THE COURT: -- if that person happens to be on cross when we break. So to be clear, you are permitted to speak to him.

MR. MCCARTY: Thank you, yes.

THE COURT: Back at 1:15ish, and we'll start at 1:30.

MR. FINDLAY:  Thank you.

COURT SECURITY OFFICER:  All rise.

(Recess.)

COURT SECURITY OFFICER:  All rise.

THE COURT:  Please remain standing for the jury.

(Jury in.)

THE COURT:  You may be seated.  Thank you.

If we would have the witness back up here, please.

MR. FINDLAY:  May I proceed, Your Honor?

THE COURT:  Sure.

MR. FINDLAY:  Thank you.

Q.   (By Mr. Findlay)  Welcome back, Dr. Vasylyev.

A.   Thank you.

Q.   When we -- before lunch, before we broke, we were talking about the government taxpayer funding that SVV has received throughout the years.

Do you recall that?

A.   Yes, sir.

Q.   And you recall we had established that the amount is just a little bit under $6 million, does that sound about right to you?

A.   It does.

Q.   Okay.  And those are all public records, correct?

A.   Yes, sir.

Q.   Okay.  Now, how much of that $6 million do you think

went into the patents and this lawsuit, Dr. Vasylyev?

A.   None of that.

Q.   None of that?

A.   Yes.

Q.   That's your testimony?

A.   Yes, sir.

        MR. FINDLAY:  Can we have the ELMO, if it's working.  If not, we'll try it the other way.  There we go.

Q.   (By Mr. Findlay)  As we just established, these are the grants, and the amounts are all available to the public. You're aware of that?

A.   Pardon me, what was the question?

Q.   Yes.  The grants, the grant information, the amounts and the folks they come from, that's all publicly available information?

A.   Yes, sir.

Q.   We were able to get this off the various websites, you understand that?

A.   Yes.

Q.   And I've put a timeline together of the different grants that we were able to determine.  And the earliest one looks like it started in December of 2007.

        Do you see that?

A.   Yes, sir, I do.

Q.   Okay.  And then the most recent one was one for

$1 million by the Department of Energy in 2022.

Do you see that?

A.  Yes, sir.

Q.  Do you have any other outstanding grants that you're waiting to figure out whether or not they're going to be given to you, as you sit there today?

A.  Yes, there are.

Q.  How many?

A.  Three or four.

Q.  Okay.  Who are they with, or who are you requesting grant monies from with those three or four that are still pending right now?

A.  Currently, these are for the U.S. Department of Energy.

Q.  Okay.  And what's the total amount of those three or four grants outstanding, approximately?

A.  Approximately somewhat around -- about a million dollars.

Q.  I'm sorry?

A.  Some -- about $1 million.

Q.  $1 million?

A.  Yeah.

Q.  All right.  So if you get that, then we'd be looking at nearly $7 million in grants from various governmental agencies since 2007; is that fair?

A.  Yes, sir.

Q.   Okay.   What are the other sources of revenue that SVV has in any given year, sir?

A.   We also sell products, sell services.

Q.   Well, earlier in your cross-examination, you admitted that, currently, SVV is not selling any products, correct?

A.   Yes, sir.

Q.   So you're not selling any products, as you sit here today, right?

A.   Right now.

Q.   Okay.   What services are you selling?

A.   So we sell design services.   We help other companies, for example, design waveguides for their own products.

Q.   And how much in revenue do you think that's generated as of this year, as of June 3rd of 2024?

A.   Oh, we didn't perform the services this year.

Q.   So you haven't performed those services this year?

A.   This year, no.

Q.   Okay.   How much revenue -- apart from the grant monies that might be in SVV's bank accounts, how much revenue can you estimate for this jury that SVV has generated in the first six months of 2024?

A.   Could you repeat the question.   I'm sorry.

Q.   Yes.   In the first six months of 2024 --

A.   Okay.

Q.   -- how much revenue can you estimate for the jury that

SVV has received other than potential grant money?

A.   No, we didn't receive other sort of money from other sources in this year.

Q.   So you didn't receive anything from any other, I guess, private sources for the first six months of this year; is that correct, sir?

A.   That's correct, yes.

Q.   Now, you see in this timeline that I put up, I put the filing dates of the '397, the '191, the '135, and the '205.

Do you see that?

A.   Could you repeat that, please.

Q.   Yes.

On the -- on the timeline that you see there, below I put the filing dates -- the approximate filing dates of the '397, 2012.

Do you see that?

A.   Yes, sir.

Q.   And that's correct, is it not?

A.   I don't remember the -- the year in which this patent was filed.

Q.   I've got it right here in front of me.  And if you want, we can look at it, but I'll represent to you that it says filed January 17th, 2012.  Does that refresh your memory?

A.   No, I'll just take your representation.

Q.   Okay.  Fair enough.

And the same for the '191, I have here that it was filed in 2017, May.  Does that sound right to you?

A.   The same answer.

Q.   Okay.  For the '135, it was December of 2019, as shown on the timeline.  Does that sound right?

A.   Same answer.

Q.   Okay.  And then, finally, the '205 was, again, September, so fall or third quarter of 2019.  That sounds about right?

A.   Possibly.

Q.   Okay.  And then you testified on direct examination that I think the first provisional application you filed was sometime back in 2009.

Do you recall that?

A.   Yes, sir.

Q.   I think you said spring of '09.  Does that sound right?

A.   Yes, sir.

Q.   And then you filed another provisional in 2010 in March of that year.  Does that sound right?

A.   Yes, sir.

Q.   And then I think you filed a third provisional, you said just a couple months after that.  Does that sound correct?

A.   Yes, sir.

Q.  And, obviously, these filing dates of the patents, the filing dates of the provisional are all intermingled with various grant awards, correct?

A.  I don't disagree with your characterization as intercommingled.

Q.  The filing dates of the patents, the filing dates of the provisional applications, are all within, near, or around some of the dates where these grants were awarded, correct?

A.  Okay.  That's fair.

Q.  Is that fair?

A.  Yes.

Q.  Is it your testimony under oath, sir, to this jury that none of those grant monies, none of those public tax dollars had anything to do with these provisional or these applications being filed?

A.  Yes, sir.

Q.  Do you keep records to that regard, sir?

A.  What kind of records?

Q.  Financial records.  Do you have financial records that would prove that is the case, sir?

A.  To prove the case of what?

Q.  That you didn't use U.S. taxpayer dollars, California taxpayer dollars to fund these patents and to fund this lawsuit?

A.   Well, I'm not sure that I understand your question fully.   So what kind of financial records would identify that exactly?

Q.   If you don't have them, you don't have them.

MR. FINDLAY:   I'll move on, Your Honor.

Q.   (By Mr. Findlay)   I'll move on, Dr. Vasylyev.

A.   Okay.

Q.   Going back to the patents, the '397 patent, you were here for opening statements, right?

A.   Yes, sir.

THE COURT:   Could I have counsel up here just for a second.

MR. FINDLAY:   Yes.

(Bench conference.)

THE COURT:   Do you have evidence that the grants were used?

MR. MCCARTY:   The answer is no.

MR. FINDLAY:   No, I don't have evidence --

MR. MCCARTY:   He testified in his deposition that his --

THE COURT:   Then I'm going to give them that instruction --

MR. MCCARTY:   Please do.

THE COURT:   -- and explain to them it's been a total waste of time.   It's been completely irrelevant, and

I keep waiting.  Are you telling this jury that none of the grant money went --

MR. FINDLAY:  I'll --

THE COURT:  Are you telling them that?  You've said it like 20 times, and I've been waiting for you to say, well, then let me show you this.

And now you just said:  Do you have any proof that it did?

And he says:  Huh-uh.

So what we're going to do is you, Plaintiff, are going to come up with some kind of corrective language --

MR. MCCARTY:  Yes, sir.

THE COURT:  -- which I'm going to read to them --

MR. MCCARTY:  Yes, sir.

THE COURT:  -- whenever you finish.

MR. MCCARTY:  Thank you.  And I was -- I did not want to interrupt his cross-examination.  I was going to seek your corrective instruction.  So I'm glad that we had this instruction.

THE COURT:  You can say -- you can say whatever you want because my guess is it would be less caustic --

MR. MCCARTY:  Understood.

THE COURT:  -- than what I would say.

MR. MCCARTY:  Okay.  Thank you, Your Honor.

(Bench conference concluded.)

MR. FINDLAY:  May I proceed, Your Honor?

THE COURT:  Yes.

Q.  (By Mr. Findlay)  The '397 patent, PTX-006, you were here for opening statements, Dr. Vasylyev?

A.  Yes, sir.

Q.  And you heard me represent to the jury that the word "computer" and the word "monitor" does not exist anywhere in that patent?  You remember me making that statement?

A.  I'm not sure I recall the exact statement, but I --

Q.  Would you agree with me, sir, that the word "computer" or the word "monitor" does not appear anywhere in the '397 patent?

A.  I'm not sure about that.  I would need to see a document -- that document.

Q.  Do you have any reason to dispute my representation that we word-searched that document, as you can do in a PDF, and the word "computer" and the word "monitor" does not show up?  Do you have any reason to disagree with that?

A.  I don't know.

Q.  Same question with respect to the '191.  Isn't it true, sir, that the word "computer" and the word "monitor" does not appear anywhere in the '191 patent?

A.  I'm not sure about that.  I don't know.

Q.  Same question with respect to the '135, isn't it true that the word "computer" or the word "monitor" doesn't

appear anywhere within that patent?

A.   I don't know.

Q.   And, lastly, with the '205, again, isn't it true, sir, that neither the word "computer" nor the word "patent" (sic) appears anywhere within those -- within that patent?

A.   I don't know.  I didn't do a word search like you did.

Q.   Do you recall during opening statements, and then I think during some of your testimony with -- with your counsel, you talked about some of the alleged benefits of these patents?

A.   Yes, sir.

Q.   I think you talked about things of, like, brightness, view angle, display thickness, things of that regard?

A.   Yes, sir.

Q.   Isn't it true, sir, that those specific allegations and those specific alleged benefits are not spelled out or written out anywhere in any four of these patents that are asserted?

A.   They may not have been spelled out exactly like that, but they're implied from the other benefits that are explained in the patents.

Q.   But those words themselves don't appear in the patents as an alleged or claimed benefit; is that true?

A.   I don't know.

Q.   And these patents-in-suit that we're talking about,

they were all drafted and prosecuted primarily by yourself; is that correct?

A.   That is correct.

Q.   Which means you wrote them and you chose the words that went into them; is that fair?

A.   Yes, sir.

Q.   So for all four of these patents, you drafted the specifications, correct?

A.   Yes, sir.

Q.   You drafted the claims of the patent, correct?

A.   Yes, sir.

Q.   And you responded and -- reviewed and responded back and forth with the -- with any Office actions from the Patent and Trademark Office; is that correct?

A.   Yes, that's how it worked.

Q.   So you decided what went in there and what didn't go in there, correct?

A.   Yes, sir.

Q.   During your direct examination, would you agree with me that you provided, through the question-and-answer with Mr. McCarty, you gave the jury a summary or description or high-level talk about what your inventions in these patents are?

A.   Yes, sir.

Q.   Okay.  Do you recall giving a deposition in this case,

Dr. Vasylyev?

A.   Yes, sir.

Q.   Okay.  Do you recall you were under oath when you gave that deposition?

A.   Yes, sir.

Q.   Okay.  You have that deposition in your binder there. Could you please pull out that deposition and go to Page 105 for me, sir.  It might be in the one below that. And if you don't have it, I'll make sure you can get it.  I think your deposition should be in there.

A.   Okay.  Yes, I can see it.

Q.   Could you turn to Page 105 of that for me, please.

A.   Sure.

Q.   And let me know when you get there.

A.   Yes.

Q.   And if you could look at -- don't read, but just look at -- down at Line 15 through 19.  If you'd read that to yourself, please, and then let me know when you're done.

A.   15 through what?

Q.   Line 15 through Line 19, please, sir.

A.   Yes, sir.

Q.   Okay.  And you were asked -- and this deposition took place back in the fall of 2023.  Does that sound right?

A.   Right.

Q.   You were asked:  Are you prepared today to give me an

elevator pitch or a high-level description of the inventions described in any of the patents-in-suit?

Did I read that question correctly?

A.  Yes, sir.

Q.  And your answer was:  No.

Correct?

A.  Yes.

Q.  Okay.  So when we asked you to give us a summary or high-level description of your inventions back when we were allowed to take your deposition, you wouldn't -- you wouldn't give us that answer, would you, sir?

A.  I was not prepared.

Q.  But you were prepared and described your impression of those inventions to the jury here today, right?

A.  Yes, sir.

Q.  Do you think that was fair that we weren't able to get that information from you when we took your deposition?

A.  I think it was fair because I wasn't prepared.  If I was, then I would certainly have given it to you.

Q.  Well, the deposition didn't come as a surprise, did it, sir?

A.  No, sir.

Q.  I mean, we worked out with -- your lawyers and our lawyers worked out an agreed date for you to sit for your deposition, correct?

A.   That's correct.

Q.   And you're aware that's usually we get one shot, usually you take one deposition, and that's it, correct?

A.   I don't know about that.  I'm not an expert in how the trial process...

MR. FINDLAY:  Can we pull up PTX-019, please.

Q.   (By Mr. Findlay)  And, Dr. Vasylyev, I'll represent this is the letter that we've looked at already, the jury has seen, PTX-19.  This is the letter that was sent by your lawyers at your direction to Acer America Corporation, correct?

A.   Yes, sir.

Q.   Okay.

MR. FINDLAY:  And then if we could pull up PTX-20, which is the Acer response.

Q.   (By Mr. Findlay)  Do you recall your lawyers sharing this response to you?  It went to Mr. Katz, but do you recall seeing this response from Acer?

A.   Yeah, I think so.

Q.   And it was just about seven days after Mr. Katz's letter, correct?

A.   Several days later, yes.

Q.   And we simply asked -- acknowledged the letter, and said:  Can you provide us more information, such as claim charts for us to evaluate?

Do you see that?

A.   Yes, sir.

Q.   Okay.  And you testified at length with your own attorney, I think, that you've created claim charts in the past, correct?

A.   Yes, sir.

Q.   But the -- the next thing that anyone at Acer heard from you or your lawyers was when you filed suit about 18 months later in this court, correct?

A.   Yes, sir.

Q.   We asked to talk to get more information, and your response was the lawsuit that you filed here in Waco, correct, sir?

A.   Yes, sir.

        MR. FINDLAY:  Your Honor, pass the witness.

        Thank you.

        MR. MCCARTY:  Your Honor, may we approach?

        THE COURT:  Sure.

        (Bench conference.)

        MR. MCCARTY:  I have a copy right here of the corrective instruction that I think would be appropriate.

        MR. FINDLAY:  May I be heard on it?

        THE COURT:  Yes.

        MR. FINDLAY:  Okay.  First of all, I apologize if I irritated the Court.  I thought, and I still believe,

that the insinuation is not inappropriate.

I would suggest, though, understanding your Court's inclination, that there simply be an end under the word "effect" -- that there be a period after the word "effect" and nothing more.  I do think -- I don't want to anger the Court.

THE COURT:  Why is it relevant?

MR. FINDLAY:  I think it's relevant because it goes to his credibility, Judge.  It goes to -- I think it potentially to damages when you look at a hypothetical negotiation --

THE COURT:  No, I think I let you go on about making products and all that stuff.

MR. FINDLAY:  Okay.

THE COURT:  Absolutely it's relevant.  I know a little bit about damages.

But the -- but the issue -- the way you handled the issue of these grants was to intimate that he was misusing the grant process, and he was doing it for the purposes of funding his litigation.  That was the only point you made about the grants, and I'm going to fix that with the jury.

MR. FINDLAY:  Okay.  All right.

MR. MCCARTY:  And, Your Honor, one additional point that their cross-examination veered into notice

letter issues and things of that nature, the witness will testify that one of his concerns was a declaratory judgment action.

Acer has filed many of those. We don't need to get into Acer-specific ones, but I think I do need to reask the witness on redirect about that concern and about that he knows that -- I just -- there's just a MIL --

THE COURT: He opened the door.

MR. FINDLAY: Okay.

MR. MCCARTY: Thank you.

(Bench conference concluded.)

THE COURT: Ladies and gentlemen, before we commence with the redirect, the Court is going to give you an instruction to follow with respect to this witness.

On cross-examination, you heard counsel for Defendant, Mr. Findlay, ask several questions suggesting or implying that the United States and California taxpayer grant money was used for the patented inventions at issue in this case or to fund the lawsuit.

The Court finds and instructs you there's no evidence to that effect and that the line of questioning about that issue was irrelevant to any of the issues that you are to decide in this case. I, therefore, instruct you to disregard any of the questions and answers that had to do with the grant money and how it was used.

Counsel?

MR. MCCARTY:  Thank you, Your Honor.

REDIRECT EXAMINATION

BY MR. MCCARTY:

Q.  Mr. Vasylyev, thank you again for your time.  A couple of follow-up questions.

I'll start where Mr. Findlay ended, which was about the time that it took for you to get your case on file after having an initial letter to Acer.

Do you recall those questions?

A.  Yes, sir, I do.

Q.  Okay.  And there was an insinuation that you were required to engage with Acer prior to getting that case on file.

Do you recall those questions?

A.  Yes, I do.

Q.  Are you aware of situations where companies like Acer have used those early discussions to sue the smaller company early before on those patents?

A.  Yes, and I was worrying about that.

Q.  And can you explain to the jury what you were worried about?

A.  Yes.  So I was worrying that once I submit those claims to Acer, Acer could just turn around and file a lawsuit against me -- against my company, and so I wanted to

prevent that from happening.

Q.  And are you aware of cases where this company has done that to smaller companies?

A.  Yes, sir.

Q.  Were you trying to protect your company and your technology?

A.  Yes, sir.

Q.  Now, there was some discussion about the grants, and I don't know if we need to get into it much more, but I do want you to have an opportunity to explain the grant process to the jury.

So if you would, can you explain the process of working with government entities for research grants?

THE COURT:  Counsel, I think I've excluded all --

MR. MCCARTY:  Okay.

THE COURT:  -- evidence on grants.  I would move on.

MR. MCCARTY:  Yes, Your Honor.  Understood.

Q.  (By Mr. McCarty)  Now, do you recall some questions about your -- your brand name, Lucent?

A.  Yes, sir.

Q.  Okay.  How long have you used that brand name for?

A.  For almost 15 years.

Q.  And you've filed that with the State?

A.  Yes.

Q.  Okay.

A.  It was actually filed with the County of Sacramento.

Q.  Okay.  And there were some questions about another company that had the same name.

Do you recall those questions?

A.  Something similar, yeah.  It had the same -- one of the words was the same, but the second word was different, so it was similar but not the same.

Q.  Did you testify in direct examination why you chose Lucent as a brand name for your company?

A.  Yeah, exactly.  Basically to have better brand that would be more memorable for the customers and suppliers, and also would better reflect the focus of the company. Because Lucent, after all, means glowing with light. That's what I explained, I think.

Q.  Did it have anything to do with some other company and some other type of technology that had Lucent in their name?

A.  No, by no means.

Q.  Okay.  Are you aware of other companies that have SVV in their name?

A.  I'm not.

Q.  Yeah.  Would it surprise you that there's a Savers Value Village men's retail store that goes by SVV down the road?

A.   No, it won't surprise me.

Q.   Would it surprise you that there's a Shenzhen Value Ventures that goes by SVV in China that makes -- that makes products?

A.   I expect -- I mean, there can be many companies that have some parts of the name same or similar.  I think it's very common.

Q.   Did you get the insinuation that Mr. Findlay was accusing you of copying some other company's name?

A.   It looked to me like that, yes.

Q.   Did you think that was a fair insinuation?

A.   No.

        MR. MCCARTY:  Now, if you could, Mr. Diaz, pull up that website for Mr. Vasylyev's company.

Q.   (By Mr. McCarty)  This is your website, right -- right, Dr. Vasylyev?

A.   That is correct.

Q.   And Mr. Findlay asked you some questions about this.

        Do you recall those?

A.   Yes, sir.

Q.   Okay.  Do you see those tabs up at the top?

A.   Yes.

Q.   There's one, I think the second one in, that Mr. Findlay didn't want the jury to see.  Which one is that?

A.   It says:   Innovation.

MR. MCCARTY:   Let's click on that one.

Q.   (By Mr. McCarty)   What's that one on the far right? What's that one say?

A.   It says:   LED Lighting & Photonics.

And it lists different technologies like flexible LED lighting panels, one, then directional edge-lit LED panels, and also advanced light coupling and oucoupling for LCD displays.

Q.   So on that last one on the right there, LCD displays, what are the products at issue in this case?

A.   These are LCD displays.

Q.   You remember some questions about selling products?

A.   Yes, sir.

Q.   Okay.   In your business, are your product -- your product business cyclical?

A.   Yes, it's project-based.

Q.   Based on contracts with particular customers?

A.   Yes.

Q.   And so at some point in time, you might not have a particular customer that you're making products for because the contract had ended?

A.   Yes, exactly.

Q.   You remember some questions about the benefits of the invention recently?

A.   Yes, sir.

Q.   Okay.  And I think there was a question about whether or not you had written the benefits of all of your inventions into the patent?

Do you recall those questions?

A.   Yes, I do.

Q.   Okay.  You actually prosecuted your patents yourself, right?

A.   Yes, sir.

Q.   So you're generally familiar with the patent prosecution and patent drafting process?

A.   Yes, very familiar.

Q.   Let me ask you this, you ever see a requirement in the patent laws that say you have to list every benefit of your invention to other companies in your patents when you file them?

A.   No, never.

Q.   Does that notion even make a lick of sense to you?

A.   Absolutely not.

Q.   Okay.  Now, there were some questions about your deposition just now.  Do you recall that?  Your testimony in your deposition?

A.   Yes.

Q.   Okay.  And your deposition is 156 pages long.  It's right here.  Do you recall that day?

A.   Yes, I do.

Q.   Okay.  Seven hours on the record.  Do you recall that?

A.   Yes, sir.

Q.   Mr. Findlay asked you a question about how in your deposition you weren't wanting to give a, quote, elevator pitch about your patents.  Do you remember that?

A.   Yes, sir, I do.

Q.   Is a deposition a time to give an elevator pitch about your patents?

A.   No, this is not what I was preparing for.

Q.   Did you sit in that chair in your deposition, just like you are now, under oath and answer their questions for seven hours?

A.   Yes, sir.

Q.   And if they had a problem with an answer, could they have gone and tried to get more time?

A.   Yes, sir.

Q.   Did they?

A.   No.

       MR. MCCARTY:  Mr. Diaz, can you pull up PTX-9.

Q.   (By Mr. McCarty)  I've heard it again that the accusation that your patents aren't about these products, and I want to get to the bottom of it.

       MR. MCCARTY:  If you could please go, Mr. Diaz, to Column 3 of the '135 patent.

Q.   (By Mr. McCarty)   This is one of those patents in the case, right, sir?

A.   Yes, sir.

Q.   All right.

        MR. MCCARTY:   Mr. Diaz, if you could go to Column 3, starting at Line 10.

Q.   (By Mr. McCarty)   All right.   In addition, modern illumination systems often utilize compact and discrete light sources, such as LEDs.

        Do you see that, sir?

A.   Yes, sir, I do.

Q.   Is that what we talked about in your direct examination?

A.   Exactly.

Q.   Use of these light sources often results in unwanted glare problems, particularly in some general lighting applications for display lights.

        Do you see that?

A.   Yes, sir.

Q.   Typically, these problems are addressed by adding conventional and bulky optical systems, collimators, and diffusers that at least partially negate the advantages --

        THE COURT:   Slow down, please.

Q.   (By Mr. McCarty)   -- that at least partially negate the advantages of LEDs such as compactness and energy

efficiency.

Do you see that?

A.  Yes, sir.

Q.  Is that exactly what we walked through in your direct testimony?

A.  Yes, those were exactly the problems that we're trying to solve is this invention.

Q.  And when you're talking about LEDs right there, are you talking about products with LEDs in them, like these screens?

A.  Yes, sir.

MR. MCCARTY:  Now, Mr. Diaz, will you go over to Column 4, starting at Line 17.

Q.  (By Mr. McCarty)  Beginning at:  More generally, your patent states:  It also relates to a device intercepting the divergent light from a light source and directing the light into a collimated beam such as flashlights, spotlights, floodlights, LED collimators, lanterns, headlights -- headlamps, backlight, or projection display systems.

Sir, are the products at issue in this case display systems?

A.  They are.

Q.  With backlighting --

A.  With backlights, yes.

Q.   Is this exactly what your patents cover?

A.   Yes, sir.

Q.   Now, there were some questions, also, about your ownership of the company.  Do you remember those?

A.   Yes, sir.

Q.   And it's true, is it not, that you own the company SVV?

A.   Yes.

Q.   You founded the company 25 years ago?

A.   Exactly.

Q.   Do you intend to get rich off this case?

A.   No.

Q.   Is that why you're in court today?

A.   No.

Q.   Are you standing up for your property?

A.   Yes, sir.

Q.   Sir, would you please turn to the jury and tell them where the damages money is going to go as part of your vision of your company.

A.   Yes.  So my vision is that the proceeds from this Court will go to the further development of my company and funding the research and development that we're doing so we have less reliance on governmental funding and we can also develop next-generation products that will be better for the -- well, businesses and people.

Q.   Is there a particular solution that you're really

passionate about that you're working on that you think is going to take off?

A.   Yes, sir.

Q.   Can you explain to the jury what that one is?

A.   Yes.  One example would be that technology that goes into that panel that I showed you.  So we see this technology going into a new product that will replace fluorescent lights globally so that they -- just regular people in businesses will be able to save -- significantly save money on the energy bills.  They will also have better lighting, will not have flicker.  It will also solve many of the environmental problems because fluorescent bulbs include mercury and also many, many other issues and also will create beautiful and nicely looking designs.

Q.   And are you investing, as we speak, a lot of money into those products, those -- those new tools and those manufacturing processes?

A.   Yes, sir.  So we're currently buying manufacturing equipment.  We're buying analysis tools and -- and materials, so all kinds of things to propel our manufacturing and further develop our products.

Q.   Thank you.

A.   You're welcome.

        MR. FINDLAY:  No further questions, Your Honor. Thank you.

THE COURT:  Sir, you may step down.

Who's your next witness, please?

MR. REICH:  The Plaintiff intends to call Tom Credelle.

(Witness sworn.)

MR. REICH:  May I bring something to the witness, Your Honor?

THOMAS CREDELLE, PLAINTIFF'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. REICH:

Q.  Good afternoon, Mr. Credelle.

A.  Good afternoon.

Q.  Are you an SVV employee?

A.  No, I'm not.

Q.  Are you what's called an expert witness?

A.  Yes.

Q.  What is the role of an expert witness in a patent case like this?

A.  In this kind of a case, my job is to understand the technology and try to explain it well enough so that you, the jury, can make some decisions about the infringement by Acer products.

Q.  Now, the jury heard about in jury selection, you know, people who have knowledge of any of the parties in this case might be leaning one way or the other.

Before this case, did you have any leanings?  Did you know of one party, like SVV, ahead of time?

A.  No, I was not aware of SVV.

Q.  Okay.  Are you being compensated in your ordinary consulting rate as your role as an expert?

A.  Yes.  My ordinary consulting rate is $500 per hour.

Q.  Does your compensation have anything to do with the outcome of this trial?

A.  It does not.

Q.  Did you have slides prepared to aid in your testimony?

A.  Yes.

Q.  Before we get too deep into your opinions, can you tell us a little bit about yourself and your personal background?

A.  Sure.  I'd be happy to.  Again, my name is Thomas Credelle.  I was born and raised in Seattle, Washington. I'm married.  My wife and I just celebrated our 43rd wedding anniversary.  We have two beautiful granddaughters, age 5 and 3, who love their grandpa.  We now live in Bend, Oregon, a small town in Oregon.

Q.  Where did you go to school?

A.  I went to school first at Drexel University in Philadelphia.  My undergraduate studies was in electrical engineering, but I specialized in solid-state physics and materials, which back in the '60s, was kind of a new topic.

After I had got my education at Drexel, I decided I really liked that field.  I wanted to do research.  I was fortunate enough to get a full scholarship to MIT and continued my education and received my master's degree a year later, again in solid-state materials and especially optical properties of materials.

Q.  Where did you go after you finished school?

A.  I decided I wanted to get involved with working, and there was two or three industrial laboratories in the United States at the time.  And RCA was one of the premier labs that did a lot of R&D in consumer products, and I had an interest in that area.  So I went to work for RCA.  Some of you may remember that they invented the color TVs that we used to have in our living room, but they did a lot of other consumer products as well, and they were always looking to the future to what comes next.

Q.  What did you do at RCA?

A.  So I did a variety of small research projects as a young scientist, but about a year after I was there, they -- they announced they were going to have a flat panel TV project.  And I really didn't know what even that entailed, but I thought it would be interesting.  And I joined that group.

Little did I know that that would set the trajectory of the next 50 years of my life.  Everything

I've done has been involved with flat panel technology and research and product engineering; and, actually, now, finally in patent litigation.

But we worked for about 8 or 10 years on flat panel ideas until we finally landed on liquid crystal displays as the concept we thought would work for big TVs. Again, this was a long time ago, but we made the first small 2-inch TVs that we could look at a picture on and we were actually quite excited about that.

Q.   And liquid crystal display, is that also called LCD?

A.   Yes, that is an abbreviation that industry folks like me like to use, but LCD is the technology that's in practically all the products that we have.  And it's a core for monitors, for notebooks, just other technologies, but that is a type of technology that's very common today.

Q.   Now, you have GE on your slide.  How does that relate to RCA and your work with LCDs?

A.   So what happened is GE bought RCA, somewhere in the mid-'80s, and they were -- they also had a research department looking at LCD technology.  They were focused on another application -- RCA was looking at TVs.  They were looking at displays for fighter jets.  They wanted to replace the bulky instruments in a cockpit that fighter pilots used to -- with this new technology, was very small and thin and rugged.  It had to survive very extreme

conditions and had to be seen in super-high brightness.  So it was a big challenge, but we succeeded.

Q.  And what was one of your biggest accomplishments while you were at GE and RCA?

A.  So that -- that accomplishment was really building the world's first display with a million pixels, a million dots.  It was only 5 inches by 5 inches.  The TVs we have in our living rooms today have something like 20 to 30 million dots.  So this was kind of crude by comparison.  But there's a picture -- it was -- it was important enough in the Popular Science regime that it was featured in one of their magazines, which was exciting for me because I'm kind of a technical guy.

Q.  Hold on.  What is Popular Science, because not everyone might know that?

A.  It's a magazine that's been around since the 1880s.  It comes out every month and it talks about new technologies every month that people can understand.  It's not written for scientists, it's written for people to understand what's going on.

Q.  And is this your name in Popular Science, and your photo?

A.  Yes.  I was the manager of that group, and that's my profile in this picture showing this Avionic display that goes into a cockpit that I said was 5 inches by 5 inches,

and it was quite an accomplishment for my team and myself.

Q.   And was this cockpit LCD display commercialized in U.S. military fighter jets?

A.   Yes, it was eventually commercialized by GE and its partners.

Q.   So where did you go after your work at GE?

A.   About this time that we finished that project, there was a small company in California called Apple that was trying to embark on a new flat panel-based notebook computer.  So they didn't exist back in the mid-'80s, but they had the vision that they were going to get into that market, and they hired me to run that group.

       So our challenge, myself and my group working with the rest of the engineers at Apple, was to design a notebook computer that we could carry around and that would work off of batteries.  And we were -- I'm proud to say we introduced the first PowerBook computers a couple years later after I joined, and it was a great success.  I started the -- a new platform for Apple, actually, to extend off of the desktop into the notebook space.

Q.   And so the PowerBook, maybe not everyone knows Apple, that's Apple's very first laptop; is that right?

A.   That's -- that is the very first one that Apple introduced.

Q.   And what were your -- next step after you decided to

leave Apple?

A.  So I did decide -- I was at Apple for about three years, and we introduced several products in the notebook space, but the company kind of had gotten stalled on its vision.  I have to say Steve Jobs was not at the company in the time I was there, and I had the opportunity to work in flat panel technology at another company called Honeywell, and I thought it would be a good career path for me, not really understanding where Apple was going to go.  So I did leave.

About a year later, Steve Jobs did come back to Apple; and, certainly, he changed the company to make it what we know today.

And maybe I'd own my own island by now if I'd stayed, but I'm happy with the choices I made.

Q.  Can you give us some of the highlights of the other work you've been doing in the LCD display industry since the -- your time at Apple?

A.  Yeah, just a couple examples because I've worked at a number of companies.  At Honeywell they were developing a backlight technology for LCDs.  What you'll learn about more, maybe you already heard it this morning, an LCD makes the picture but a lighting system provides the light energy.  So there was a company that Honeywell was doing advanced backlights that would make the picture look better

and save power.  At Motorola, it was about cell phones and how to integrate LCDs into the smaller cell phone factors of the day.

I did those projects at reasonably big-sized companies, but decided that I wanted to have more hands-on control of the products that we were developing.  I'm kind of an inventor, and I'd just like to get my hands more on the -- on development.  So I joined some startup companies working on everything from backlights to electronics to electronics packaging, the theme was always related to flat panel, even some 3D displays, so it quite varied, but it's given me a good experience background in this field and it keeps me excited about the technology.  I just love this stuff.

Q.  And then you mentioned you're a bit of an inventor. During the course of your work in the display industry, did you get any patents yourself?

A.  Yes.  I'm proud to say that I've received a little over 80 U.S. patents and many more foreign patents, and it kind of spans my career from my early days in R&D, but even through product development.  I'm kind of a problem solver, so it's about trying to find a solution to a problem, much like Dr. Vasylyev.  How can we make this better?  How can we do something different and create a new business, create a new product?

Q.   And what role have patents played in your industry experience at the companies you worked at?

A.   I've seen the impact.  I saw the impact first at RCA, who had a huge patent portfolio.  I wasn't sure why they spent so much money on patents, but I soon came to realize how important it was for them to protect their business as they grew, new products, competing with competitors.

In smaller companies, I found it even more critical; because as a small company, you don't have a lot of resources, so you need a head start, and that's one thing the patent system gives you.  You have an idea, you can patent it, and you have a chance to develop a product and a business based on those ideas.  So it's -- it's -- I'm really a believer in the system.

Q.   And have you previously been qualified as an expert in a patent case?

A.   I have.

MR. REICH:  Your Honor, Plaintiff offers Mr. Credelle as an expert in LCD light optics and nanotechnology in LCD displays.

MR. KAUFMAN:  No objection, Your Honor.

THE COURT:  He'll be admitted as such.

Q.   (By Mr. Reich)  Mr. Credelle, are you a lawyer?

A.   No, I'm not.

Q.   So how is it, then, that you understand the patents in

this case?

A.   Well, patents are really written not for lawyers. They're written for technical people.  The idea is to be able to explain an idea well enough that a person who had the skill in that area could understand it and understand what the claims mean.

Q.   And so what is the area of skill or the person of skill that these patents are written for?

A.   So on the screen, there's a -- there's an acronym we use in this business, a person of skill in the art.  That person would have a -- at least a bachelor's degree in an engineering discipline like electrical or optical or physics, and at least three years of relevant industry experience.  It's good to combine the two to really be able to understand the technology at issue, for example, in this case, optics.

Q.   Now, if this level of skill is required, how is a person like me or the jury supposed to understand these patents?

A.   Well, that's -- that's part of my job this afternoon, is to try to make that make sense of these somewhat complicated ideas and see how the parts relate to each other and the benefits we've already discussed this morning.  So I hope to be able to do that and then compare these claims of these patents to the Acer monitors.

Q.  All right.  Can you give us a roadmap of what we're going to be talking about today?

A.  Yes.

Q.  And what are we seeing here on your slide?

A.  Well -- so I will start with the patents-in-suit. There are four, as you've heard, so I don't have to spend a lot of time on them.  But just to remind you, those four patents talk about the accused products, the certain categories of the Acer monitors, and then perform the infringement analysis; which I'll have to warn you is a little tedious, but I have to go through each claim element and show where that is found in the Acer product.

But it will be -- I'll have a checklist, so it will hopefully make sense as we go through it.  But that's -- that's the most important part, probably, of my -- of my job.

And then, finally, make some comments about the technical value of these inventions as it relates to damages.

Q.  Before we dive into all of that -- and I'm pointing here because I have a screen here -- can you give us a sense of your conclusions?

A.  My conclusions are that certain Acer monitors infringe Claim 16 of the '135 patent; Claims 9 and 14 of the '397 patent; Claim 10 of the '191 patent; and, finally, Claim 17

of the '205 patent.

Q.   Okay.  How did you approach your investigation in this case?

A.   So I reviewed a lot of material.  And we also did a lot of teardowns of monitors, as was described earlier this morning.

Of course, starting with the patents-in-suit, my job is to fully understand those patents and the details in those patents, and, most importantly, the claims, what's claimed.

Secondly, to tear down Acer products or review data from teardowns of Acer products to try to match up the claim with the feature and look at -- I was aided by confidential information that Acer provided to -- to me, answers to some questions that wouldn't be available to -- to, for example, Mr. Vasylyev, but also looked at public data.  What is -- what is Acer advertising?  What is their features?  And, finally, testimony by Acer employees.

Q.   Did you prepare a report of your opinions in this case on infringement?

A.   Yes.

Q.   About how long was that infringement report?

A.   Thousands of pages.

Q.   Let's go to the first section in your little roadmap here starting with SVV's patents.

What are you showing on this screen?

A.  This might look familiar, but we -- these are the four patents-in-suit, and we are referring to them by the last three digits.  I think it's apparent.

So these are the four patents that we'll be discussing this afternoon.  They are PTX-6, 8, 9, and 10.  I think they're in your folders.

Q.  And were all four of the patents part of your investigation?

A.  They were.

Q.  Are these patents related in any way?

A.  There is some relationship, and it often happens, but these are related.  And I'm going to try to indicate kind of how they're related.

Q.  All right.  Can you explain the -- a little bit the relationships you're showing on the screen?

A.  Sure.  So in the blue box, I've highlighted a group of patents that have some relationship to each other.  But more importantly, they kind of stem from an initial idea that has a patent number ending in '007.

Q.  And for the record, is that the '135, the '397, and the '191 patents?

A.  That's correct.  I'll try to remember to add those.

Q.  Okay.  And let's just take an example of this '007 patent family and maybe look at some of those features that

the Court's patent video from last week told the jury about.

What are we seeing here with respect to the information page of the '135 patent?

A. So this information page -- actually, it's fortunate it's the same for almost all patents. So we get to know right where stuff is after a while. But it certainly starts with the title and the patent number and the date of issue, who is the inventor. But I want to focus on the lower right box on this slide where I've highlighted some dates when the invention -- the initial '007 invention was issued.

For example, this '135 patent stems back -- is a continuation of an idea patented in the '007 on April 21st, 2010.

Q. And is that first provisional -- I think the jury's already heard of it. When is the first provisional for this '135 patent?

A. There was actually two provisionals, but the earliest one was on April 21st, 2009. And, yes, we have discussed that already.

Q. And I think Mr. Findlay had this nice little timeline, and perhaps that is a little confusing. What's significant about the priority date of this earliest provisional?

A. This earliest provisional -- a provisional application

is one that's -- that you can file with the Patent Office that isn't a fully -- fully written-out application.  It can be the basic idea, the essence of the invention, and a few claims.  And it'll -- it establishes a date when the invention took place.  So that's important for establishing the date of the invention.

And the inventor has a year to write a full application.  And in most cases, they do.  Sometimes they decide maybe the idea wasn't that good, but these were filed as full patents.  So that establishes that date.

Q.  And so is that part of that constitutional bargain we heard about earlier?  That's when a patent owner, you know, dedicates their -- or discloses their invention to the public at the earliest date?

A.  Yes.

Q.  Now, is there any dispute in this trial over the priority dates of these patents in the case?

A.  No, there's not.

Q.  Moving on to the second main part of the '135 patent, the specification, we've heard a little bit about this from Dr. Vasylyev, but can you emphasize some of the things that you saw in this patent?

A.  Yes.  Patents always start with the description of the background.  That's useful.  But this tells you kind of the field of the invention.  Where does this normally apply?

And this is a device for collecting, distributing radiant energy, which is light, into or from an optical waveguide. So this is already saying -- this is something about managing light.

It has two elements that I've highlighted from the abstract. The abstract kind of tells you in a nutshell what the patent is about. And this one, again, is an apparatus, which means it's a device. It's not a "how to do it." It's a thing. It's for distributing light with a waveguide -- sometimes we call that a light guide -- using cylindrical lenses and small deflecting elements that will help get the light where we want it to be. This is all about getting the light to a certain place.

Q. Now, I want to look at that third main part of the patents, and that's the really important part for you. It's the claims. We'll get into those a little bit later, but just the high-level, what are you emphasizing on this slide?

A. So this is -- this is the first claim of the patent. I've highlighted that it's a system. That means it's a -- it's a -- it's an apparatus or a device.

Q. And is that a device like a monitor is a device?

A. For example, a monitor would be a device or a system.

Q. Can we just focus on some of the key elements of this particular claim with maybe an example from the patent?

A.   Okay.   Hopefully that'll be useful because there are --
it is -- it is a very complicated claim.

So I've highlighted a few of the elements, and I
will try to kind of walk you through it, maybe not in
exactly the order that is on the -- on the claim, but
starting with the blue area, those are LEDs.   We've heard
about LEDs so far.   That is the light source.   That goes
into an optically transmissive plate, which is simply like
a piece of plastic that's clear that's going to be the
waveguide or the transmission of light.   That's highlighted
in yellow.   So light from the LED can go into this light
guide.

Then there are light-extracting features.   So like
it says, we're going to get the light out of this light
guide, which are these little gold-colored bumps on the
bottom.   And then that light will start flowing upwards.
In this case, imagine the LCD is on the top of the screen.
So this is light going towards that LCD.   And there's a set
of lenses, cylindrical lenses that the light will pass
through.   That's all about helping to manage the light that
comes out of the system.

Q.   Now, this was useful to talk through, but is the
Figure 26 a limitation on this particular invention?

A.   No.   Patents usually have multiple examples.   They're
called embodiments.   There's just different ways to -- to

make -- to use an idea.  So this is just one of the examples.  It's not a limitation.  They don't have to look this way.

Q.  And, obviously, we only looked at a few of the words.  Are we going to go through every single word in all of these claims later on?

A.  We are, yes.

Q.  Now, returning to our family list, we have another family.  What is that?

A.  This is called the '791 family, the '205 patent.  So it stems from an earlier invention, the '791.

Q.  And can we look at the information page of the '205?

A.  Yes.

Q.  What are we seeing?

A.  Again, we see the same inventor, Dr. Vasylyev.  And this time we can see highlighted in the application data that this goes back to Patent No. 8,735,791.

Q.  And is this provisional date on here, again, that constitutional bargain when this patent was disclosed to the Patent Office?

A.  Yes, and that, in this case, would be July 13th, 2010.

Q.  Turning to the '205 patent specification, what does this patent add to the information in some of the other patents?

A.  So had I read the title it would have been a clue.  But

this adds a couple features that weren't in the previous patent.  This adds a planar light-trapping optical structure,  so an optical structure that can somehow trap light -- I'll explain how that works -- and a photoresponsive layer with quantum dots.  You heard a little bit about quantum dots, but it's a key part of this particular patent.

Q.  All right.  And just briefly at the claim, because I know we're going to do a lot on it later, what are you noticing in the Claim 1 of the '205 patent?

A.  So, again, this is a system, like a monitor, and it has these -- I've highlighted this photoresponsive layer with the quantum dots and the light-trapping layer, which, again, are new features that weren't in the previous patent.

Q.  Are we ready to move on to the Acer accused products section?

A.  Yes.

Q.  What Acer products are accused of infringement in this case?

A.  The products fall into the category of monitors, LCD monitors.

Q.  Now, is it every single LCD monitor that Acer makes?

A.  No.

Q.  Are there specific monitors to these claims?

A.   There are specific monitors that were identified as infringing each of the patents, and the list is different for the different patents because they have different claims.

Q.   And what are you showing here as an example of that?

A.   This is a product that actually does infringe all four of the patents, and it is a gaming monitor, the XB323U.  I think we saw some pictures of that earlier this morning.

Q.   And how did you go about determining, then, if this product infringed the asserted claims?

A.   So, again, we -- we heard this morning a little bit about teardowns, about taking these things apart, and the SVV lab did a lot of those teardowns, but this is one that I tore down independently of SVV to make my own conclusions, although I trust their data 100 percent.

So I did -- I've done that teardown.

Q.   And can you walk us through maybe a physical demonstration to show what this teardown evidence would look like?

A.   Yes.

MR. REICH:  Your Honor, may I have Mr. Credelle come down to do the teardown?

THE COURT:  If you have a microphone for him.

MR. REICH:  Yes.  He's got one on, sir.  Thank you.

MR. KAUFMAN: And, Your Honor, may I move to get a better view?

THE COURT: Oh, absolutely.

THE WITNESS: Okay. Am I on?

Q. (By Mr. Reich) You've got to move it --

A. Oh, I've got to move it.

Q. Put that in your pocket.

A. Okay. How is that? Clear?

Q. All right. The jury may be wondering what this is. What do you have here?

A. So as I mentioned teardowns, and you saw some pictures and I think there's even one on the screen, but maybe you've never seen the inside of a monitor except for these pictures today. But when you take it apart, there's a lot of interesting stuff inside, interesting for this case, but maybe interesting in general.

So I've taken that apart, I did my analysis on these pieces, and now I will put it back together to show you, you know, how each of the layers kind of works, hopefully.

Q. And do you also have some slides that will assist us in this teardown reconstruction?

A. Yes, I do. So as we go along, there'll be some slides as a placeholder.

Q. Do the components that we're looking at have some sort

of identification information on them?

A.   Yes.   So certainly the monitor itself -- this is the back of the monitor that I took apart, and it has that Acer sticker on it, but the LCD module inside -- and that's where we're going to focus our attention right now -- has an -- its own identifier.   So it has a model number, a manufacturer.   So it -- so Acer knows, like, which one to put in their monitor.

Q.   And is that what you're showing on the slide here with the AU Optronics?

A.   Yes.   AU Optronics is a manufacturer in China.   They have a model number, and this is the unit that goes into this monitor.

Q.   And just to be clear, does Acer make any of the LCD modules that go into the monitors that are at issue in this case?

A.   They do not.

Q.   So all that discussion in opening about their innovation doesn't apply to this piece?

A.   This part, they buy.

Q.   What are you going to illustrate here?   What is this first part?

A.   We're going to start with the lighting system that's part of this LCD monitor or LCD display.

            Just as a reminder, an LCD, like we have on our

monitors, has two main parts, it has an LCD where we put the information that tells you what pixels to turn off and on, but it doesn't actually generate any light.  It acts like little shutters.  So if you want a bright picture, the light comes through; if you want it dark, it turns off those shutters.  They control how much light comes through, so it's very clever.

But since it doesn't make light, we have to start with a light source, an illumination source behind that LCD.  I'll show you the LCD glass at the end of this demo.

But it starts with the backlight.  So I call it a backlight, it's really an illumination system.  Switch it on.

Q.  Yeah, so what is this that we're seeing here, this white part?

A.  Well, okay.  So this is a metal tray and everything is going to be put in this metal tray, and there's a reflector; this white material is a reflector, it's not like a mirror, but it reflects light very well.  And at the bottom edge, there's an array of LEDs, and they're turned off at the moment, I'm going to turn them on.

Q.  I'll turn them on.

A.  So we have LEDs, and it'll stabilize in a minute if things go well.  So now we have a light source.  We have a bunch of LEDs; and, interestingly, they're blue.  That's --

you know, your flashlights are usually white.  I think these are blue LEDs, but all the light is concentrated at the bottom.  Not so useful because we want the light to come through the LCD from the light source.

Q.  And we've also -- we've heard LED and we've heard LCD.  Are those different?

A.  They are different.  Even though marketing people who sell TVs mix them up sometimes.  But LEDs are the light source, light-emitting diode, that's everywhere these days, and then the LCD makes the picture.  So we're starting with the LEDs, and it will be part of the LCD monitor.

Q.  What is the next part you're going to put back in our teardown?

A.  So we've heard about waveguides or sometimes called light guides.  This is a patterned piece of plastic that has lens structures on the top and little microstructures on the bottom.  They're so small that you can't really see them or I'd pass it around.  But they're -- they're -- they're very fine.  You can almost feel them, but this is the first step.

Q.  And does it -- is it flexible?  Can you show that --

A.  Oh, yeah, this is -- this flexible.  This one is -- sometimes they're even thinner than this one, but these are flexible.  You've probably seen curved monitors sometimes in the stores.

So if you remember -- recall the discussion this morning, the -- this waveguide or light guide, its purpose is to efficiently -- and that's important -- get the light from down here scattered over this area.  And so this -- the design of this light guide does that with these lenses you've heard about and these microstructures carefully designed into this piece of plastic to now give a fairly uniform light source.

Q.   And can we take a look on our slide deck as to some of those structures?

A.   Oh, yes.  So you may remember seeing these images.  And I think there was even a board over there.  But this is a close-up view of the top surface of this -- of this plastic.

Q.   And then the little cavities, where are those?

A.   The cavities are on the backside.  So if we didn't have those cavities, the light would come from these LEDs.  It would just go all the way up to the top and bounce back and eventually be lost.  So those cavities have to be designed to extract the light, but you want to extract more light up here and less light down here to make it even.  So there's a whole science in doing that, but that's all been designed into this system.

Q.   What's the next layer we need to add back to our deconstruction?

A.  So we're going to add a quantum dot layer next.

Q.  Hold on.  The jury's heard a little bit about it, but what are quantum dots?

A.  I think you have heard -- I'll say -- they're so fascinating, I'll say it again.  These are nanoparticles that are so small -- I think we said, you know, 10,000 could fit across the width of one human hair.  It's only equal to -- you know, it's really small.  But there's billions in this jar.  And the unique thing about quantum dots is that -- the size of the quantum dot will tell you what color it's going to become.

So if I shine blue light on these red quantum dots, I get a brilliant red, and that's going to help us make a better backlight.  If I shine them on the green dots, they're going to light up green.

Now, they're being lit up even in this room because there is blue light in this room.  So the purpose of these dots is to convert the blue light to something useful -- in this case, red and green -- because if you add red, green, and blue together, you get white when it's light.

Q.  All right.  Can you show us the quantum dot layer?

A.  So this -- so this is the quantum dot layer.  It has a little bit of a yellowish cast, but those dots are embedded in this plastic film and protected, scattered uniformly

with the right amount so that it will create white light.

So I'm going to leave this a little offset.

I'm sorry you can't see it, Your Honor.

But this side over here is blue.  You see that? And this is now converted to a whitish color.  It's a little bit violet-looking, but it's now been converted by the light coming out of that light guide surface.

Q.   What would happen if we cut into the middle of this quantum dot layer and zoomed in?

A.   So we've done that.  And this is a cross-section.  And it shows the quantum dot layer separates -- between two barrier films.  That protects the quantum dots and protects them against environmental damage.  But the quantum dots are scattered through that layer, and they're so small that you wouldn't be able to see them with a normal microscope. You'd need a very specialized electron microscope to see the dots.

Q.   Can you explain how the quantum dot layer works?

A.   So, again, as I illustrated with the little jars, the light coming through this film, if it -- if the blue light happens to hit one of those dots, it will convert that to a different color.  So if it hits a red quantum dot, it will make a red light.  So -- and same for green.

So out of the front surface here, now we have not only the blue light we had before, but now we've created

some red and green.  So now we have a better, you know, white source.  And this is more efficient than the way it used to be done with white LEDs.

Q.   What's the next layer we need to focus on?

A.   It's -- it's fairly typical in displays to have a diffuser.  This is just kind of a very light diffuser.  This helps kind of spread out the light in a very special way so we'll get a little bit better uniformity.

So it -- you see -- especially those of you in the front, you can see it's pretty bright, it's pretty uniform.  But that -- that's a part of this system.

Q.   Okay.  How about the next layer that we're going to add?

A.   So the next layer we call an optical film stack.  And this is a multilayer part that's going to be important in this optical design of these patents to kind of recirculate light back to make the whole system more efficient.

Q.   And what -- what about -- should the jury see anything on this backside?

A.   Well, you can see it's kind of mirror-like on this backside.  And, actually, almost -- it looks like a very funny mirror, but it does have the ability to reflect light.  It's got a structure, and I'll show you what the structure looks like in a moment.

Okay.  So I've put this film on the top, and those

of you kind of right in the front here can see -- actually, it increased the brightness quite a bit.  That happened for two reasons.  This -- this mirror property that I was explaining is actually sending some light backwards, which seems counterintuitive; but that light goes back through the system and can strike those quantum dots again and make more red and green light.  And the light isn't wasted because it goes back to that light reflector I showed you, and then it comes right back out again.

And so that light can actually go around the system a few times.  And once it's kind of -- everything is kind of organized, the light will come out to the -- to the user, and you'll have the right brightness, the right color.  And we've done that all in a very efficient and thin section.

Q.  And then what is the next layer we need to add?

Oh, actually, can we zoom in on the -- this layer and explain to the jury what's inside?

A.  Yeah.  So I mentioned that it's kind a mirror.  It's actually this pyramidal structure you see on the screen.  I think we saw some cross-sections before, but that pyramidal structure acts like an interesting mirror.  Light comes up to those surfaces.

We heard about this concept of total internal reflection.  So depending on the angle of the light hitting

these surfaces, it can actually bounce and come right back down again or it can come out.

So the goal is to have enough light coming out and recycling the stuff that wasn't really in the right position yet. It comes through that system a few times, and it'll come out.

A special feature of this design is that you'll see that the pyramid is touching the upper plastic sheet, making contact, and that creates a window. Light can go through that window. And that's all part of the optical design of the system to get the right distribution of light. You want to have a lot of light in the front. You want to have some to the sides. It's all part of this design.

Q. I noticed I'm not getting the bright blue light in my eyes here on the side. Is that what you're talking about, the design?

A. Yes, yes. I mean, again, if you -- once I put the final diffuser on, it will look more -- more even. But -- but, yes, that -- this -- this is -- this is brighter than this. This is what it was with just the quantum dot film, and now with the added optical film stack, we've increased the brightness and we've also made the white a lot brighter. The white is more white.

Q. Now, what is the next layer?

A.   So this -- part of the optical -- part of the optical design of any backlight system is to decide you want to have light over a certain viewing condition.  Monitors tend to be a little more focused.  TVs want to have light going out, you know, very far.  This is designed to kind of finalize that and give some more uniformity to the light source.

Q.   And then what's this last piece that you have?

A.   So this is what I worked on 50 years ago, the roots of this liquid crystal display.

This is a -- this is the 20 -- 32-inch monitor.  This is the backside of the LCD.  It's not much light goes through it because it's turned off.  But you can see there's some electronics on the bottom there.  And if we had plugged it in, this would be on the top.

Now, this is -- so the computer sends a signal, it turns the pixels to the right amount of transmission, those little shutters.  It lets that light through.

So of course, if it's a black scene, no light comes through.  If it's high bright -- so that's what -- just about all LCDs, how they all work, whether it's for a cell phone or a tablet or a TV.  And these days, they're all driven by LEDs as a source.

Q.   Now, Mr. Findlay recently was saying efficient LED lighting had nothing to do with LCD displays, but what

would this do without efficient LED lighting?

A.   Well, without efficient LED lighting, it would not be as bright.  It would take more power.  It might have lower reliability.  You want to have as --the goal is efficiency, efficiency and light control.

So the beauty of this system is the light is generated along the edge and managed to be exactly where you want it to be.  Those lenses do some focusing, and the reflections add some -- some spreading.  The net result is -- is -- is a nice product.  Acer makes a nice product.

Q.   Now, you can return to your seat.

A.   Okay.

Q.   Now that we know about all of these components, can you walk us through how the light actually travels through this system?

A.   I'll try to do that with an animation that I prepared -- prepared.

Q.   Okay.  What are we seeing in this animation?

A.   If we were to cut that -- that stack of films and display right through the middle and look at the side, we'd see LEDs are on the left.  They'd be on the bottom.  We'd have a light guide plate, often called a waveguide; and reflecting sheet, which is the white sheet below it; the quantum dot layer; and the optical film stack.  I have not drawn the diffusers because they aren't so important for my

analysis.

Q. And this stack-up is not actually how someone uses the monitor. You've laid it on its back for illustration purposes?

A. That's right. Imagine it just sitting down on the table.

Q. And what is the first little feature you wanted to emphasize here?

A. So the LED is the first feature -- well, okay, I'll -- it's probably good to have this illustration first. So those lenses that I showed you, I just folded them up. So we're looking at a cross-section. You can't see the lenses, but they are on that top surface.

Q. And I think you mentioned the LED was something you wanted to focus on next. Why are a bunch of arrows coming out of it?

A. So the LED emits light pretty much over a wide angular cone. Most LEDs you might have in flashlights, they can send a big beam; or if they put a lens on, they can make a collimated beam. But light comes out at all angles, and it will be the same for this kind of device. The light is being spitted out from the LEDs and going into the -- into the edge of that light guide plate.

Q. Well, just to keep this simple, can we follow one of the little light rays there?

A.   Yes.

Q.   What are you showing with this one ray?

A.   So using the principle of total internal reflection, if the angles of those light rays are correctly chosen, the light will be basically in the light guide, it won't come out, as long as it doesn't hit the little microstructures at the bottom.  So the light will just go to the end and bounce and come back and eventually be lost.

Q.   Is that how we get light all the way to the top edge?

A.   Yes.  In the sense of the demo, it'd be going towards the top.  And there is a reflector at the top so light can come back.

Q.   Now, let's say one of these light rays hits one of the microcavities that we have a board of over there, what would happen?

A.   When we -- when a different angular beam hits one of those structures, light will be scattered and reflected and refracted off of that microstructure.  And some of the light will go forward towards the LCD and some will go back towards the reflector.  In fact, almost half the light goes back towards the reflector.

Q.   Let's just focus on two rays again to simplify this. What happens to the light that goes back towards the reflector?

A.   So it goes back towards the reflector.  It is a very

efficient white reflector so that light will be reflected back towards the LCD.

Q.  And then as the light is leaving the light guide plate, what happens next?

A.  Those -- those light rays will now go through that lens structure and be focused for the -- for the desired cone of light, and then the light will go and some of the light will hit these little quantum dots and turn the light red -- red and green, and some of the blue light will just continue through.

Q.  What happens next when the light gets to the optical film stack?

A.  So when it gets to that stack, some of the light will be at the right angle to -- to go towards the LCD.  Some will be kind of at the wrong angle and will be reflected back.  And some of the light will go through the optical window at the top of the pyramid and go straight to the LCD.

Q.  What happens to that light that is reflected back downwards?

A.  So that light will go through the quantum dot film again.  It'll go through the light guide, and that's very transparent.  It's no loss.  It'll hit the back reflector. It will come back towards the -- towards the viewer.  And on the way, it may hit another quantum dot, and it'll

generate more red light.

Some of the rays will, again, be reflected. And as this process goes through, the light will eventually be in the right cone with the right amount of red, green, and blue to make our desired white brightness for the display.

Q. We walked through one teardown here for one monitor. Do you have a list of all of the Acer accused monitors that infringe in this case?

A. I do.

Q. Can you turn to your binder at Tab PTX-337. Let me know when you're there.

A. Yes, I'm there.

Q. What is PTX-337?

A. This is a list of Acer models. Various -- I think there's 66 different models, and along with each model is the identification of the LCD module -- that part I took apart -- and they come from different manufacturers in Asia. And sometimes the same LCD is used in a different monitor, so we can just do one teardown and apply it to two -- to two monitors occasionally.

Q. And is this a summary of voluminous Acer data that you put together?

A. Yes.

MR. REICH: Your Honor, we'd move to admit PTX-337.

MR. KAUFMAN:  No objection, Your Honor.

THE COURT:  Admitted.

Q.  (By Mr. Reich)  And if the jury ever wants to look at the list of accused products, is that in PTX-337?

A.  JTX?

Q.  PT --

A.  PTX -- yes, it is.

Q.  Now, we've also put it on a slide to make it a little easier.  There's a lot of them.

You look like you've also grouped them.  Can you explain what we have here?

A.  Yes.  There's -- there's -- there's different ways to make these backlight systems and these LCD modules, I should say.  Certainly the LCD module can have different size, different resolution, those kind of features, but from a backlight or lighting point of view, the first group is in a category called edge-lit.  They all have a structured -- that structured light pipe layer that I showed you with the lenses and the micro features on the back.  They have other optical films in their design.

The second -- and there are, I think, 40 -- 47 -- 50 -- 56 or 57 products in that category.

The next category adds the optical film stack that I was just showing you in the previous slides.  That's the -- the stack-up that has those -- these pyramidal

structures that recycles the light with the windows.

And then the final category, which this monitor is one of the categories, it adds the quantum dot film. So the quantum dot film is actually a relatively new feature for monitors. A lot of TVs use it these days, but it's kind of new for monitors. But it does add some performance benefits.

MR. REICH: And, Mr. Diaz, if we could have the ELMO. Hopefully we don't break it.

Q. (By Mr. Reich) And I've written here -- you see: Representative teardown.

What are we showing?

A. Yeah, that -- that XB323U is the model number of the teardown that I showed you the parts from. And it was also in our -- our infringement exhibits as well.

MR. REICH: And just in case the jury wants to look at it, I'll just tag it PTX-401. My peeling sticker ability is not the best.

Now, if we can go back to the slides, Mr. Diaz.

Q. (By Mr. Reich) We did one teardown, and that was the representative one we saw. Are we going to -- did you look at teardown evidence for every single one of the Acer accused products?

A. I did.

Q. Kind of what are you showing here?

A.   This is a little collage of some of the imagery that is found in PTX-285 to PTX-335.  These were generated by SVV in their teardown to document each and every one of the Acer monitors.  I've reviewed all the data in my analysis to look for infringement using those photographs as well as personal visits to SVV labs.

Q.   And PTX-285 to PTX-335, that's already in evidence with Mr. -- or Dr. Vasylyev, correct?

A.   Yes.

Q.   Now, doing some rough math from your chart to this set of numbers, we have 66 accused products and 50 teardowns. Why is that?

A.   Again, as I mentioned, maybe it's because we're lucky or they use the same module, but we find all of the evidence of infringement is contained in the LCD module. The claims don't talk about the power supply or plastic. It's the -- it's the LCD module.  And it's -- it's pretty much the case often that the two different monitors can use the same LCD.  But the monitor might have different features, different plastic color, other features that they would sell differently.

     So this reduces the number of actual teardowns we need to do by a fair amount.

Q.   And, again, is that module, LCD module information in PTX-337?

A.   Yes, that's also included there as well.

Q.   Did you physically tear down all these products?

A.   No, I did not.

Q.   Who did that?

A.   That was done by SVV company.  As you heard a little bit this morning from Dr. Vasylyev, they performed the teardowns, and they became quite good at it.  They had to do a lot of them.  And they -- they organized their data well, and I certainly reviewed their procedures and processes through my multiple visits to Sacramento to verify that their data is sound.

Q.   And based on your review of the data going to see these actual physical products, can you ensure that the data is reliable and accurate?

A.   I can -- I can attest to that.

Q.   Are we going to have to look at the claims against all 66 teardown photos, hundreds and hundreds of photos, in this trial?

A.   Fortunately not.  That -- I think the good news is there's a lot of similarity between the way the optics work in these various products, especially the ones that are accused, as I'll describe.

        So I have chosen a representative product that -- that I believe represents the performance of all of these accused products, although there are some differences.  I

don't want to say that there's no differences, but where there are differences, I will identify those differences and explain to you why those differences don't affect my opinions.  But I want to be complete.  So we had to go through this process, and you'll see the results in a moment.

Q.  All right.  Are you ready to start to explain your conclusion that Acer infringes the asserted claims?

A.  Yes, I am.

Q.  All right.

MR. REICH:  Your Honor, I have some claim boards. May I have my colleague help me set them up?

THE COURT:  Of course.

Would now be a good time to take a break while we do that?

MR. REICH:  Perfect time, Your Honor.

THE COURT:  Ladies and gentlemen of the jury, we're about to take a short recess.  Please don't discuss the case while we're on recess.  And we'll be back in 10 or 15 minutes.

COURT SECURITY OFFICER:  All rise.

(Jury out.)

THE COURT:  You may be seated.

You may step down.

This doesn't need to be on the record.

(Off-the-record discussion.)

THE COURT:  I don't know if we discussed this at your pretrial conference, but it is entirely up to you, the Defendant, to decide whether or not, when they call your corporate witness, how you want to handle -- you can go into -- you can ask no questions, you can ask some questions, you can ask all your questions.  That's entirely up to you on how you handle that, regardless of what you do, if you wish to -- it's the young woman.

MR. FINDLAY:  Yes, Ms. Shang.

THE COURT:  Regardless of what you do while they have their case on direct, you'll be permitted to ask questions, if you choose to, of her in your case.

MR. FINDLAY:  Understood.  Thank you, Judge.

THE COURT:  Anything we need to take up?

MR. REICH:  No.

MR. FINDLAY:  No.

(Recess.)

COURT SECURITY OFFICER:  All rise.

THE COURT:  Please remain standing for the jury.

(Jury in.)

THE COURT:  Thank you.  You may be seated.

If you'd recall your witness, please.

MR. REICH:  If I can have Mr. Credelle come back.

THE WITNESS:  Thank you, Your Honor.

THE COURT:  Okay.

Q.  (By Mr. Reich)  Mr. Credelle, did you have boards made with the asserted claim language in this case?

A.  Yes, I did.

MR. REICH:  And if I could have Mr. McCarty put the first claim up here.

Q.  (By Mr. Reich)  Is this the same claim language that's in the patents?

A.  Yes, it is.

Q.  Did we just reformat it a little bit?

A.  Yes, we've broken it into more manageable bites to do the analysis.

Q.  And what are these little boxes that are on the board?

A.  Once I've shown infringement by the representative product, we'll put a checkmark by that element.

Q.  Now, for the first patent, the '135 patent, Claim 16 is asserted, but what are you showing with respect to Claim 16?

A.  Claim 16 is actually what's known as a dependent claim. That means it's an add-on to Claim 1.  This depends on Claim 1.

So for my analysis, I need to show that all the elements of Claim 1 are met, and then the additional language added by Claim 16.  That'll be my procedure.

Q.  And so is that why we have the board starting with

Claim 1?

A.   That's why we're starting with Claim 1.  Exactly.

Q.   For the first part of Claim 1, it says an edge-lit illumination system comprising.  We have no box there.  Why is that?

A.   This is the -- called the preamble of the claim.  It is not a requirement of the claim.  It's a description of what's to follow.  So it is -- in this case, it is the Acer monitor.

Q.   And are we still going to treat this XB323U monitor as representative, for the most part?

A.   Yes, that's my intention.

Q.   What are the full set of accused products that you have found infringed the '135 patent?

A.   This is the chart I showed you before.  This -- this particular -- all of the Acer monitors infringe the '135 patent.

Q.   Now, the word here, "comprising," what does that mean?

A.   That simply means including, so it includes all of the elements we're going to discuss.  It can have more elements, but at least it has to have each one of those elements to satisfy the claim.

Q.   For the first limitation of Claim 1, and we have the language on the PowerPoint, as well, but it begins with "an optically transmissive plate," and ends with "third edge."

Did your analysis show that this claim limitation is met?

A.  Yes, it did.  I demonstrated during my teardown exercise that the light guide plate, which is the optically transmissive plate, is flexible.  And I've highlighted it on the screen.  I've colored it in yellow; you notice it's not actually yellow, but it's the first part that I installed in the teardown.

Q.  And we're breaking this down into parts here.

What is the front surface?

A.  The front surface would be the surface facing you, the jury, it's the surface that has the lenses.

Q.  And what is the back surface?

A.  The back would be the opposite side.  I didn't -- it was hard to see, but it's very mirror-like, but that's the back of this light guide plate.

Q.  And what is the claim referring to in the accused products with respect to these edge pieces?

A.  The claim identifies the edges because later on they may refer to the first edge or second edge.  So it identifies them, and I've highlighted in colors which is which.

For example, the first edge is nearest to the LEDs, which, remember, were at the bottom in my demonstration.  And the other edges are opposite --

opposite those.

Q.   So the first edge is down here at the bottom?  Second edge at the top?

A.   That's correct.  Third at the left, and fourth at the right.

Q.   Thank you.

If we've met all those pieces, may I check this claim limitation off?

A.   Yes.

Q.   We'll try this left-handed.  I'm actually right-handed. Good enough.

With this next limitation, beginning with "wherein a distance" and ending at "optically transmissive plate," has your analysis shown that this claim limitation is met in the accused products?

A.   Yes.  This -- this claim limitation is basically setting some size parameters for the light guiding plate. It says that the width and -- the width and length have to be 20 to 40 times greater than the thickness.  I've measured the thickness of the light guide I showed you. It's 3 millimeters, about an eighth of an inch, and the size is much larger than -- than 20 times or 40 times that 3 millimeters.  So this claim is met by this particular unit.

Q.   And is it met by all of the accused products on the

list?

A.  Yes.  There is some variations in the size of the various units.  I think the smallest one is maybe 20 inches or 22-inch diagonal.  The light pipes range from 2 to 3 millimeters, the light guides, so they're all met.

Q.  May I put a check by this limitation?

A.  You may.

Q.  For the next limitation, we have something highlighted here -- the limitation, just for the record, begins "a plurality of light-emitting diodes" and ends with "first edge."

Why have you highlighted optically coupled?

A.  This is a term that's been construed by the Court.  It maybe needed some clarification, so we analyzed the parts in the same way.  Optically coupled is -- is -- has been construed to mean providing for the transfer of light from one optical component to another.  So that's the construction I use as if I just replaced that phrase with optically coupled and do my analysis.

Q.  All right.  Applying the Court's construction, how is this limitation and the claim met by the accused products?

A.  I've identified the blue LEDs that I've showed you along the bottom of the unit.  There's a picture here showing the blue LEDs lit up.  They are optically coupled; that is, the light from the LEDs goes right into the bottom

edge, the first edge of the light guide plate.

Q. What does it mean for the light to be divergent light beam?

A. So this divergent refers to sort of spreading out. So if you look at the top view, you can see the light from the LED is actually spreading out as it goes into the light guide plate, and that will help fill out the whole light guide plate to make the light more uniform.

Q. May I check this limitation off?

A. Yes.

Q. All right. The next limitation of Claim 1 here, a lenticular array of linear cylindrical lenses and it ends in optically transmissive plate.

That's a bit of a tongue twister. What is a lenticular array of linear cylindrical lenses in the accused products?

A. Yes, it is a little complicated.

I'll start with the cylindrical lens concept. You're probably familiar with the magnifying glasses. They're spherical, they're round; that's a spherical lens. But if you have a lens that is only in one dimension, it only focuses in one dimension, that's called a cylindrical lens. It can be any shape -- any size, but it has the shape of a cylinder.

And so we've identified the top surface I showed

you as cylindrical lenses, and there's a magnified view of these cylindrical lenses on this -- on this image.  They are lenticular array, which just means we have a lot of these lenses side-by-side.  They're a very small pitch, very fine pitch.  Again, we're trying to make a thin -- thin LCD module.

Q.  And focusing on the cylindrical lens part, what are you showing here?

A.  So to determine the shape of these lenses, the SVV labs has a tool -- a profiling tool called ZDot, and it allows you to optically determine the actual shape of a surface. It's a very cool tool, actually.  But in this case, we're using it to profile the -- the height of the lens and the width of the lens.

So I'm showing a cross-section with the arc, the radius of curvature is 187 microns and it's also kind of a 3D image created by this tool, and you can see it has that cylindrical shape.  This is just one lens.

Q.  And for the record, for our representative product here, is this available in the PTX-319 exhibit?

A.  Yes, that would be the file.

Q.  Now, were all of the products -- did they have identical cylindrical lenses?

A.  No.  This is one area where there is some variance of the lens shape.

Q.   So what are we seeing here on this slide?

A.   I've showed three representative examples where there's some differences.  The top image is what I just showed you from the XB323U.  On the lower left from PTX-288 is a 28-inch monitor.  You can see it has a little different shape, and it's actually about twice as wide.  The lens is bigger.  So that design has a different shape.  It follows a cylindrical shape over most of the surface, so it is a cylindrical lens.  But near the corners, near the edges to the next lens, there's a little bit of a dip.

Q.   And what about this last one, how does a person of skill in the art analyze this last lens you've showed us?

A.   So what we have to do when we look at these structures is look to see if there are -- if there are cylindrical lens properties, and I've identified in this particular case from PTX-314 that the -- the two -- the right and left edges of this lens structure have a cylindrical shape at the arc that I've shown.  I've drawn a constant radius or curvature through those two edge sides.

        Those two edge sides will focus the light in the same way that a full cylindrical lens will do.  So it is a cylindrical lens.  However, the center section is not focused the same way.  So it's -- but it is a cylindrical lens because it has cylindrical-focusing properties.

Q.   So may I put a check by this limitation?

A.    Yes.

Q.    The next claim limitation of Claim 1 begins "a plurality of discrete light-extracting surface relief features" and ends with the "back surface."

There's a lot here.  Let's break it down.  What's this first part in the accused products?

A.    So as I mentioned on the backside of the light guide plate, there has to be some structure to cause the light to be bounced out.  This particular model has an array -- a two-dimensional array of circular surface relief features.  These are formed by a laser process.  And if you look up close, maybe it kind of looks like a crater, but there's a shape created by the laser which actually creates a multiple surface cavity in that plastic.

Q.    And how are these little craters you mentioned formed in the light guide plate?

A.    They're formed in, because as this process takes place, it actually creates a depression on the surface.  So they're actually formed in this surface.  And it's done, as I say, with a laser, so they can -- they can do it very quickly.

Q.    Now, what -- what makes these examples light-extracting?

A.    Light-extracting kind of means that -- the light guide plate, without extraction, as I mentioned, the light would

just stay in the light guide.  It would be pretty useless.
But to create a backlight system, we need to extract the
light.  So these are designed to extract the light.  And as
I showed in my animation, that light can go up towards the
LCD, or it can go back towards the reflector and then go up
to the LCD.

Q.  And -- and the claim also talks about a two-dimensional
pattern.  How is that met?

A.  Well, if you look at this pattern, it's not a regular
pattern, but it is a two-dimensional pattern.  Those are
designed on purpose to not be at a regular pattern because
you can get some optical effects that are undesirable.  So
the engineers design a pattern that is somewhat random but
does the purpose of extracting the light in the right way.
So it is a two-dimensional pattern in this next surface.

Q.  And with respect to the next part of this limitation,
what is that referring to in the accused products?

A.  So this -- this says that there are smooth and planar
portions, and there are a plurality of these -- these
features.  So I've identified three circular areas.  These
are each discrete surface relief features.  And they're
separated by this smooth part.  And the smooth part is very
critical for the light to go from the LED to the far end.

        We want to bounce some of the light past the
beginning and let it go all the way to the end.  So the

smooth part acts like that total internal reflection mirror so the light can go all the way and distribute uniformly across the whole surface.

Q.  Now, does every one of the accused products have microstructures that look identical to this?

A.  No.  Again, this is a case where there is some variability among the products that I analyzed.

Q.  Can you describe the different types of microstructures that you found in these accused products?

A.  Yes.  So the one I just showed you was this crater-like structure from the -- from PTX-319.

Another design for light extraction is a little bit more like -- I would call it a crater from the PTX-321. And right below it is another kind of crater-like structure, PTX-325, that has a little different depth compared to the previous one.  All of these are designed to extract the light properly to go both up and down in the structure to achieve the performance benefits with those lenses that I mentioned.

Finally, there's an odd ball, but one of the -- one of the styles of -- of extracting surface relief features that is created by a printing or -- printing dots on the surface of the light guide.  And these dots are round, and they do stick above the surface, but they're also embedded into the surface through the process of

putting the ink with the dots in it onto the surface. Much the way, you know, ink would go into paper, it would be absorbed in paper. This is on plastic. It has -- it's porous, so those dots can go into the surface and form a light-extracting surface feature.

Q. May I -- well, excuse me.

Do all of the microstructures that we're seeing on this screen meet the claimed requirements?

A. Yes, they do.

Q. So may I put a check by this limitation?

A. Please do.

Q. The next limitation begins "a reflective surface," and it ends with "optically transmissive plate."

Has your analysis shown that this claim limitation is met?

A. Yes, this is met by the reflective white sheet, the reflective surface that I identified when we started doing the teardown example. That is a reflective surface.

Q. And may I put a check by this limitation?

A. Yes.

Q. I'll have Mr. McCarty help me with the next board.

We're still in Claim 1. It's a long claim.

The next limitation begins "a light-diffusing layer," and it says "approximately coextensive with the optically transmissive plate."

Has your analysis shown that this limitation is met?

A.   Yes.  I identified, actually, two different light-diffusing layers that would satisfy this claim element.  And they are coextensive, meaning basically in alignment with the light guide plate.

Q.   Now, the claim says a diffusing layer.  Why is it okay to identify two?

A.   Well, the word "comprising" if you think of as the word "includes," it does include a diffusing layer.  It actually includes two but that still satisfies the claim.

Q.   So does "a" mean one or more in a patent context?

A.   In a patent context, yes.

Q.   It only needs at least one to infringe?

A.   At least one.

Q.   May I put a check by this limitation?

A.   Yes.

Q.   The next limitation begins "wherein the optically transmissive plate," and ends with "divergent directions."

Has your analysis shown that this claim limitation is met?

A.   Yes, it has.

Q.   And I'll just stop you right there because you've highlighted something in blue that I want to point out. What's that?

A.   Again, this is another indication of a Court construction, so what does total internal reflection mean?

Q.   What was the Court's construction?

A.   I'll read it:  The phenomenon that involves the reflection of all incident light off the boundary between a first and second medium of lower refracting index, when the angle of incidence to the second medium exceeds the critical angle.

It's a very technical definition but it's an accurate definition.  But it's representing the bouncing off that upper surface that you saw in the animation this morning.  So...

Q.   Applying the Court's construction, did you -- how did you find that that claim limitation is met in the Acer accused products?

A.   So the optically transmissive plate is the light guide. It does receive light on that input edge, which is at the bottom of that demo set.  And the light goes towards the second edge by bouncing off the upper and lower surfaces on the smooth parts of the light guide plate, and that process is referred to as total internal reflection.  So that is satisfied.

Q.   Now, with the next portion of this claim limitation: Distribute the light received on the first edge in both the front and back surfaces towards divergent directions.

What is that talking about in the accused products?

A.   It's basically talking about the angles of light. There are a lot of light rays coming off of that LED.  If I drew them all, it would be just a massive number of lines going up and down and every which way.  So I've identified two rays that show that there are divergent directions between the bounces from the top and bottom surfaces.

Q.   May I put a check by this limitation as being met?

A.   Yes.

Q.   For the next limitation beginning "wherein the optically transmissive plate," and ending with "back surface," has your analysis shown that this claim limitation is met in the Acer accused products?

A.   Yes, it has.

Q.   How so?

A.   Well, this one is -- let me walk through my analysis.

So the light guiding plate is configured to receive light on the front surface.  Now, the front surface is the top of the light guide plate.  We know that the light originates at the LEDs, but the light goes through the light guide plate.  And as I -- as I -- as I had said before, the light goes up to that optical film structure and goes backwards.  So this design and this optical system has light going back towards that upper surface, again,

through that lens and then into the -- towards the back surface of the light guide plate.

So that's a critical part of the design of this optical system that creates the efficient light source.

Q. And even in some of the accused products that don't have the optical film stack, will there be light that comes back down?

A. Yes. There's other -- there's other structures -- they call them BEF structures -- that have the same pyramidal structure but without the stack, and those have the same property of reflecting the light back down towards that front surface through the front surface to the back surface to the reflector and then back out again.

Q. And what would happen if the light guide plate in the accused products was not configured to receive light on the front surface?

A. There would be a lot of wasted light.

Q. May I put --

A. It would not be an efficient system.

Q. May I put a check by this claim limitation?

A. Yes.

Q. For the next limitation beginning with "wherein an area," and ending with "surface relief features," has your analysis shown that this claim limitation is met?

A. Yes.

Q.   How so?

A.   This limitation talks about the area of the cavity microstructure feature, which in this case is about 64 microns in diameter, very small.  Compare the area of that to the area of one lens, which is about 160 microns wide but 400 millimeters long, so that's -- the area is thousands of times larger.  So this claim element is met by this product and all the other accused products.

Q.   And 400 millimeters is running edge to edge here?

A.   Yes.

Q.   Top to bottom?

A.   Top to bottom.  Yeah.  The lenses run top to bottom, if I didn't say that earlier.  That's the direction of the lens.

Q.   May I put a check by this limitation?

A.   Please do.

Q.   For the next limitation beginning with "wherein at least one of the plurality of discrete light-extracting surface relief features" and ending with "reflective surface," has your analysis shown that this claim limitation is met?

A.   Yes, it has.

Q.   How so?

A.   As I illustrated in the -- in the animation, when light strikes the -- the microstructures, light will be deflected

both upwards and downwards in this design -- by design. And, therefore, light is going both directions. And it is disrupting the total internal reflection to carry that out. So remember, the light is not deflected. It stays in the light guide.

Q. Now, if the point is to get light to the viewer, why would you ever want to send light to the back reflector?

A. This is all part of the optical design of this efficient lighting system. That light going down towards the reflector and scattering off that surface will create a more uniform light profile and better manage where the light goes so we have an efficient, bright lighting system.

MR. REICH: Now, Mr. Diaz, can I see the ELMO, please.

Q. (By Mr. Reich) Were you here in opening when Acer's counsel showed this slide?

A. I was.

Q. Now, this non-infringed -- it's kind of over the claim limitation. Do you see that?

A. I do.

Q. What is some of the key language that seems to be covered up here?

A. Basically, the claim requires to extract at least some of the light towards the reflective surface. And that is exactly what happens. Some of the light does go towards

the reflective surface in the accused products.

Q. Now, I don't want my orthopedic surgeon to get mad, but it's important, so I'm going to write it with my right hand here.

If this slide was meant to suggest that all of the light was supposed to go back, as required by these claims, would that be wrong?

A. That would be probably a very -- I can't imagine that kind of design. It wasn't meant to mean that at all. It's some light needs to go back.

Q. The claim says some, not all, right?

A. Correct.

Q. And you just explained this a second ago, but, again, why are backlit systems designed this way, or at least these infringing ones?

A. Well, the principle of the patent is to get this managed light to be efficient and controlled. And sending light backwards is part of that process. Some backlights, maybe in the past, might have been designed with just all the light trying to go up, but that is not as an efficient and uniform system as having light go both ways because we have this very bright reflector on the bottom side.

Q. So let me see if I'm correcting this slide. It should say: Monitor backlights do --

A. Do.

Q.   -- deflect light towards the back of the backlight.

And then is that a correct and accurate understanding by a person of skill in the art?

A.   That would be correct.

MR. REICH:   And just in case the jury wants to see this corrected slide, we'll mark it as PTX-402.

Q.   (By Mr. Reich)   May I put a check by this limitation?

A.   Yes.

Q.   We made it through Claim 1, but now we have to do Claim 16.

Has your analysis shown that Dependent Claim 16 is met?

A.   Yes.

Q.   How so?

A.   The claim requires that the focal length of the lens -- now, let me stop for a moment.  These lenses have the ability to focus light to a line point.  So if a parallel beam is coming up, it'll come to a focus, much like a magnifying glass -- spherical -- to, you know, burn those ants we used to do as kids.

So you'll come to a focus, and that's called the focal length.  So these lenses have a property that the focal length is required to be less than the distance between the upper and lower surface.

So by these measurements of the radius and

curvature of these lenses, I can calculate the focal length.  And in this example, it's a half of -- about a half a millimeter, and the thickness of the light guide is 3 millimeters, so it satisfies the claim in this case.

Q.  And then with respect to all of the other Acer accused products for this patent, did your analysis show that this claim limitation is met?

A.  Yes.  I've done the math and compared the light guide thickness to the focal length calculated from the curvature of that lens, and in every case, it infringes.

Q.  May I check off Claim 16 as infringed?

A.  Yes.

Q.  And do all the -- or which Acer monitors infringe Claim 16 of the '135 patent?

A.  All of the accused monitors infringe Claim 16 of the '397 -- I'm sorry, of the '135 patent.

Q.  And just so we're clear, how many claims need to be infringed for a patent to be infringed?

A.  I'm sorry.  Could you repeat.

Q.  How many claims need to be infringed for the patent to be found to infringe?

A.  Oh, at least one claim.

        MR. REICH:  All right.  If I could get Mr. McCarty to put up the next patent.

Q.  (By Mr. Reich)  Next up is the '397 patent.  On the

screen, though, we have -- what are you showing?

A.   Dependent Claims 9 and 14.  Both of these depend on Claim 1, so I follow the same process.  First, look at the -- if Claim 1 is met by the accused products, and then the added language of Claim 9 and 14.

Q.   We'll start with Claim 1, then.

At the preamble, again, what did you identify as an optical cover that meets these claim limitations?

A.   Again, these are the Acer monitors.

Q.   Now, which monitors infringe the '397 patent?

A.   Should be a list on the next page.

Yes.  So this is a shorter list because of the features of the claims.  It is the so-called edge-lit design with the optical film stack and the quantum dot films.  The teardown was an example of the XB323U.  In addition, the edge-lit designs with the optical film stack without the quantum dot films, those are the CB342CK; two versions of the XF270H, the RX and ZX; and the XB271; and the XB272.

I should have read for the quantum dot style, not only the sample product but also three versions of the XB273K, the G, the P, and the S model.

Q.   For the first limitation of the '397 patent, beginning with "a generally planar layer," and ending with "said layer," has your analysis shown that this limitation is

met?

A.   Yes.

Q.   Can we break it into parts?  I've highlighted a first part.

A.   Right.

Q.   How is that met in the accused products?

A.   So -- so in this -- in this stack of films, I've identified the optical film stack as a planar layer.  In cross-section, it has a planar layer you can see in the upper right corner; actually, two planar layers in either side of the pyramidal structure.  So I've identified that as the optically transparent material satisfying the first part.

Q.   And then with respect to this next piece, you've highlighted in blue.  Does that mean we have another claim construction?

A.   We do.

Q.   What is that construction?

A.   Simply that "corrugated" means shaped into alternating ridges and grooves.

Q.   How have you determined applying the Court's construction whether this limitation is met in the accused products?

A.   Again, by examining the cross-section that I showed you that I have on the screen, you can see that as a corrugated

structure with -- with ridges and grooves.  As I said, it's -- it's between two planar surfaces.

Q.  And -- and how is this optically -- or strike -- excuse me.

Going to the next aspect of this claim limitation, how is that met?

A.  This -- this -- this claim element requires that there's a transparent optical window in a predetermined pattern and configured for communicating light, meaning transferring light from one layer to another.  And these accused products, I've identified the top of the pyramidal structure, which is in contact between the planar layers. That contact forms a clear window where light can freely transfer between those windows, and those are all useful to control the exact distribution of light that we see on the front of the screen.

I'd also like to add, just for clarification, that on the bottom of this slide, there's a -- kind of an artist conception of these pyramidal structures showing a flat top.  The upper right corner is a top view of these pyramidal structures where you can see that it's spread out, and that creates a window or a path for light to go straight through this pyramidal structure without going backwards.

MR. REICH:  Now, can I see the ELMO, Mr. Diaz.

Q.  (By Mr. Reich)   Were you here in opening with Mr. -- when Mr. Findlay showed this slide?

A.  I was.

Q.  He seemed to suggest that -- or he suggests right here the accused products are prism sheets without optical windows.

Are these sheets you're pointing to, the optical film stacks, what's commonly referred to as BEF, or just normal prism sheets?

A.  Those are terms that are used in industry.

Q.  And so the optical film stack, though, is not just a normal prism sheet, right?

A.  That's correct.  It -- it's a stack for a reason.  A BEF sheet doesn't have to have a stack.  It could be freestanding and it wouldn't have a window.

Q.  So we should put optical film stack there, right?

A.  Right.  Right.

Q.  I'll abbreviate it.

Now, he seemed to suggest that no such window existed in the accused products.

Do you recall that.

A.  I do remember him making that comment.  I disagree.

Q.  I want to show a zoomed-up version of what we were looking at in your slide.

What is this image, can you explain to the jury

how this shows, clearly, an optical film stack -- or,
sorry, in the optical film stack, an optical window?

A.   We're looking at the top surface of the pyramidal
structure in that stack-up.  And so we're focusing in on
that interface, and it's hard to photograph, but we have a
photograph of that region.  You can see there is a flat
portion.

Q.   Is that -- that's this portion right here?

A.   That's correct.

Q.   And then the next optical window, is that this portion
right here?

A.   Yes.

Q.   And they kind of repeat?

A.   Yes.  And I'll say that you might wonder why there's no
bottom of the pyramid structure, but the microscope is
focusing on the top so we can look just at the top.

Q.   Now, there was a suggestion that you said all prism
sheets are -- somehow meet this limitation because of
manufacturing tolerances.

     Do you recall that?

A.   I recall having a discussion about that during my
deposition.

Q.   But you're not saying that all prism sheets meet this,
correct?

A.   That's correct.

Q.  You have to specifically find, and you did find, actual windows that we could see, correct?

A.  Yes.  And those are the -- those are the monitors we've accused for this patent.

MR. REICH:  I'm going to mark these as PTX-403, PTX-404, in case the jury wants to check out these images.

Q.  (By Mr. Reich)  So may I check this limitation off?

A.  Yes.

Q.  For the next limitation beginning with "Wherein the corrugations," and ending with "total internal reflection," has your analysis shown that this claim limitation is met?

A.  Yes.  This requires that the corrugated surfaces are aligned parallel to each other and to a reference line, which you can imagine is the edge of the plastic film, and they are configured to retroreflect light, reflect light back towards the -- towards the back of the module.

Q.  Well, you said "retroreflect," do we have a claim construction we need to apply?

A.  Oh, yes, thank you.

Q.  What is the Court's claim construction?

A.  So retroreflect says that it means reflecting light so that the paths of the reflected rays are parallel to the incident rays.  And that is -- that is the way retroreflection works on a structure like this.

Q.  May I check off this limitation?

A.  Yes.

Q.  Before I do that, what is an incident ray?

A.  So in this case, we're talking about a light ray coming into this structure, this optical film stack, and that's indicated, for example, where I've drawn a red circle.  The light ray is coming up.  They are total internal reflected downward back where they came from.

That's the meaning of retroreflecting, by the Court's definition.  So we have this kind of round trip U-turn the light is making back towards the back of the -- towards the back reflector.

Q.  Okay.  Now can I check it off?

A.  Yes, now you may.

Q.  We're done with Claim 1.  So has your analysis shown that Dependent Claim 9 is met in the Acer accused '397 products?

A.  Yes.

Q.  How so?

A.  This calls for a plurality of light collectors, and I'm pointing to the lens array that's collecting light from the light guide, sending it towards the optical film stack.

Q.  And how is that disposed in an energy exchange relationship with said optical windows?

A.  I think simply you can think of light coming -- light is energy, as we heard this morning.  That energy is going

from the light guide plate up towards those windows.  And some of that light, at least, will go right to those windows and then go out to the -- to the viewer.

Q.  And does this claim design help get the light to the right direction for the viewer?

A.  Yes.  This is all part of the design of this efficient optical system that we've been discussing today.  There's many elements that are not obvious.  This is one of them, that light will have this feature.  So this is an important element in the -- in the patent.

Q.  Moving on to Dependent Claim -- oh, actually, may I check Claim 9 off as infringed?

A.  Yes.

Q.  Moving on to Dependent Claim 14.

Did your analysis show that this claim is met?

A.  Yes.

Q.  How so?

A.  This claim requires that the light sources are located below a plane of the optical film stack.

Now, it's hard to look at what we're looking at our demo unit, but if you look from a top view, and I photographed the LEDs from a side view, you can see clearly that the LEDs are in line with the light guide plate, and that is all below the optical film stack.  So the optical film stack is above the LEDs, and this claim element is

met.

Q.   May I check Dependent Claim 14 off as infringed?

A.   Yes.

Q.   And that's for the full set of '397 accused products?

A.   The '397 accused products set, correct.

          MR. REICH:   Mr. McCarty, can you help me with the next board.

Q.   (By Mr. Reich)   All right.   Moving on to the '191 patent.   For Claim 10, where do we need to start?

A.   Claim 10 is dependent on Claim 1, so following my process, we'll start with Claim 1.

          It's a little long, but we'll go through it again piece-by-piece.

Q.   Hopefully some of these features will be familiar by now.

A.   Yes.

Q.   Starting with the preamble, what are -- what are the type of accused products?

A.   These, again, would be Acer monitors.

Q.   Which Acer monitors infringe the '191 patent?

A.   The '191 patent is infringed by the monitors shown on the screen.   It's the monitors that have the edge-lit design, the optical film stack, and quantum dot film.   So for the first time, we have a quantum dot model.   The models I've recited before, they're on the screen.

Q.   And for the record, is that the XB323U, which is our next representative one here, and then the three versions of the XB273K?

A.   That is correct.

Q.   For the first limitation of the '191 patent, beginning with "a rectangular optically transmissive sheet," and ending with "a hundred millimeters or more," has your analysis shown that this claim limitation is met?

A.   Yes, it has.  Again, using the Court's construction for total internal reflection, I've identified the light guide plate as satisfying this claim.

Q.   And we'll break it down into parts.  With respect to that first part, I think you said something about the light guide plate.  Can you -- can you explain how that's met again?

A.   Rectangular optically transmissive sheet configured to guide light.  So it is the light guide plate.

Q.   Now, what about the surfaces, how is that aspect met?

A.   This identifies two surfaces, as before; a front surface and a back surface.  I've identified those on this slide.

Q.   And what about the thickness measurements?

A.   In this case, the requirement is for the thickness to be between a -- less than a millimeter up to a few millimeters.  That's satisfied by the light guide

thicknesses in these products and that the length and width dimensions of the screen itself are more than a hundred millimeters, which is 4 inches, so clearly this is met by the monitors.

Q.   It's a bigger kind of monitor size thing; is that right?

A.   Yes.

Q.   Now, with respect to the next -- may I check this limitation off?

A.   Yes.

Q.   With respect to the next limitation, beginning with "artificial light source," and ending with "sheet," have your analysis shown this claim limitation is met?

A.   Yes.  The artificial light source is simply the LEDs, and there's an array of them, as I showed.  And they're on the screen, and they are arranged to illuminate the end of the light guide plate.

Q.   May I check this limitation off?

A.   Please do.

Q.   The next limitation begins "a plurality of rounded ridges" and ends with "transmissive sheet."

        Has your analysis shown that this claim limitation is met?

A.   Yes.  The lenses I've identified are these rounded ridges, and they do go between the LED side all the way to

the -- would be the top of the light guide plate in the sample model.

Q.   May I check this limitation off?

A.   Yes.

Q.   The next limitation begins -- or reads "a two-dimensional pattern of discrete cavities formed in the second broad-area surface."

Has your analysis shown that this claim limitation is met?

A.   Yes, it has.

Q.   How so?

A.   I've identified these cavities.  They are discrete. They're formed in the back surface of the light guide plate.  I've circled two of them.  They're a two-dimensional pattern, and you can see the cavities magnified in the lower right corner.

Q.   Now, I think in opening, Mr. Findlay suggested that you said something like this could only be met by cavities that look like a coffee cup.

Do you recall that?

A.   Yes, I believe he misquoted my testimony from my deposition.

Q.   What were the coffee cup structures that are in the accused products?

A.   These accused products have these -- this type of

structure, but there are other accused products that have more of a scoop-shaped microstructure.  I showed you maybe with respect to the first patent.  And those do look more like a cup.

MR. REICH:  Mr. Diaz, can we go to Slide 60?

THE TECHNICIAN:  60?

MR. REICH:  60, yes, thank you.

Q.  (By Mr. Reich)  And so in PTX-321, that's one of the cup structures, right?

A.  Yes.  That's -- that's the -- that's the reference for what we were discussing in my deposition, but all of these are cavities.  Some are more complex than others, but they're all -- they're all cavity structures.

MR. REICH:  And so going back to Slide 93, Mr. Diaz.

Q.  (By Mr. Reich)  Is this structure also a cavity?

A.  Yes.

Q.  And is it formed in the back surface of this light guide plate?

A.  Yes, as I described before for this kind of process, there is actually a formation in the light guide plate itself, as you can kind of see from the 3D image on the lower right.

Q.  All right.  Well, we'll see if they try to misquote you again.

May I put a check by this limitation?

A. Yes.

Q. The next limitation begins -- it's a little bit longer, "a light converting layer" and ends with "transparent walls."

Has your analysis shown that this claim limitation is met?

A. Yes.

Q. Starting with this first half, how so?

A. The light converting layer is the quantum dot film I showed you where blue light is converted to red and green light. It's parallel to the light guide plate, and it receives energy from that -- from the -- from the blue light -- from that light guide plate.

Q. And then with the -- respect to the next part of the limitation, how is that claim limitation met?

A. First, that the -- the quantum dot film, the light converting layer has barrier films on the top and bottom. It's called a first transparent wall and a second transparent wall in this claim. And that the quantum dot layer is partially transmissive. This is illustrated by looking through that quantum dot film in the lab, looking at I think a cell phone underneath, if it was -- if it was fully absorbing you wouldn't be able to see what was underneath. So it's partially transmitting. This is met.

Q. And sandwiched between, at least that's words that I understand?

A. Sandwiched between, yes. Oh, right. So the quantum dot layer is sandwiched between the two barrier films.

Q. And are you showing that same layer here on the next slide?

A. To show that these actually are transparent walls, I peeled back the barrier films so you can see the quantum dot film between those two films. This whole stack-up is only maybe about a half millimeter thick.

Q. May I check this limitation off?

A. Yes, you may.

Q. Our next limitation begins with "a reflective back cover" and ends with "light converting layer."

Did your analysis show that this claim limitation is met?

A. Yes. You remember I showed you the white reflecting layer behind the light guide plate and the quantum dot film on the top? They're coextensive which means they're in line with each other, and they're the same size.

Q. May I check the limitation off?

A. Yes.

Q. The next limitation here begins "a total internal reflection surface" and ends with "total internal reflection."

Did your analysis show that this claim limitation is met?

A.   Yes, it's shown that, and I demonstrated -- hopefully you could see that on the demo that this optical film stack has total internal reflecting surfaces for certain angles of light coming up from this quantum dot layer, and that will be directed back down through the quantum dot layer, back to the reflector and back up again.  So this claim element is met.

Q.   And that's what you described as helping to get that better brightness, better whiteness we saw?

A.   Correct.  Correct.

Q.   May I check this limitation off?

A.   Yes.

Q.   The next limitation begins "wherein at least one of the rounded ridges" and ends with "rounded ridges."

Did your analysis show that this claim limitation is met?

A.   Yes.

Q.   Starting with this first part, can you explain that?

A.   We've looked at these images before, and it says that they have an arcuate cross-section.  Arcuate means bow-shaped, almost like a bow and arrow, that kind of bow shape is the meaning of arcuate.  It has that cross-sectional profile as you can see by the image.

Q. And then with respect to the second portion of this limitation, how is that met in the '191 accused products?

A. Yes, I covered this on a previous patent, that the area of the cavities is much, much less -- much, much less than the area of the lens.

Q. May I check this limitation off?

A. Yes.

Q. The last limitation of Claim 1 begins with "wherein the plurality of transmissive layers" and ends with "artificial light source."

Did your analysis show that this claim limitation is met?

A. Yes, it did.

Q. How so?

A. As I've illustrated on the screen, this is the quantum dot film layer where maybe you remember that the blue light comes into this film and red and green light are converted so the light -- the energy is actually absorbed by these tiny quantum dots. And then the second wavelength, red or green, is created as an output of that little dot. So that's -- and that all comes from the LEDs attached to the light guide plate.

Q. May I check this limitation off?

A. Yes.

Q. Is that all the limitations of Claim 1?

A.   That is all -- all the limitations of Claim 1 are met.

Q.   So how about Claim 10?  Did your analysis show that Dependent Claim 10 is infringed?

A.   Yes, it did.

Q.   How so?

A.   So Claim 10 states that at least some of the discrete cavities have a round shape -- generally a round shape, and have a curved wall within the cavity sloped at an angle with respect to the flat surface.  It's called the broad-area surface.  So first, I've identified a pair of discrete cavities, and our profiling tool can actually give us a sectional view of the cavity.  It has -- this discrete cavity has multiple parts, and many of those parts are sloped relative to the flat surface.  So that satisfies this claim element.

Q.   And, obviously, we have a lot of discrete cavities here, all the little dots.  We're just focusing on one here in our image; is that right?

A.   That's correct.  I've blown up just one of the many dots.  They all have generally the same shape.

Q.   And with respect to this next part about the sloped at an angle with respect to the broad-area surface, how is -- how is that met here?

A.   I've tried to show that by zooming in on that -- the side of that little complex structure, and I think you can

probably imagine it does have sloped walls.  But when you look at this profile data, it shows truly there is an angular slope between certain sections of this discrete cavity actually in more than one place.

Q.  May I check this Dependent 10 off as infringed?

A.  Yes.

MR. REICH:  Mr. McCarty, can we go to the '205 patent.

Q.  (By Mr. Reich)  Last patent, but we have two boards, unfortunately.

Do we need to start with Claim 1 as well for Claim 17 of the '205 patent?

A.  Yes.  Yes, as before, we'll do the same process.

Q.  Starting with the preamble, what type of devices infringe Claim 1 and then Claim 17 of the '205 patent?

A.  That would be certain Acer monitors.

Q.  And which are the monitors that infringe Claim 1 and 17 of the '205 patent?

A.  This would be the same list as before, the XB323U; three models of the XB273K, G, P, and S models.

Q.  Starting with this first limitation, it begins with "a first broad-area reflective surface," and ends in "total internal reflection."

Has your analysis shown that this claim limitation is met?

A.   Yes.   I've identified the first broad-area reflective surface as the optical film stack that has that reflective nature on the bottom side.

Q.   And how is this configured for reflecting light using a total internal reflection?

A.   It's configured to reflect light by the design of the pyramidal structure.  So as I've illustrated in the right illustration, as light hits those walls, they're set so that light can be retroreflected back towards the back reflector.

Q.   May I check this limitation off?

A.   Yes.

Q.   For the next limitation, beginning with "a second broad-area reflective surface," and ending with "broad-area reflective surface," how is this claim limitation met?

A.   This is an easy one.  I think we can do it quickly. It's the reflective layer at the back of the stack, that white film.  It's indicated in yellow on the drawing -- on the slide.

Q.   May I check it off?

A.   Yes.

Q.   The next limitation, also one that's familiar:  A generally planar photoresponsive layer disposed between the first and second broad-area reflective surfaces.

How is this met in the accused products?

A.  Again, as we've seen in these pictures, the quantum dot layer is between those two reflective surfaces, and this claim element is met.

Q.  May I check it off?

A.  Check.

Q.  The next layer is a little bit longer.  We'll take it in parts, but the limitation begins "a photoresponsive layer" and ends with "transmitted."

Has your analysis shown that this claim limitation is met?

A.  Yes.  Yes, it has.  And this illustration I've shown before where light is converted into red and green light from the incoming blue light.

Q.  And with respect -- and that's with respect to the first part, the quantum dots.

What is this second portion of the limitation talking about with respect to a spectral range?

A.  So you may remember Dr. Vasylyev talked about the properties of light, and different wavelengths have different colors.  So this is simply saying that there's one spectral range of color, for example, blue, that's -- it's around 450 nanometers.  That energy can be converted to green or red, which is at a different spectral range of the whole energy spectrum.

So in this case, that blue light is converted to a

longer wavelength light that's green -- that appears green to our eyes or red to our eyes.  That's a different spectral range.

Q.   And is that what you showed us with your quantum dot illustration as well earlier?

A.   Yes.  You remember these illustrations.  They were changing the color of blue.  Blue goes into, you know, red and green.  It's like magic.

Q.   May I check this limitation off?

A.   Yes.  Yes.

Q.   The next portion of this claim is a monochromatic light source configured to emit light in the first spectral range.

How is that met in the accused '205 products?

A.   This claim element is met by the blue LEDs.

Q.   And are the blue is -- that blue color is the first spectral range?

A.   That's the first spectral range that I mentioned, yes.

Q.   May I check this claim limitation off?

A.   Yes.

Q.   The next limitation begins "a planar array of lenses" and ends with "photoresponsive layer."

How is this limitation met in the accused products?

A.   First of all, the planar array of lenses I've

highlighted with a box on the -- it's the top surface of the light guide plate.

Q. And then how is this distributed over an area of the photoresponsive layer?

A. So those lenses are distributed over an area. It's the same size as the photoresponsive layer. It has the same area as the photoresponsive layer. And that photoresponsive layer is -- is between -- I'm sorry. The lenses are between the light source and the photoresponsive layer.

MR. REICH: Mr. Diaz, can I have the ELMO, please.

Q. (By Mr. Reich) Mr. Credelle, do you remember in opening when Mr. Findlay showed this slide?

A. I do.

Q. And, again, his non-infringement is covering up some claim language.

What is the key claim language that he's covering up here?

A. The -- the key of this claim is that the array of lenses are distributed over an area.

Q. And so just because it's so important here, how is the set of lenses in the accused products distributed over an area of the photoresponsive or the quantum dot layer here?

A. So if you imagine the lenses are distributed over an area, it's the same area as the photoresponsive layer, then

this claim element is met.  So it's -- it's -- that's -- that's the interpretation -- the correct interpretation of this claim element.

Q.  Now, what Mr. Findlay said is the array of lenses is under the photoresponsive layer, not over.

Do you see that?

A.  Yes.

Q.  I mean, part of this, is this whole illustration's flipped on its side.  As these products are used, what's the orientation?

A.  The orientation is lenses, then photoresponsive layer, the quantum dot film.

Q.  We have to flip it to its side, right?

A.  Yeah.

Q.  We were using the animation as if it was flipped over, but these products are actually on their side; is that right?

A.  Yes.  The way we normally use them.

Q.  And the claim doesn't just say lenses over the layer, does it?

A.  No.  I don't interpret it that way.

MR. REICH:  And this will be PTX-405, in case the jury wants to see it to check that argument.

Q.  (By Mr. Reich)  Going back to the slides, does the claim language also make clear exactly where in

relationship between the layer -- the photoresponsive layer and the lenses -- the lenses are supposed to be?

A.   Yes, it does.  They're -- they're located between the light source and the quantum dot film.

Q.   And so the light source is -- again, our drawing is knocked over?

A.   Yes.

Q.   But the light source is coming from the bottom or from the back and going to the front; is that right?

A.   That's correct.

Q.   So the lenses, are they in the accused products in the exact place that the claim requires?

A.   This -- this illustration is on its side.

Q.   Yes, but in the accused products, are the lenses in the exact right place as required by the claims?

A.   Yes, that's my opinion.

Q.   May I put a check by this limitation?

A.   Yes.

Q.   With respect to the next claim limitation here, "wherein the surface relief structures," beginning with that, and ending with "propagation direction," how is your analysis shown that this claim limitation is met in the '205 products?

A.   The surface relief structures referred to in this claim are the optical film stack structures.  They redirect light

at a high angle, effectively backwards towards the --
towards the rear of the -- of the backlight system, the
original propagation direction.  So it's those structures,
as I've indicated, with the return paths of the blue arrows
on this illustration.

Q.   May I check this limitation off?

A.   Yes.

Q.   With respect to the next limitation, which we have
another board --

        MR. REICH:  Mr. McCarty, can you help me?

        MR. MCCARTY:  Last one.

Q.   (By Mr. Reich)  It begins with "wherein the
photoresponsive layer," and ends with "normal incident,"
how is your analysis shown that this claim limitation is
met in the accused Acer products?

A.   It's actually in the same way that I discussed with
respect to the last patent.  This layer is partially
transmissive, as you can see looking at that cell phone
under the sheet.  So it does not absorb all the light; and,
therefore, this claim element is met.

Q.   And what does "normal incident" mean?

A.   Normal incidence means looking straight down on the --
on the sheet.

Q.   May I put a checkmark by this limitation?

A.   Yes.

Q.  For the next limitation, last limitation of Claim 1, beginning with "wherein the first and second broad-area reflective surfaces," and ending with "photoresponsive layer," how is your analysis shown that this claim limitation is met?

A.  I hope by now this maybe becomes a familiar theme, that the light going towards that optical film stack will -- a large portion will be reflected back down towards the lower reflector in order to give the light a chance to go through those quantum dot films more than once.  That's actually one of the reasons that it's not fully opaque quantum dot film.

So that goes -- that process continues until the light achieves the right angle to either come out the optical windows or come out the sides of the pyramid structures to the viewer with the right distribution of light, brightness, and color.

Q.  Now, I believe during opening, Mr. Findlay suggested that light trapping is only beneficial in solar systems. How is that not the case?

A.  Well, I disagree with that statement.  Even if it's true of solar systems, in this case, light trapping that requires multiple passes through this system, maybe at least two, is clearly one of the -- the key inventions of this process.  This ability to cycle light through these

film structures with keeping the light efficiently pointed at the viewer is -- is key.

And light trapping is a good descriptive term for that process of -- of trapping the light into a few cycles before it gets the right angle to go out.

Q. And is that how we got from the -- the purplish color to the white color, getting that multiple passes?

A. Yes. I mean, that that -- to me, personally, that was very dramatic when I first did this test. But it's true, you can see the improvement in the whiteness of that layer and the brightness of that layer with this optical film stack. And the only way that can happen is if the light is cycling backwards, as I just described.

Q. Now, Mr. Findlay also briefly talked about SVV's website mentioning light trapping. Does the fact that SVV wrote something on their website about light trapping's benefits also in solar limit these claims in any way?

A. No. It's totally different applications of the term. So since the SVV company has applications of managing light for solar and for illumination -- those are totally different, though. The processor is totally different. It doesn't limit these claims.

Q. Okay. May I check this limitation off?

A. Yes.

Q. All right. Very last claim. Here we go. With respect

to Claim 17, I've broken it into three parts.

With respect to this first part, beginning "a light converting optical system," and ending in "total internal reflection," how is this met in the accused products?

A.  As we've discussed several times, the light guide is optically transparent and it has the total internal reflecting property at the two surfaces, so light can bounce down that light guide until it hits a deflecting element.

Q.  Now, may I check this claim limitation off?

A.  Yes.

Q.  With respect to the second part, beginning "wherein a broad-area surface," and ending with "curved walls," has your analysis shown that this part of the claim limitation is met?

A.  Yes.  This does add one feature to what we've discussed previously.  We have the same light-deflecting surface features.  I've circled two of them.  And it has that familiar kind of cavity -- complex cavity shape.  And I've also indicated before that they have curved -- curved walls.

Q.  May I check this aspect of Claim 17 off?

A.  Yes.

Q.  For the final part of Claim 17, beginning "wherein a

distance," and ending with "surface relief features," how has your analysis shown that this part of Claim of 17 is met?

A.    This one is pretty simple.  It's comparing the size of two adjacent deflecting surface features to the distance between them.  This requires that the distance between two is greater than the size of each of the two, and this is done to improve the uniformity of the system, generally. But this is what the claim requires, and it is met.

Q.    May we check off Dependent Claim 17 of the '205 patent as infringed by the '205 patent accused products?

A.    Yes.  Yes, you may.

Q.    So we made it through all the claim boards.

          MR. REICH:  Your Honor, I'll sticker these after the end, but just to save the jury's time, I won't do it right now, if that's okay.

Q.    (By Mr. Reich)  Now, we just went through all the claim boards, every claim limitation.  It took a while, I admit.

          Did you ever -- despite Mr. Findlay's suggestion that this was a solar invention -- see the word "solar" anywhere in the claims?

A.    It does not appear.

Q.    I didn't see it either.

          Aren't you glad, also, that we didn't have to do every single claim board in opening like he suggested?

A.   Yes.

Q.   That might have taken a long time.

Now, are we done with all the claim boards?

A.   I believe we are, yes.

MR. REICH:   Why don't we just take that one down.

Q.   (By Mr. Reich)   We've gone through all the claims, but can we now talk about Acer's acts of infringement?

A.   Yes.

Q.   Why do we need to talk about Acer's acts of infringement even after you've shown that the products meet all of the claim limitations?

A.   We have to demonstrate that Acer commits acts of infringement with their newly designed products.

Q.   Which acts of infringement did you find Acer committed with these monitors?

A.   They -- they offered for sale and sold and shipped products to the United States.

Q.   Okay.   Focusing on this slide, what are you showing with respect to Acer's offer for sale?

A.   This is an example taken from Acer's website that shows that these products are indeed offered for sale in the United States with pricing and availability and can be purchased by anybody.

Q.   And is that Acer Inc. indicated at the bottom of the website?

A.   Yes, this -- this website is managed by Acer Inc.

Q.   And on the website, does Acer provide a price and a description of the accused product?

A.   They do.

Q.   Can you turn to Tabs JTX-3, 4, 5, 6, 9, 10, 11, 12 in your binder.

A.   Okay.

Q.   Let me know when you've had a chance to look at all of those.

A.   Yes, I've seen them before.

Q.   What are these exhibits?

A.   These are voluminous spreadsheet data that shows purchasing -- purchasing order information from Acer America to Acer Incorporated for products that they will eventually sell.

Q.   All right.

     MR. REICH:   Your Honor, I move to admit JTX-3, 4, 5, 6, 9, 10, 11, and 12 into evidence.

     MR. KAUFMAN:   No objection, Your Honor.

     THE COURT:   Admitted.

Q.   (By Mr. Reich)   Let's just focus on one of them as an example.   It's JTX-12.   I'll show it on the screen here.

     What are you showing with respect to JTX-12?

A.   This excerpt of the spreadsheet, I'm highlighting that these are products -- Acer-brand products that are destined

for the United States.

Q. Now, are you the one who's going to be talking about all of Acer's sales data in detail just right now?

A. I will not. Dr. Farber will cover that topic.

Q. Can you turn to JTX-14 in your binder.

A. Okay.

Q. Are you familiar with this document?

A. Yes.

Q. What is it?

A. This is an annual report from Acer Incorporated for 2022.

MR. REICH: Your Honor, we move to admit JTX-14.

MR. FINDLAY: No objection, Your Honor.

THE COURT: Admitted.

Q. (By Mr. Reich) Showing a part of JTX-14 on the screen, what are you showing here with respect to Acer America Corporation?

A. This shows that Acer America Corporation is a wholly owned subsidiary of Acer Incorporated. I think that was discussed this morning during opening, but this gives the details of that.

Q. And, again, who is Acer America Corporation?

A. So Acer America is -- is the -- the entity that's in the United States that handles sales of products in the United States.

Q.   Going to PTX-300, which is in the record, what do the products indicate about the Acer companies?

A.   First of all, this indicates that these monitors, of course, have a model number and a lot of data, but it's manufactured by Acer Incorporated, and Acer Incorporated is located in Taiwan.

Q.   And you've also got another box on FCC rules.  What is that?

A.   So any product that's to be shipped into the United States has to pass the FCC rules for electromagnetic interference.  They get this sticker if they pass that test, and then they are -- can be sold in the United States.

Q.   For direct infringement, does Acer have to know about the -- about the asserted patents or intend to infringe?

A.   Not -- not actually, they do not.

Q.   So what did you conclude about Acer's direct infringement?

A.   I concluded that Acer directly infringes by selling, offering for sale, and shipping products to the United States, the asserted patents.

Q.   Now, beyond direct infringement, do you understand that there's another type of infringement called indirect infringement or inducement?

A.   Yes, that's my understanding of the law.

Q.  Now, the Court's going to instruct the jury as to the law.  Are you going to opine on intent or knowledge?

A.  That's -- that's for the jury to decide.

Q.  But can you help us understand some of the technical issues associated with Acer's notice and intent?

A.  Okay.

MR. REICH:  Your Honor, actually, may I approach real quick?

THE COURT:  Sure.

(Bench conference.)

MR. REICH:  Your Honor, this was the aspect that you asked us to approach in pretrial.  He's going to talk about a technical person's understanding of the notice letter and what a technical person could understand from that.  Never opine as to actual intent that Acer has, but we just wanted to approach to ensure that you were okay with that.

MR. KAUFMAN:  If all it is is what a technical person would understand the letter to mean, I have no issue.

THE COURT:  What is -- what is the fight over?  Is Acer arguing they didn't get notice or this wasn't a notice letter or it wasn't enough?  I mean, what --

MR. KAUFMAN:  We argued originally in the motion in limine that he's not qualified to give the legal opinion

about what legally constitutes notice for purposes of induced infringement.

And they conceded that that's for you to instruct the jury and not for him.

And so if he's not going to do that, that moots the issues that we raised.

MR. REICH:  We agree.

THE COURT:  So what is the point --

MR. REICH:  Just to explain that an engineer who received this identification of claims and products can do teardowns, much like he just did.  It's very short.

THE COURT:  I'm just not sure how that's -- what that's relevant to?  What are you trying to do?

MR. REICH:  I'm just trying to prove that Acer could have done teardowns themselves.

THE COURT:  I don't think you need him to say that.

MR. REICH:  Well, I think you do need a --
respectfully, I think you need a technical person to say a technical person can do teardowns.

THE COURT:  I know that.

MR. REICH:  Yes, but I don't know that the jury --
can I just ask that question, Your Honor?

THE COURT:  You can ask that.

MR. REICH:  Okay.

THE COURT: Do you have an objection to that, that your folks -- he's a technical person and that technical people can do teardowns?

MR. KAUFMAN: No.

MR. REICH: Perfect. That's the one question.

THE COURT: Okay. Let's go ahead.

(Bench conference concluded.)

Q. (By Mr. Reich) Now, we saw this letter earlier. Do you recall that?

A. I do.

Q. My question is, as a technical person, you know, receiving a letter like this that Acer received, could a technical person do the teardowns that you did to determine whether there was infringement?

A. Absolutely. It's very straightforward.

Q. All right. Now, moving on. Did you review discovery responses in this case?

A. I did.

Q. What are we seeing here?

A. This is an answer to a request for admission stating did they receive a copy of the letter we just looked at. They said they did.

Q. And -- and when you say "they," Acer received a copy of this letter?

A. Yeah, I apologize, yes, Acer.

Q.   And -- and "by this letter," we're talking about JTX-1, which is the notice letter in this case?

A.   The notice letter, that's correct.  I'll try to be more accurate.

Q.   And with respect to this next request for admission, what did Acer admit here?

A.   They admit here that the list of patents from SVV that they received notice on January 29th, 2021.  So they -- they are aware of these patents.

Q.   Okay.  Ultimately, though, who is going to judge, using evidence like this and other evidence that will be in trial, whether Acer had notice or intent to infringe these patents for induced infringement?

A.   Again, that's a task for the jury.

Q.   Okay.  The final section of your roadmap was technical value and damages.  Why are you discussing the technical benefits of SVV's asserted patents?

A.   The main reason is that this information is helpful to our damages expert to assess the damages based on those benefits.

Q.   Now, we heard a little bit about this earlier.

     Do patents have to list all of the benefits that come from using the claimed technology?

A.   No, that's -- that's -- would be somewhat unusual, actually, in my experience.

Q.   So as a person of skill in the art, can you explain to us how, you know, a person of skill in the art, an engineer would understand the technical value and benefits associated with SVV's technology?

A.   They would do probably what -- what I have done is to look at the -- look at the different -- the benefits of this particular technologies and how it could impact, in this case, displays; making an illumination system for displays that's thin, that manages light properly so you can get the best use of your photons, you can get the color and the brightness, and you can put the light where you want it.

So some of these lensing features and some of the other features we've discussed this afternoon all become what a person of skill in the art would analyze and say, yes, this makes a better monitor.  It's brighter, has better color, better viewing angle because the light is managed better, such things like that.

Q.   And -- and so what are the benefits of SVV's technology?

A.   So, you know, the benefits are what I was just, maybe, highlighting; that the monitor itself is now going to be a better product, is going to be brighter, have richer colors, it'll have a well-tuned viewing cone of light for that application.  And it's -- it's basically a superior

product.

Q.   And can these benefits, though, manifest in multiple ways?

A.   Yes.  For example, one of the benefits of this efficient lighting system from these patents is that you don't have to make it brighter.  You can make it the same brightness as another model and save costs.  Smaller power supply, fewer LEDs, items like that.  So there's two ways that Acer and its manufacturing partners can utilize these benefits.

Q.   And what part of the accused products gets these benefits?

A.   The benefits are to the monitor itself.

Q.   Now, are you the one who's going to be quantifying the precise numeric value of these benefits?

A.   No, I leave that task to Dr. Farber.

Q.   All right.  Thank you, Mr. Credelle, for your time.

Can you please just look at the jury one last time and tell them your ultimate conclusion in this case.

A.   It's very clear to me, after all of my analysis, that Acer's accused monitors infringe Claim 16 of the '135 patent, Claims 9 and 14 of the '397 patent, Claim 10 of the '191 patent, and, finally, Claim 17 of the '205 patent.

Q.   Thank you.

MR. REICH:  And just for the record, Your Honor,

PTX-406 through 411, we'll mark the boards and take pictures of them.

With respect to this demonstrative, I'll mark it as PTX-412.

And then with respect to the quantum dots, 413.

I pass the witness.

May also Your Honor, at some point, let the jury feel the components of this system and just pass it around the jury box?

THE COURT:  I don't have a problem with that.

MR. REICH:  Okay.

THE COURT:  I don't have a problem with that.

MR. REICH:  And if they feel the top, they can kind of feel the lenses.

THE COURT:  All right.

MR. REICH:  Thank you.

THE COURT:  You can just wait until they do this, and then...

MR. KAUFMAN:  Okay.  Your Honor, may I begin?

THE COURT:  Yes, sir.

CROSS-EXAMINATION

BY MR. KAUFMAN:

Q.  Good afternoon, Mr. Credelle.

My name is Craig Kaufman.  I don't believe that we have met before.  I am one of Acer's lawyers.  I believe

you met my colleague, Mr. Chen, when you were deposed in this action.

A.   Thank you.   Nice to meet you.

Q.   Nice to meet you.

So I guess, to start, I'd just like to clear up a few things on the infringement side in terms of just so the jury clearly understands which products are accused of infringing which patents.   Can you help me out there?

A.   Okay.

MR. KAUFMAN:   So if I can have the ELMO, please, he says with trepidation.

Q.   (By Mr. Kaufman)   Okay.   So with respect -- I'm really concerned with the edge-lit patents here -- the products here.   The 57 products at the top.

Do you see those, sir?

A.   I do.

Q.   Now, you offered your opinion that those products infringe only the '135 patent, correct?

A.   That's correct.

Q.   They do not infringe the '191 patent, correct?

A.   That was a smaller list.

Q.   Right.   But, again, just so we're clear, the edge-lit patents do not infringe the 1 -- the '191 patent?

A.   Yes, I believe that's correct.   It's a lot of products to keep track of, but, yeah.

Q.   Believe me, I understand.

The -- the edge-lit products listed here, the 57 products also do not infringe the '397 patent?

A.   That's correct.

Q.   And, finally, the edge-lit products here do not infringe the '205 patent?

A.   That's also correct.

Q.   So for the -- for the '397 patent, we have five accused products, if I count this correctly, correct?

A.   Yes, I believe that's right.

Q.   And then for the edge-lit -- for what I'll call the quantum dot patents, the '191 and the '205 -- can I call those the quantum dot patents?

A.   Yeah, that's useful.

Q.   We have four accused products?

A.   That's right.

Q.   Okay.  I just want -- I just wanted to make clear because sometimes it sounded like -- like you were suggesting that all products infringed all patents.  I just wanted the jury to understand so that we're all on the same page.

A.   Yeah, it was not my intention.

Q.   I didn't think so.  I just -- you know, sometimes...

All right.  So you testified earlier that you've been in this business for about 40-plus years?

A.    That's correct.

Q.    And you've been designing LCD panels?

A.    I've been doing a lot of things.

Q.    Yeah.

A.    Included.

Q.    Among the many things you have done --

A.    Yes.

Q.    -- you've designed LCD panels?  You've worked in the industry for people like Apple and Motorola?

A.    Yes.

Q.    You've been involved in industry organizations?

A.    Yes, I'm a fellow of the SID.  I've contributed to the development of this engineering society for displays for decades.

Q.    And the SID is the Society for Information Display?

A.    That's correct.

Q.    And over the 40 years or so, you've regularly attended their technological symposium?

A.    Yes, up until a couple years ago I was still attending even though I was semiretired.

Q.    I apologize for interrupting you, Mr. Credelle.

        And you served on the program committee for that organization?

A.    Yes, I think for about 15 years.

Q.    And even when you were no longer -- you had

transitioned to your consulting role and your litigation role, you still attended those meetings?

A.   Yes.

Q.   And because you love this stuff?

A.   I've been a fan of it since I started working 50 years ago.

Q.   It's -- it's interesting things, and it's been your life's work?

A.   And it's changing every decade.

Q.   Now, prior to being retained by this case, you had never heard of SVV, correct?

A.   In my interactions with companies, I didn't have any reason to interact with SVV, no.

Q.   Right.  And before you were hired in this action, you've never reviewed or seen SVV's patents?

A.   That's correct.

Q.   And before you were retained in this matter, you had never met Dr. Vasylyev?

A.   That's correct.

Q.   And before you were retained in this matter, you never heard of Dr. Vasylyev?

A.   That's correct.

Q.   And so just to put a pin on the date, you were retained by SVV roughly in January of 2023?

A.   That's correct.

Q.  Okay.  So prior to January of 2023, you'd never heard of Dr. Vasylyev or his patents or his company?

A.  Our paths had not crossed.

MR. KAUFMAN:  Now, if we can have PTX-6, please.

Q.  (By Mr. Kaufman)  You, of course, recognize this.  This is one of the patents-in-suit?

A.  Yes.

Q.  And you've reviewed this patent a lot?

A.  Like all of them.

Q.  Yes.  You would consider yourself very familiar with this patent at this point?

A.  I would say I'm familiar with it, and especially the claims.

Q.  Yes.  The word "monitor" does not appear in the '397 patent, correct?

A.  It's been a while since I did a word search.  And I think we talked about this at deposition.  I don't recall the word "monitor" being in this patent and maybe no reason to have the word "monitor" in this patent.

Q.  And the word "LCD" does not appear in the '397 patent?

A.  I haven't done a word search, but I take your word for it.  I don't think it -- I don't think that word shows up.

Q.  And the word "computer" does not appear in the '397 patent?

A.  Again, this is about the optical system.

Q.   Okay.

THE COURT:   You need to answer his question.

THE WITNESS:   I'm sorry.

THE COURT:   Could you ask your question again.

Q.   (By Mr. Kaufman)   The word "computer" does not appear in the '397 patent?

A.   I don't believe so.

Q.   Okay.

MR. KAUFMAN:   If we could have PTX-9, please.

Q.   (By Mr. Kaufman)   Again, PTX-9 is our old friend, the '135 patent?

A.   Yes.

Q.   And the word "computer" does not appear in the '135 patent?

A.   I don't believe it does.

Q.   And the word "monitor" does not appear in the '135 patent, correct?

A.   I believe that's correct.

Q.   And the word "LCD" does not appear in the '135 patent, correct?

A.   I don't recall seeing that word.

Q.   All right.

MR. KAUFMAN:   If we have PTX-8, please, the '191 patent.

Q.   (By Mr. Kaufman)   And as with the other patents, you've

spent a lot of time with the '191 patent?

A.  I did.

Q.  And the word "monitor" does not appear in the '191 patent?

A.  I don't recall it appearing.

Q.  And the word "LCD" does not appear in the '191 patent?

A.  Probably not.

Q.  And the word "computer" does not appear in the '191 patent?

A.  I would say that's probably accurate.

Q.  All right.  And just to complete the -- the patents here --

        MR. KAUFMAN:  If we could have the '205 brought up, Exhibit 10.

Q.  (By Mr. Kaufman)  Now, let's look at this.  Again, you reviewed the '205 patent extensively for this case?

A.  I've reviewed it as part of my work.

Q.  And the word "monitor" does not appear in the '205 patent, correct?

A.  I'm guessing it doesn't.

Q.  And the word "LCD" does not appear in the '205 patent, correct?

A.  Probably not.

Q.  And the word "computer" does not appear in the '205 patent?

A.    I would imagine that's correct.

Q.    Sir, you talked earlier -- earlier in your testimony, I think I heard you use the term "BEF"?

A.    Yes.

Q.    And BEF is short for brightness enhancement film?

A.    Yes, that's a term coined by 3M.

Q.    And 3M was the first company to come out with a brightness enhancement film?

A.    That's the -- yes, it was.

Q.    Other people make them now, correct?

A.    Right.  I think their patents have run out, yeah.

Q.    Now, Dr. Vasylyev didn't invent the -- the first LED edge-lit monitor, did he?

A.    No, I wouldn't say that.  I would -- I would agree with that.

Q.    Edge-lit backlight -- edge-lit backlight assemblies were well-known going back into the early 2000s, correct?

A.    They were known.

Q.    And Dr. Vasylyev did not invent using light guide plates in backlight assemblies, correct?

A.    That is correct, as a broad -- yes.

Q.    Yeah.  And Dr. Vasylyev did not invent the concept of using light-deflecting elements on the bottom surface of light guide plates, correct?

A.    That would -- I mean, he did not.

Q.   And Dr. Vasylyev did not invent the concept of using reflective sheets below the light guide, correct?

A.   That was known.

Q.   And Dr. -- and we -- is another name for -- for the BEF or brightness enhancement film prism sheets?

A.   It's sometimes referred to as prism sheets.

Q.   And -- and Dr. Vasylyev did not invent the use of prism sheets in -- by backlight assemblies?

A.   Backlight assemblies?

Q.   Yes.

A.   No.

Q.   And Dr. Vasylyev did not invent the use of cylindrical uses -- cylindrical lenses -- I apologize -- on top of the surface of the light guide, correct?

A.   That I'm not sure of.

Q.   Okay.  I'll come back to that.

Now, just towards the end of -- of your -- your direct testimony, you testified a little bit about what the law requires for infringement.  You're not a legal expert, correct?

A.   That's correct.

Q.   You never went to law school?

A.   No, I did not.

Q.   You have not studied -- other than what you've been instructed by your counsel, you haven't studied patent law?

A.   Only with respect to my last ten years of my career.

Q.   And the last ten years has been serving as an expert witness in cases like this, correct?

A.   Cases like this, that's correct.

Q.   All right.  So our old friend, the XB232 -- and I apologize to everybody involved that Acer couldn't come up with a better marketing name for the product.  I believe you testified that you did the teardown of this product; is that correct?

A.   Yeah, I did the teardown of this model, but another model was in the exhibits done by SVV.

Q.   Okay.

A.   The same model, a different unit.

Q.   Okay.  So you took apart this specific unit?

A.   Yes.

Q.   But there was a -- another XB232 that was in the picture?

A.   Correct.

Q.   Okay.  But they're the same -- it's the same model?

A.   Correct.

Q.   When did you perform this teardown?

A.   I think I took it apart about two weeks ago.

Q.   Okay.  And prior to taking this apart, you didn't do any teardowns of the Acer products, correct?

A.   No, I did not participate in those teardowns.

Q.  SVV did the teardown -- teardowns, correct?

A.  Correct.

Q.  And you had no involvement in selecting the products that were torn down, correct?

A.  That's correct.

Q.  SVV chose the products to tear down?

A.  That was done before I was retained.

Q.  Okay.  Okay.  So SVV did their teardowns prior -- before -- before you even became involved in the case?

A.  That's my understanding.

Q.  Okay.  So you've -- you testified you visited Sacramento?

A.  Yes.

Q.  And you examined the products while you were at Sacramento?

A.  Yes, I spent, on a couple of trips, two full days with their team in their lab and investigated the components and parts from the teardowns.

Q.  When was the first trip?

A.  I think it might have been September.  I'd have to check my records.

Q.  When was -- was the second trip more recently?

A.  Yes, within the past month.

Q.  Okay.  And there have been lots of pictures.  We have a binder full of exhibits of pictures that were taken.  All

those pictures were taken by SVV, correct?

A.   Yes.

Q.   And -- and those curves that that were shown in your demonstrative, sort of that -- you know, the arcs and the cylinders, that analysis was performed by SVV, correct?

A.   They did that initial analysis with that instrument, but I also used that instrument during my visits.

Q.   Okay.  So they did an initial version, and you did follow-ons; is that correct?

A.   I was -- I was -- I was reviewing all of the data that they had taken and that included checking shapes and such with their help, but while I was there in Sacramento.

Q.   And did you -- strike that.

     Okay.  They simply -- they presented you with the pictures and the data that they had generated, correct?

A.   That, plus the actual samples.

Q.   Okay.  Did they still have all of the samples when you visited them?

A.   Yes, they have a large room with a lot of Acer monitors in it.

Q.   All 50 samples?

A.   Yes.

     MR. KAUFMAN:  Now, if we can have the '135 patent, please.  And if we could go to PTX-9.0054.  We don't need the callout here.

Q.   (By Mr. Kaufman)  Sir, I'd like to start with Claim 1. You spent a lot of time with the jury explaining Claim 1. The jury will be pleased that I do not intend to go through all of the -- the limitations that you went through with Mr. Reich.

But Claim 1 is an independent claim, correct?

A.   Claim 1 is an independent claim, that is correct.

Q.   And although it's not officially asserted in this action, to infringe Claim 16, all elements of Claim 1 must also be present, correct?

A.   Yes, that's correct.

Q.   And you understood that to be the case, correct?

A.   That is right.

Q.   And if a product does not include a limitation in Claim 1, then it does not infringe Claim 16, correct?

A.   That would be the case.

Q.   Okay.  And you -- we've got a limitation requiring that -- that you spent a fair amount of time with Mr. Reich regarding -- which is the:  At least a plurality of discrete extracting surface relief features is configured to disrupt total internal reflection at the back --

MR. KAUFMAN:  Do we have that?  There we go.

Q.   (By Mr. Kaufman)  -- service to extract at least some of the light propagated in the optically transmissive plate towards the reflective surface.

Correct?

A.   That is correct.

Q.   Now -- and you showed that.  You had the demonstrative, and it showed the light going out the front and it showed the light going out the back, correct?

A.   Yes, that's the way it works.

Q.   Because -- correct -- the correct direction, ultimately, for the light is to go out the front, correct?

A.   Depending on your orientation, but, yes, I -- yes, up towards the LCD.

Q.   Right.  It does me or you little good if the light doesn't come out the side of the monitor with the LCD facing me, correct?

A.   That would be -- that wouldn't be desirable.

Q.   And so directing light towards the plastic would be undesirable?

A.   Yes, if you had no other -- yes.

Q.   And "configured to" means designed to do a function, correct?

A.   Basically.

Q.   And so if something accidentally happens, it's not -- it's not configured to do that function, correct?

A.   I wouldn't agree with that.

Q.   You wouldn't agree with that.

     So configured, to you, means intentionally

designed?

A.   It can be, or -- yes, it can be.

Q.   And just so I'm clear, you would not consider accidental light leakage to be configured to do something; is that correct?

A.   It's not the way I'd put it.

Q.   It's not the way you put -- I believe that is the way you put it.

        MR. KAUFMAN:  So can we have -- may I approach, Your Honor?

        THE COURT:  Sure.

Q.   (By Mr. Kaufman)  So the correct direction, ultimately, is the direction towards the front or LCD side of the monitor, correct?

A.   Ultimately, we want to have as much light going towards the LCD as possible, that is correct.

Q.   And that's because that's where -- that's where the user is?

A.   Right.

Q.   Okay.  So we could go back to PTX-9.054, Columns 58, Lines 9 through 13?

A.   The patent.

Q.   It's the patent.  It'll come up on the screen there for you, Mr. Credelle, so you can just...

        MR. KAUFMAN:  PTX-9.0054, back to the page with

the claims.

Q. (By Mr. Kaufman) Now, Dr. Credelle, you talked about this earlier, the optically transmissive plate configured to receive light on the front surface?

A. Yeah, this -- yes, I did talk about that.

Q. And to be clear, the -- the LEDs are not putting light into the front surface, correct?

A. They are, ultimately.

Q. Well -- but the LEDs initially are putting light into the side, correct?

A. That's the first step on their path.

Q. Yes. They -- they're optically coupled to the side?

A. They -- yes, they're coupled to the input side.

Q. There's no LEDs on the front of the monitor inputting -- inputting light?

A. There's no LEDs there.

Q. And so what happens is the light -- the light comes into the side and ultimately bounces up to and out of the front, and then reflects back into the assembly; is that correct?

A. Yes, through the action of the layers of the structure.

Q. And you -- you've talked about it most in the context of our friend, XB392 (sic), but I believe you referred also to the -- and it has the special -- the special film that's different from the BEF, right?

A.   Yes, it's a stack.

Q.   It's a stack.  But -- and then for the -- the bulk of the products, the ones that don't have the stack, you testified that the BEF causes the reflection?

A.   Yes, that's the -- that causes the retroreflection.

Q.   And the reflection then causes the light to go back into the top surface?

A.   It goes back from that film, which is above the light guide plate, into the top surface of the light guide plate, yes.

Q.   Okay.  And the BEF is -- can be the 3M product that we talked about earlier?

A.   For example.

Q.   That's an example of one type of BEF?

A.   Correct.

Q.   And did you measure the -- the amount of light that reflected back into the top surface?

A.   That's a difficult measurement to make.

Q.   Okay.  So the answer would be no?

A.   I did not personally measure that amount of light.

Q.   Okay.  Did you measure any reflection off the back of the -- the BEF or the stack at all?

A.   No, I used published data in my -- to understand that process, but I did not deem it necessary to measure.

Q.   Okay.  And 3M has been selling BEF for a long time?

A.  I think since the '90s.

Q.  Since the '90s -- since the '90s.  That is a long time.

Okay.  So if we can move along to PDX-3, we'll look at 3.60.

You recall this, Mr. Credelle?

A.  Yes, I do.

Q.  And we have three -- we have four examples here, three of them I'm not going to talk about right now.  What I'm interested in is the one that's PTX-324.

A.  Okay.

Q.  And the XV270.

A.  Got it.

Q.  Now, the -- the claim limitation requires that the discrete light-extracting surface relief feature be formed in the back surface, correct?

A.  Yes, that's what it requires.

Q.  Now, what is shown in the blown-up picture here for XV270 is a blown-up picture of an ink or paint dot, correct?

A.  We're looking at the top surface of the paint dot.

Q.  Yeah, and that paint dot is printed onto the back of the light guide, correct?

A.  During the fabrication process, that's the way it's made.

Q.  Kind of like inkjet printing at home?

A.  Yeah, inkjet printing with special materials and solvents to do the job.

Q.  A larger and fancier inkjet printer?

A.  Say again.

Q.  A larger and fancier inkjet printer to handle the special materials?

A.  Yes.

Q.  And the ink -- the ink dots they're made of a different material than the light guide, correct?

A.  I have to say yes, in general, but, you know, it's -- yeah, they're a different material than the polycarbonate light guide.

Q.  The light guide is made out of polycarbonate?

A.  Generally.

Q.  And that's plastic?

A.  That's plastic.

Q.  And the ink is made out of a different chemical compound?

A.  Correct.

Q.  And it is -- it is painted on top of the backside of the light guide?

A.  During the fabrication process, it's -- it's painted or printed on the surface, and then it gets embedded in the surface as I described in my report.

Q.  And you don't know what type of ink is used for the

printed dots, correct?

A. That's correct. I don't know the exact formulation or chemistry.

Q. And you don't know the specific chemical properties of the link -- of the ink?

A. No, not the specific properties, correct.

Q. And you also talked about cylindrical lenses with respect to Claim 1 of the '135 patent, correct?

A. I'm sorry, you said the lens?

Q. Cylindrical lenses.

A. Oh, yes, I did.

MR. KAUFMAN: And so if we go up to PDX-3.57.

Q. (By Mr. Kaufman) Okay. And, again, I'm going to focus on one of these because one of these is not like the others. I have got no issue with PTX-288 or PTX-319. But I'd like to talk about PTX-314 if you --

A. Not surprising, okay.

Q. So we've got a dark line here at the top, correct?

A. You're referring to the arc line?

Q. Yeah.

A. The darker -- yes, the dark line.

Q. Hang on. I do this at great peril. We've got -- I'm drawing the red line here. So we have a dark red -- where I've drawn the red line, that -- that's not the actual shape of the lens, is it?

A.   No, no, it's not.

Q.   The lens has more -- I'm really getting daring here -- has more of a flat shape along the top here, correct?

A.   Yeah, the -- the lens -- the shape follows that arc at the right and left edge, but it's reasonably flat in the middle.

        MR. KAUFMAN:   And if we can have PTX-315 at 315.009.

Q.   (By Mr. Kaufman)   And, Mr. Credelle, this is a picture or computer-generated image of the -- the lens structure in both PTX-314 and PTX-315, correct?

A.   It looks -- it looks like that, yes.

Q.   And this is the -- this is the flat part we identified before, correct?

A.   Yeah, that's mostly flat, yes.

Q.   Okay.   And that's a flat top, not a cylindrical top, correct?

A.   That's correct.

        MR. KAUFMAN:   Can we have the '397 patent, please?

Q.   (By Mr. Kaufman)   You talked some about the '397 patent earlier.   We have examples in the '397 patent of optical windows, correct?

A.   Yes.

Q.   And, for example, if we look at PTX-006.0002, we have -- we have Figures 1 and 2, and those show Optical

Windows 14, correct?

A.   Yes, I believe that's the -- what it's pointing to.

Q.   One -- in one case, they're going across the -- the corrugations --

A.   Correct.

Q.   -- from left to right, and in the other case, they're parallel to the corrugations?

A.   Right.  Right.

MR. KAUFMAN:  And then if we could go to PTX-006.003.

Q.   (By Mr. Kaufman)  And here we have Figures 3 and 4.  In Figure 3, we've got square windows?

A.   Yes.

Q.   And in Figure 4, we have circular windows?

A.   That's what they look like.

Q.   And so these are all examples of the windows that are provided in the '397 patent, correct?

A.   Those are certainly examples.

Q.   Yeah.  Now, you've talked -- in addition to talking about the flattened tip that you took pictures of at the top of the pyramid structure, I believe -- and I just want to be clear -- you testified earlier that you did not think that all pyramid structures would necessarily have an optical window at the top due to manufacturing tolerances?

A.   We had some discussion about that topic before.

Q.   And so just -- just so we're clear, is it your testimony today in this court that a pyramidal structure can be made that would not have -- using normal manufacturing tolerances that would not have an optical window at the top?

A.   I think we discussed this during my deposition.  My answer is that with manufacturing tools, you can come very close to a sharp tip if you don't have a second layer that can -- that can create more of a window.

So that -- there may be an incidental opening, but I wouldn't really consider it a window with the manufacturing tolerances.  I'm not up-to-date with the manufacturing cost structures, but that is feasible, and it would not have a window because it would be small.

Q.   So if the -- if the -- if the pyramid were perfectly sharp at the scale of a wavelength of light, then you would say there was no window?

A.   It would have to be some dimension on that scale, and I don't know frankly -- I think when I had my deposition, we were guessing at what that might be, but it's sharp, but I didn't know exactly how sharp it was.

Q.   The -- and the light -- the wavelength of light is very, very small?

A.   Yes.

Q.   And so it would have to have something really extreme

is what you're saying?

A.  It would -- yes, it would -- it would be a precise feature.

Q.  Ordinary manufacturing wouldn't do the trick?

A.  I really can't comment.  I don't want to answer because I don't know the details, but that's a guess.

MR. KAUFMAN:  Can we have PTX-8, the '191 patent? And if we could turn to PTX-008 at 0026, Column 23, Lines 7 to 18 -- 17 to 18?

MR. REICH:  Your Honor, may I briefly bring the witness a bottle of water?

THE COURT:  Of course.  You don't even have to be brief.

MR. REICH:  I'm not particularly fast right now, so...

THE WITNESS:  Thanks.

Q.  (By Mr. Kaufman)  I'm sorry, you can get some water if you would like, Mr. Credelle.

A.  I'm good.  They brought it to me, so carry on.

Q.  So you recall talking about this earlier today, correct?

A.  Yes.  Yes.

Q.  And you've defined a cavity here as an enclosed structure meaning that there are some surfaces that are kind of opposite one another, correct?

A.  I don't remember that exact definition.  I mentioned that some of the structures have multiple shapes.

Q.  And then you illustrated the shape of that structure by analogy to a coffee cup or tea cup, correct?

A.  That discussion was in reference to a specific shape of a deflecting element in one of the products.

Q.  I brought you your -- your transcript from your deposition.

A.  Okay.

Q.  You recall having your deposition taken in this action, correct?

A.  Oh, absolutely -- yes, I've reviewed it.

Q.  And you spent time with my colleague, Mr. Chen, correct?

A.  Two days.

Q.  And you -- you swore an oath at the beginning to tell the truth, just like you would -- just like you did in this court, and you gave your best testimony, correct?

A.  That's correct.

Q.  And if you could take a look at Page 307, starting at Line 18, and read the question to yourself.

A.  So Page 307, starting where?

Q.  Line 18.

A.  Oh.  Okay.  I see that -- I see that discussion.  I think that's consistent what I've said here today.

Q.  Right.  So the question was -- reads:  So you've said that the definition of cavity is like a hole in the ground, a depression, something that can hold something else as opposed to a slanted surface.

Is that your definition?  Did I read that correctly?

A.  Yes.

Q.  And then starting at Line 22 on Page 307 and continuing on Page 308 down to Line 8, you have your answer.

Have you read that to yourself, Dr. Credelle -- Dr. Credelle?

A.  Yes, and for the record, this is referring to some distinction between this one design and a Kunimochi design. But, yes, I read it.

Q.  So you've read the answer to yourself?

A.  Yeah.

Q.  And the answer to the question, that's:  I tried to make kind of a plain language definition.  I'm not a lexicographer, but in my report, I said a cavity by its nature is an enclosed structure, meaning that there are some surfaces that are kind of opposite each other.

A.  Yes.

Q.  That's probably a better way to say it, and the boundaries of this structure I'm thinking of a coffee cup or a tea cup.

A.   Yes.

Q.   That has surfaces surrounding, well, the liquid, if it's tea or if there are light rays coming into this structure, they'll bounce differently than if it was a sloped surface.

Did I read that correctly?

A.   You did.  I obviously was giving you an example of a structure that had two side walls, and I used a tea cup as an example.

MR. KAUFMAN:  And if I could have PDX-3.58.

Q.   (By Mr. Kaufman)  And up in the upper right-hand corner, this is one of the structures you've identified as a -- as a cavity -- sorry, let me -- as a -- as a discrete cavity, correct?

A.   Yes, it is.

Q.   Okay.

A.   It's actually not called a cavity in this claim.

Q.   I'm sorry, I didn't -- you said it's not called a cavity?

A.   This claim element, it's a surface relief feature.

Q.   Yeah.

MR. KAUFMAN:  Let's go to -- let's go to Claim 1 of the '191 patent and put that up at PDX-3.93.

Q.   (By Mr. Kaufman)  Now, Claim 1 here of the '191 patent recites a two-dimensional pattern of discrete cavities,

correct?

A.   Yes.

Q.   And it again shows the same picture of structure we were just looking at?

A.   Yes.

Q.   And I was just using that page because it happened to be the next one up as opposed to finding the new page, but you correctly pointed me to this claim, so let's look at in the concept of this claim.

A.   Just trying to be accurate.

Q.   I have no problem with that.

     And you're telling the jury that this -- that this structure is a cavity?

A.   Yes.

     MR. KAUFMAN:  Can we bring up PDX -- PTX-10, the '205 patent?  And if we could go down and find Figure 18 at PTX-10.009.

Q.   (By Mr. Kaufman)  Do you see Figure -- Figure 18, Mr. Credelle?

A.   I see that -- that illustration.

Q.   And the reference numeral 10, those are lenses, correct?

A.   I'd have to check the -- the patent, but they certainly look like cylindrical-shaped lenses or maybe spherical.

Q.   And Layer 4 is a photoactive layer, which in this case

can also be, you know, the photoresponsive layer that you've identified, correct?

A.  It could be.

MR. KAUFMAN:  So if we can go to Column 19, Lines 50 to 58.  PT -- 0019.

Q.  (By Mr. Kaufman)  So does this help you understand that Layer 4 is the photovoltaic layer in Figure 18?

A.  Give me a chance to read it, please.

Q.  Of course.

A.  Okay.  Yes, I -- I agree with you.

Q.  And the --

A.  It's called the photovoltaic layer.

Q.  And the photovoltaic layer is an example of a photoresponsive layer as the term is used in the claim?

A.  That is an example.

Q.  Yeah.  I'm not suggesting it's the only example, but it is -- for purposes of the diagram in this discussion, it is an example, correct?

A.  In this case they're talking about a photovoltaic layer in this embodiment.

MR. KAUFMAN:  And if we can go back to Figure 18, please?

Q.  (By Mr. Kaufman)  Now, here in Figure 18, of course, you can see that the lenses 10 are on top of the -- the photovoltaic layer 4, correct?

A.   In this illustration, that's how they're drawn.

Q.   And they're -- so they're over the photovoltaic layer 4, correct?

A.   They're over the layer 4.  That's the photovoltaic layer, or is it just the dot?  Yeah, that's the photovoltaic layer, yes.

Q.   So 50 is the dot and -- and the dot is not relevant.

A.   Yeah.  Yes, in this example, that's how it's drawn.

        MR. KAUFMAN:  Now, if I could have PDX-3.112.

Q.   (By Mr. Kaufman)  And you recognize this, Mr. Credelle, correct?

A.   Yes.

Q.   And you identified the lenses as being highlighted in yellow with this black -- this black box, correct?

A.   Correct.

Q.   And that -- those lenses are under the quantum dot layer, correct?

A.   Physically, they're located -- yes, they're under the quantum dot layer, yes.

Q.   Okay.  All right.  Now, earlier when you were talking to Mr. Reich and you were talking about just -- what the patents were about generally, when you were speaking about the '135 patent, you pointed to a paragraph in the patent called the field of the invention.

        Do you remember that testimony?

A.   Yes, that was towards the beginning of my testimony.

Q.   Yeah, I mean, it was a long time ago.  And -- and -- and hopefully time will not run much longer.

MR. KAUFMAN:  But if I could have PTX-10 up, please.  And if we could go to PTX-10.0010 at 1, Lines 50 to 58.  Blow that up, please.

A.   Okay.  I've read that.

Q.   (By Mr. Kaufman)  And that's -- that's -- this paragraph is the field of the invention section for the '205 patent, correct?

A.   I believe that's the paragraph you cut.

Q.   And the first sentence reads:  The present invention relates to a device and method for harvesting radiant energy emanated by a distant radiant energy source, particularly, to collecting the sunlight and absorbing it by a light sensitive material, medium, or device.

Did I read that correctly?

MR. REICH:  Objection, Your Honor.  The Court's motions in limines and orders make clear that just simply reading part of the spec is not the claims.  You can't limit it to an embodiment or --

THE COURT:  Ask the question again.

Q.   (By Mr. Kaufman)  The first sentence of this paragraph, the field of the invention, states that the present invention relates to a device and method for harvesting

radiant energy emanated by a distant radiant energy source,
particularly, to collecting the sunlight and absorbing it
by a light sensitive material, medium, or device.

Did I read that correctly?

A. Yes.

Q. Now, you talked at the very end of your testimony about some of the alleged benefits provided by the invention. Do you recall that?

A. I do.

Q. And one of the -- one of the -- the advantages that you identified was improved color gamut, correct?

A. I said improved color, but, yes, it's color gamut, that's correct.

Q. The words "color gamut" do not appear in the '205 patent, correct?

A. They don't go into that detail.

Q. And the words "color gamut" do not appear in the '191 patent, correct?

A. I believe that's correct.

Q. And just so I'm clear, and the color -- the improvement in color gamut only applies to the quantum dot products, correct?

A. That's not the way I would say it.

Q. Well, I thought I understood your testimony that that was an additional benefit of the quantum dots?

A. It's a benefit of the quantum dots, coupled with the optical system which illuminates them efficiently.

Q. But you need -- you need both?

A. You need both, but you just said quantum dots.

Q. Yeah. I apologize.

So you need both the quantum dots and the -- the backlight assembly to obtain the improved color gamut?

A. That's correct.

Q. And so the improved -- we had 57 products on your list from the beginning. You remember when I started and we went through the list of the things that don't infringe, the '191, the '397, and the '205, even under your understanding of it, they also don't have that benefit, correct?

A. They don't have quantum dots. They don't have that benefit.

Q. And you also said that the -- the inventions improved brightness, correct?

A. Brightness is improved in all cases.

Q. And -- but the word "brightness" doesn't appear in the '135 patent, correct?

A. Efficiency might, but I don't think brightness does.

Q. And the '397 patent doesn't say anything about improved brightness, correct?

A. Probably not.

Q.   And the '191 patent doesn't say anything about improved brightness, correct?

A.   I don't recall seeing that.

Q.   And you also talked about viewing angle, correct, as a benefit?

A.   Whoops, sorry.

        Yes.

Q.   And the '191 patent says nothing about an improved viewing angle, correct?

A.   Not exactly.

Q.   And the -- the '397 says nothing about an improved viewing angle, correct?

A.   It's improved distribution of light which affects viewing angle, so indirectly it's viewing angle and distribution of light would be similar.

Q.   Right.  But the '397 patent doesn't use the words "improved viewing angle," correct?

A.   That I agree.

Q.   And the '135 patent does not use the words "improved viewing angle," correct?

A.   I believe that's correct.

Q.   Okay.  Mr. Credelle, you're familiar with something called an open cell LCD sheet?

A.   Yes.

Q.   And that's from your -- that's the black part when you

did your demonstrative, that's the black part with all the LCD -- may I pick it up?

A.   You may pick it up.  Just don't break it.

Q.   So that's this?

A.   That's that.

Q.   This isn't the invention, correct?

A.   That is an LCD, it's not the invention.

Q.   And you can buy -- you can -- it's possible to buy this as a component, correct?

A.   I think if -- well, probably not you or I, but companies can.

Q.   Somebody who was interested in making LCD monitors could buy -- could buy this?

A.   Yes, that's correct.

Q.   The individual component?

A.   That's correct.

Q.   And they can also buy -- I'm not going to pick it up.  It's plugged in.  I'd probably electrocute myself.

A.   You would probably break the wires.

Q.   Yeah, I don't want to break -- but you could buy this as a separate component?

A.   Each individual part is purchasable.

Q.   Okay.

         MR. KAUFMAN:  I pass the witness, Your Honor.

         THE COURT:  About how much do you have on

redirect?

MR. REICH:  Maybe 20 minutes.

THE COURT:  Ladies and gentlemen, I always give you all the option at this point, would you like to stay and finish this witness, or we can start in the morning? It's entirely up to you all.

JUROR:  Let's finish.

THE COURT:  There you go.

MR. REICH:  I'll try to make it quicker.

THE COURT:  Thank you.

                    REDIRECT-EXAMINATION

BY MR. REICH:

Q.  Starting a little bit where Mr. Kaufman left off, and you explained it on direct.

        Doing a word search, you might find not all the benefits are listed.  But as a person of skill in the art reading the patents, the benefits you described, is that what you would understand from this technology?

A.  Yes, that's what I tried to indicate because you need to understand optics to understand the benefits.  And that's what a person of skill in the art would appreciate.

Q.  Now, with respect to that portion of the '205 patent that he -- Mr. Kaufman read to you, just because there's an example in the '205 patent that talks about a solar application, is that a limitation of the claims?

A.   Certainly not.

Q.   And do the claims say solar electricity or solar collector?

A.   They do not.

Q.   They don't use the word "solar" at all?

A.   They do not.

MR. REICH:   Mr. Diaz, if I could have my Slide 112?

Q.   (By Mr. Reich)   Now, again, for illustration purposes, we flipped this over, but how is the monitor actually set up?   With the LEDs at the bottom?

A.   LEDs at the bottom.

Q.   And the claim language talks about distributed over the area.   It doesn't say located on top of, correct?

A.   That's my interpretation.   I think that's the accurate read.

Q.   And so how is -- you know, if we just look at this square in the ceiling -- I'm loosing my jacket, excuse me.

If we just look at the square in the ceiling, do you see that over the whole area of that square, there's a bunch of little squares?

A.   Yes.

Q.   They're distributed over the area of the larger square?

A.   Correct.

Q.   They go edge-to-edge?

A.   Correct.

Q.   They're not on the roof?

A.   But they're not on top.

Q.   Okay.  With respect to the '397 patent, Mr. Kaufman pulled up Figure 18.  Do you remember that?

A.   Yes.

Q.   And now Figure 18 is also not a limitation to the '397 patent, is it?

A.   No.  None of the embodiments are.

Q.   It's just the claims that matter?

A.   It's the claims that matter.

Q.   And there was some sort of hypothetical -- I didn't quite understand it -- with respect to optical windows. But I just want to make clear, you investigated all of the optical windows in the optical film sheets; is that correct?

A.   Yes, those -- those accused products, I looked at all the optical windows.

        MR. REICH:  And if I could have the ELMO here, Mr. Diaz?

Q.   (By Mr. Reich)  And, again, this was the PTX-404 example that we looked at.  Do you recall that?

A.   Yes.

Q.   And is this an example of a measurable, not a hypothetical, optical window from the accused products?

A.   That's what it is.

MR. REICH:  Can we go to Slide 57, please?

Q.   (By Mr. Reich)  Do you recall that Mr. Kaufman also talked about these lenses?

A.   Yes.

Q.   I appreciated that he admitted that the -- at least two of these meet all the limitations.  Do you remember that?

A.   I do.

Q.   Now, with respect to this one at PTX-314, can you explain, again, why this is a cylindrical lens despite the little flattop?

A.   So the lens structure, as in all of these products, is designed to bring light more in from the edges.  It's to focus the light.  So the structure of these lenses are different.  There's no question about that.  But a significant portion of this last structure we're looking at on the right and left sides have the shape of a lens.

So they -- they actually are focusing light and keeping those errant rays from going out.  So they're focusing them in, but the rays that go through the middle of the lens are not focused as much so they could go more straight through.  So it's a different optical design, but it is still a cylindrical lens.  It just has different properties.

Q.   It has the cylindrical components making it a

cylindrical lens; is that right?

A.   That's right.

MR. REICH:   Mr. McCarty, can you put that board back up?

Q.   (By Mr. Reich)   I think this was completely clarified by your testimony, but I just want to make sure we all agree.   These are discrete cavities; is that correct?

A.   These are discrete cavities.

Q.   Now, we also talked a little bit about some printed dots.   You mentioned solvent.

Can you explain again how that solvent and the ink are formed into the light guide plate?

A.   So the process, as I understand it, because I've seen the results of printed dots on light guides, is that in that process, it's designed to embed the particles into the surface so they can get the deflection -- deflection out. If it's strictly on the surface, it's not going to be as effective as if it's embedded in.   And I proved that in the lab by scraping away the printed dot.

And if there is a cavity -- a small cavity where the dots material -- the printed material is kind of stuck. So from my technical background, I believe that the ink is actually dissolving the surface a little bit -- well, it's drying, and that allows it to really adhere because that's another property that's required of these printed dots.

They can't fall off in the use of products.  So those are stuck on, and they're actually embedded.  Still, there's stuff on the top.  There's no question, there's still stuff on the top.  But that entire structures is what's the deflecting element that does the job.

Q.  Now, you also talked with Mr. Kaufman, about some light measurements.  He asked you did you do measurements about light.  Do you recall that?

A.  Yes.

Q.  Let's talk about some of the light measurements you did do.  Talking about that microstructure, the microcavity here, you testified to this already, but about how much of that light actually does and is configured to go backwards when light hits it in the light guide plate?

A.  So I measured -- I made measurements on one of the models.  I think it was this XP323, it was in the lab, but we put -- we wanted to know how much light is going up and how much is going down.

         So we actually made a measurement with a black cloth under the light guide plate, a very highly absorbing black cloth.  So all the light we could measure is only coming from the top of the light guide plate.  And we removed the black cloth, and we measured the brightness again.  It was double.

         So that tells me that about half the light is

going directly towards the screen and about half is being recycled. Again, part of this design is to spread the light out and make it uniform, so this is a design feature of these particular products.

Q. And we also -- he was asking you about measurements, about this retroreflection that's caused by, for example, the optical film stack. How do we know that that is actually causing retro -- retro or just regular reflection, what kind of measurements did you do there?

A. Well, you can make the measurements carefully. It's more complicated. There's been articles written and reports written about how much that is retroreflected, and it's in my report, but I believe it's about 30 to 40 percent, depending on the angle of the light, can go backwards, and -- and that's a good thing.

So it can -- it can get into position to be where we want it to be. Some light is lost in that process, but you get this -- this effect for any kind of sheet, whether it's the optical film stack or whether it's a so-called BEF sheet that's used in other products.

Q. And with respect to the optical film sheet and the quantum dots, did -- did we see here in your demonstration a tangible example of how that reflection benefits the monitors?

A. Yes, that's another measurement we made, and the -- the

brightness measured with the photometer went up, as I recall, 20, 30 percent, and the intensity of red got higher and the intensity of green got higher.

And so that tells us directly that more quantum dots are generating light, and that proves that there's light recycling through the system, because otherwise, the red and green would stay the same. And frankly, if you didn't have this recycling, you wouldn't get the color gamut and the improvement that the quantum dots can offer.

Q. Now, there was also, if you recall, Mr. Kaufman perhaps was suggesting something about the -- the fact that SVV did these teardowns. Do you recall that discussion?

A. Yes, vaguely.

Q. I'm not sure. It would be unfair, at least, to suggest that SVV is bad or -- you know, a wrong actor by spending 18 months doing 50-plus teardowns and preparing that evidence. That wouldn't be a proper suggestion, would it?

A. No.

Q. Now, you looked at all that evidence, and can you explain how you know it is verifiably reliable and accurate data?

A. So I've done quite a few teardowns in my career, and I've done design of products. So I'm familiar with the optical tools and measurement tools that one would use in a lab. And I -- when I visited on the two occasions,

spending almost two days each time, to review precisely how they do their teardowns, how they keep track of their samples. You have to have some track of where -- you know, you have a lot of samples, they could get mixed up.

I was very impressed with the rigor that they used to both make the measurements, record the data, and keep the samples in an inventory because I said I want to see the lens from Part No. XYZ, and rapidly that was removed. It was a small cutout section. I could look under the microscope. I verified with many of those kind of sample testing, and it gave me the confidence to allow me to make an opinion that I did today, that I -- that's verifiable, reliable data.

Q. And so even if SVV spent all those months and took those pictures originally, you verified the results independently?

A. That's correct.

Q. Now, Acer hasn't torn down any monitors themselves to say these teardowns are wrong, have they?

A. Not to my knowledge.

Q. Acer hasn't gone to SVV's labs to take measurements to confirm that these are accurate, have they?

A. Not to my knowledge.

Q. Do you recall when Mr. Kaufman did that word search for computer again?

A.   Yes.

Q.   We heard the same thing with Dr. Vasylyev's cross-examination.  Do you recall that?

A.   Yes, I do.

Q.   But Mr. McCarty pointed out the patents talk about displays.  Do you remember that?

A.   Yes, one of them.  I don't remember which one, but yes.

Q.   And they all talk about lighting systems, is that right?

A.   Correct.

Q.   And are displays and lighting systems the key parts of the monitors that are at issue in this case?

A.   Yes, I mean, without a backlight system that was efficient and working, you wouldn't have a good display. It -- you know, maybe the LCD is maybe the heart of the monitor, but the LCD works because it has an illumination system to allow you to see a picture.  So that -- that is -- that is the core of these Acer monitors.

         MR. REICH:   And then, Mr. Diaz, if we could go back to the ELMO.

Q.   (By Mr. Reich)  Mr. Kaufman was pointing out with respect to this just we want to clarify -- make sure everyone is clear which patents are against which products.

         The edge-lit, is that all the patents?

A.   All the patents are edge-lit, and they have the special

light guide features that I described.

Q.   Now, with respect to the edge-lit and the OFS, is that the first two patents here?

A.   Yes, I believe that's correct.

Q.   And then with respect to the -- this last set -- or I guess this is the set here that is the '191 and the '205? The edge-lit OFS, the edge-lit OFS and quantum dots, that's the '397.  The edge-lit OFS and quantum dots, that's the '191, the '205?

A.   That's right.

Q.   And also these two categories infringe the '135, correct?

A.   Yes.  I guess we should have made a different table.

Q.   Yeah, well, there we go.

All right.  Now that that's clear or at least the jury can look it up with 401 later, I think that's actually all the questions I have.

THE COURT:  Anything else, counsel?

MR. KAUFMAN:  I have just one brief correction for that last exhibit.

MR. REICH:  Yeah, I'm going to tweak it actually myself, Your Honor.  This is like that.

MR. KAUFMAN:  And with that correction, Your Honor, I have no further questions.

THE COURT:  Okay.  You may step down, sir.

Ladies and gentlemen of the jury, thank you for a long day.

If you would be here tomorrow about 8:15, we'll get started at 8:30.

Please remember my instructions not to discuss anything about the case when you go home.

Bring warm clothes for tomorrow, and I will see you at 8:15.

COURT SECURITY OFFICER:  All rise.

(Jury out.)

THE COURT:  You may be seated.

Is there anything we need to take up?

MR. MCCARTY:  For the Plaintiffs, Your Honor, I believe we do have some stickering that needs to be done on some of these boards, and I want to say that your staff may have contacted us about getting that done before the end of the day, but it didn't need to be done in front of the jury, so...

THE COURT:  Didn't -- I heard --

MR. REICH:  I don't think it needs to be done.  We already said it on the record.  If you're okay with it, we'll just put the stickers on.

THE COURT:  I think that's fine.

Can you go ahead and move to admit them?

MR. REICH:  We move to admit the stickered

exhibits going 401 to 413.

MR. KAUFMAN:  No objection, Your Honor.

THE COURT:  Admitted.

MR. REICH:  Thank you, Your Honor.

THE COURT:  Anything else for the Plaintiff?

MR. MCCARTY:  Nothing from the Plaintiff.

MR. KAUFMAN:  Nothing from the Defendant, Your Honor.

THE COURT:  I look forward to seeing you tomorrow.

COURT SECURITY OFFICER:  All rise.

(Court adjourned at 6:03 p.m.)

CERTIFICATION


     I HEREBY CERTIFY that the foregoing is a true and correct transcript from the stenographic notes of the proceedings in the above-entitled matter to the best of my ability.


 /S/ Shelly Holmes _____          6/3/2024
SHELLY HOLMES, CSR, TCRR             Date
CERTIFIED SHORTHAND REPORTER
State of Texas No.: 7804
Expiration Date: 10/31/2025