**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

|  |  |  |
|---|---|---|
| SVV TECHNOLOGY INNOVATIONS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | **Civil Action No. 6:22-cv-640-ADA** |
| | ) | |
| v. | ) | |
| | ) | |
| ACER INC., | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**ACER'S RULE 50(b) RENEWED**
**MOTION FOR JUDGMENT AS A MATTER OF LAW**

# TABLE OF CONTENTS

I.      Legal Standards ................................................................................................ 2

II.     The Jury's $10.3 Million Verdict Was Not Reasonable Based on Evidence at Trial ........ 3

III.    SVV Presented No Evidence of Willful Infringement—There Is None ........................... 6

IV.     There Is No Evidence of Statutory Infringement by Acer. .................................................. 8

    A.      There is no evidence that Acer makes, sells, offers to sell, or sells the accused products in the United States or that it imports the accused products in the United States. .......................................................................................... 9

    B.      The jury lacked legally sufficient evidence to find Acer vicariously liable for acts performed by Acer America. .................................................................. 10

        1.      The jury lacked legally sufficient evidence to find that Acer directed or controlled Acer America to sell, offer for sale, or import the accused products. ................................................................... 11

        2.      The jury lacked legally sufficient evidence to find that Acer America acted as Acer's agent for selling, offering for sale, or importing the accused products. ................................................................... 12

        3.      The jury lacked legally sufficient evidence to pierce the corporate veil and find Acer America to be Acer's alter ego. ................................. 13

        4.      The jury lacked legally sufficient evidence to find Acer liable for any act of direct infringement. ................................................... 15

    C.      There is no evidence that Acer induced infringement of the asserted claims because the jury lacked legally sufficient evidence to find that Acer possessed the specific intent to encourage another's infringement. .................... 16

    D.      The jury's infringement verdict cannot stand because the jury lacked sufficient evidence that Acer performed any act of infringement, was vicariously liable for any act of infringement, or possessed the required mental state to induce infringement. ................................................................ 17

V.      Conclusion ................................................................................................... 18

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Akamai Techs. v Limelight Networks*,
   797 F.3d 1020 (Fed. Cir. 2015) (en banc) ............................................................. 11

*Brunneman v. Terra Int'l*,
   975 F.2d 175 (5th Cir. 1992) ................................................................................. 6

*Gardemal v. Westin Hotel Co.*,
   186 F.3d 588 (5th Cir. 1999) ................................................................. 13, 14, 15

*Johnston v. Ferrellgas, Inc.*,
   96 F.4th 852 (5th Cir. 2024) ................................................................................. 2

*Lucent Techs. v. Gateway*,
   580 F.3d 1301 (Fed. Cir. 2009) ...................................................................... 2, 4, 5

*Pellegrini v. Analog Devices*,
   375 F.3d 1113 (Fed. Cir. 2004) ............................................................................. 2

*Provisur Techs. v. Weber, Inc.*,
   No. 2023-1438, 2024 WL 4363502 (Fed. Cir. Oct. 2, 2024) ........................... 2, 6, 8

*Roche Diagnostics Corp. v. Meso Scale Diagnostics, LLC*,
   30 F.4th 1109 (Fed. Cir. 2022) ...................................................................... 3, 16

*Shockley v. Arcan, Inc.*,
   248 F.3d 1349 (Fed. Cir. 2001) ............................................................................. 6

*Smith v. Garlock Equip. Co.*,
   658 F. App'x 1017 (Fed. Cir. 2016) ..................................................................... 10

*United States v. Bestfoods*,
   524 U.S. 51 (1998) ....................................................................... 10, 11, 13

**Statutes**

35 U.S.C. § 271 .......................................................................................................... 18

35 U.S.C. § 271(a) .............................................................................................. 1, 9, 10

35 U.S.C. § 271(b) ................................................................................................. 9, 16

**TABLE OF EXHIBITS**

| Exhibit | Document Title |
|---|---|
| 1 | Excerpts from the Trial Transcript (hereinafter, "Tr.") |
| 2 | PDX_4 – Plaintiff SVV's "Damages Demonstratives" |
| 3 | JTX-001 – January 22, 2021 letter from R. Katz to Acer America Corporation |
| 4 | JTX-002 – January 29, 2021 email from P. Yo to R. Katz |
| 5 | JTX-015 – Supply Agreement Between Acer Incorporated and Acer America Corporation |
| 6 | JTX-014 – Acer Incorporated 2022 Annual Report |

The law provides that patent damages may take the form of either a per-unit running royalty or a one-time lump-sum royalty. Here, the jury agreed that a one-time lump-sum royalty was appropriate, but the jury's award of a lump sum totaling over $10 million was solely based on a flawed per-unit running-royalty theory presented by SVV. That per-unit running royalty fails to provide legally sufficient evidence to support the jury's lump-sum award. The highest amount for a one-time lump-sum royalty award would be no more than $767,000. At a minimum, this Court should remit the jury's lump-sum award to no more than $767,000, the maximum supported by the evidence presented at trial.

But the jury's finding Acer liable cannot stand either.

The Patent Act holds that "whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States, or imports into the United States any patented invention," infringes the patent. 35 U.S.C. § 271(a). Acer does none of that, and the jury heard no evidence showing otherwise. The accused products are not made in the United States. Acer does not sell them here or import them. And SVV presented no evidence showing that Acer has either used the accused products or offered them for sale. Every allegedly infringing act was performed by Acer America, a nonparty and a corporate subsidiary of Acer. Instead of suing Acer America, SVV seeks to hold Acer vicariously liable for its actions. But SVV has failed to present sufficient evidence to pierce the corporate veil or establish any other theory of vicarious liability. SVV could have sued Acer America. It simply chose not to.

The Patent Act also holds a party liable for willful infringement or inducing infringement if that party knew that their actions caused infringement or took deliberate steps to avoid learning whether their actions caused infringement. But the jury heard no evidence that Acer possessed this subjective intent. What the jury did hear was evidence showing that when Acer took steps to

learn from SVV whether it was infringing, SVV simply refused to engage in discussions.  Indeed, SVV approached Acer America in January 2021, identified the asserted patents, alleged that Acer America infringed, and asked to engage in discussions.  Just one day after receiving SVV's notice, Acer responded and sought to engage in such discussions so that it could learn what SVV claimed to already possess: evidence supporting SVV's allegations that products sold by Acer America infringe SVV's patents.  SSV refused to respond and provide this evidence in January 2021.  Acer did not hear again from SVV until eighteen months later when it was served with the Complaint.

Acer respectfully renews its Rule 50(a) motions and requests that this Court enter a directed verdict of noninfringement or, at a minimum, remit the damages award to no more than $767,000.

## I.    Legal Standards

A motion for judgment as a matter of law under Federal Rule of Civil Procedure 50 should be granted if "'a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue,' which occurs when 'the facts and inferences point so strongly and overwhelmingly in the movant's favor that jurors could not reasonably have reached a contrary verdict.'"  *Johnston v. Ferrellgas, Inc.*, 96 F.4th 852, 857 (5th Cir. 2024) (citation omitted).

For example, "a lump-sum damages award cannot stand solely on evidence which amounts to little more than a recitation of royalty numbers."  *Lucent Techs. v. Gateway*, 580 F.3d 1301, 1329 (Fed. Cir. 2009) (reversing district court's denial of defendant's JMOL regarding damages award).  Similarly, knowledge of the asserted patents and evidence of infringement "as a matter of law is not enough to establish deliberate or intentional infringement."  *Provisur Techs. v. Weber, Inc.*, No. 2023-1438, 2024 WL 4363502, at *4-5 (Fed. Cir. Oct. 2, 2024) (reversing district court's denial of JMOL regarding willful infringement).  A verdict of direct infringement cannot stand absent evidence showing that the defendant made, sold, offered for sale, used, or imported an infringing apparatus into the United States.  *See Pellegrini v. Analog Devices*, 375 F.3d 1113,

2

1118-19 (Fed. Cir. 2004) (granting summary judgment of noninfringement when "there is no evidence of record that any . . . manufacturing occurs in the United States or that Analog offers to sell those products in the United States").  And a verdict of indirect infringement cannot stand absent evidence showing that the defendant knew the acts it brought about "constitute[d] patent infringement" or that the defendant took "deliberate actions to avoid confirming a high probability of wrongdoing."  *Roche Diagnostics Corp. v. Meso Scale Diagnostics, LLC*, 30 F.4th 1109, 1118-19 (Fed. Cir. 2022) (alteration in original) (citation omitted).

**II.    The Jury's $10.3 Million Verdict Was Not Reasonable Based on Evidence at Trial.**

At trial, SVV's damages theory was based on a per-unit running royalty.  *See, e.g.*, Tr. 375-76.  According to Dr. Matthew Farber, SVV's expert, the parties "would have agreed to a running royalty structure" of $5.91 for each infringing unit resulting in a total running royalty ranging from about $5.4 million to about $7.5 million through trial (depending on whether the jury found indirect infringement).  *See, e.g.*, Tr. 375, 384, 393.

Dr. Farber presented one additional number to the jury, which he called a "lump sum."  Tr. 388-89.  But it was really a per-unit running royalty.  Tr. 843-44.  Dr. Farber calculated his "lump sum" by taking *his* projection of Acer's "sales from trial through the first patent to expire in 2030," multiplying *his* projected sales by $5.91 per unit, and adding it to his prior number through trial (about $5.4 million to about $7.5 million through trial), resulting in a range of about $13.2 million to about $15.3 million (again depending on indirect infringement).  Tr. 384, 388-89; Ex. 2 (PDX_4) at 51, 53.  According to Dr. Farber, the parties would have needed "to have some idea of Acer's use going forward" to calculate a lump sum; otherwise, "Acer overpays or underpays," and "that's not what the parties would want."  Tr. 375-76.  Yet, SVV and Dr. Farber presented no evidence about the parties' expectations in 2017 as to projected sales of the accused products through 2030.

3

Acer's theory of damages, on the other hand, was based on a lump-sum model derived from SVV's prior licenses to the asserted patents.  According to Acer's corporate representative, Ms. Kate Shang, Acer prefers to structure patent license royalties as a one-time lump sum to avoid per-unit accounting.  Tr. 493; *see also* Tr. 484-93.  According to Dr. Keith Ugone, Acer's damages expert, SVV's prior licenses to these patents for lump sums informed his opinion that the parties here would have agreed to a lump sum between $188,000 and $767,000.  Tr. 863; *see also* Tr. 858-63.

The jury agreed with Acer that a one-time lump-sum structure was appropriate but awarded $10,306,900—*significantly higher* than any actual one-time lump-sum figure offered at trial.  ECF No. 158 at 8.  There is not a sufficient evidentiary basis to support the jury's damages award of a one-time lump-sum verdict of $10,306,900.  *Lucent*, 580 F.3d at 1323-36, 1340; Tr. 898 (Acer's trial counsel moving for JMOL based on an improper lump-sum calculation).

In *Lucent*, Lucent sought a per-unit running royalty of 8% of sales revenue for the accused software, which, based upon the sales data presented, would amount to $561.9 million.  580 F.3d at 1323.  Microsoft, however, countered that a one-time lump-sum payment of $6.5 million was appropriate.  *Id.*  The jury awarded a one-time lump-sum payment of $358 million, and the district court denied Microsoft's motion for JMOL.  *Id.* at 1309.  Faced with the question of whether "Microsoft would have agreed to, at the time of the hypothetical negotiation, a lump-sum, paid-in-full royalty of about $358 million," the Federal Circuit held that the award "is not supported by substantial evidence, but is based mainly on speculation or guesswork," and reversed the district court's denial of Microsoft's JMOL.  *Id.* at 1324-25, 1335.

The Federal Circuit held that the jury's award was "problematic" because "no evidence of record establishes the parties' expectations about how often the patented method would be used

by consumers." *Id.* at 1327.  "Lucent submitted no evidence upon which a jury could reasonably conclude that Microsoft and Lucent would have estimated, at the time of the negotiation, that the patented date-picker feature would have been so frequently used or valued as to command a lump-sum payment that amounts to approximately 8% of the sale price of Outlook." *Id.*  The Court rejected Lucent's expert's approach that, in explaining how one would calculate a lump-sum award, urged the jurors to apply the running royalty to an estimate of future use, even though there was no evidence of the parties' expectations at the time of the negotiation.  *Id.*

Here, as in *Lucent*, the jury's "award is not supported by substantial evidence and is against the clear weight of the evidence." *Id.* at 1324.  As in *Lucent*, there was "no documentary evidence or testimony showing the parties' expectations as to usage" of the patented invention here.  *Id.* at 1327.  As in *Lucent*, there was no evidence upon which the jury could reasonably conclude that SVV and Acer would have estimated, at the time of the negotiation, that the patented feature would have been so frequently used and highly valued as to command a lump sum that amounts to $5.91 per unit—for a feature of a component of a display with an average selling price of $2.  Tr. 845-46.  Nor was evidence presented—by either party—showing that Acer would have agreed to a one-time lump-sum payment of $10M at the hypothetical negotiation in 2017 for this technology. *See* Tr. 375 (applying a 2017 hypothetical negotiation date).  This absence of evidence supporting the jury's lump-sum award results in the "unmistakable conclusion that the jury's damages award is not supported by substantial evidence," and it should be set aside.  *Lucent*, 580 F.3d at 1335.

As in *Lucent*, "[t]his is not an instance in which the jury chose a damages award somewhere between [the] maximum and minimum lump-sum amounts advocated by the opposing parties." *Id.* at 1332.  That range was $188,000-$767,000.  Tr. 858-63.  Indeed, the only evidence of an actual lump sum advocated by the parties was that of Dr. Ugone, who opined that the highest lump

sum the parties would have agreed to at the hypothetical negotiation would be $767,000.  Tr. 862-63.  Nor could Dr. Farber, SVV's expert, have presented any actual lump-sum amount given that none were provided in his expert report.[1]  Thus, the Court may either remit the damages award to a one-time lump sum in the amount of $767,000 or grant a new trial on the issue of damages as requested in Acer's concurrently filed motion for a new trial.  *Shockley v. Arcan, Inc.*, 248 F.3d 1349, 1362 (Fed. Cir. 2001) (the Federal Circuit applies the "maximum recovery rule," which remits an excessive jury award to the highest amount the jury could properly have awarded based on the relevant evidence and gives the plaintiff the option of a new trial on damages or the remitted damages award); *Brunneman v. Terra Int'l*, 975 F.2d 175, 178 (5th Cir. 1992) (the Fifth Circuit applies the "maximum recovery rule").

## III.    SVV Presented No Evidence of Willful Infringement—There Is None.

"To establish willfulness, a patentee must show that the accused infringer had a specific intent to infringe at the time of the challenged conduct."  *Provisur*, 2024 WL 4363502, at *4 (citation omitted).  No such specific intent was demonstrated here.

The first time that Acer learned of SVV and the patents tried to verdict in this case was in a single-page letter from SVV's counsel to Acer America Corporation dated January 22, 2021.  Tr. 452-53, 480-83; Ex. 3 (JTX-001).  The letter identified ten additional patents and did not include any claim charts.  Ex. 3 (JTX-001).  Though the letter identified three specific patent claims, only two were from the asserted patents (both from the '397 patent), and neither of those claims were among those found valid and infringed by the jury.  *Compare* Ex. 3 (JTX-001), *with* ECF No. 158 at 4.  And though the letter identified two Acer products, it did not identify which

---

[1] Citing *Lucent*, Dr. Farber's report acknowledged that he was aware of no evidence of expectations as to Acer's use of the patented technologies at the time of the hypothetical negotiation and thus opined that the parties would have agreed to a running royalty structure.

patents or claims SVV alleged were infringed by those two products. Ex. 3 (JTX-001). The letter asked Acer America to "advise us whether it is willing to engage with [SVV] in discussions regarding the amount of damages appropriate" so the parties could seek "an amicable resolution." *Id.*

Acer willingly engaged in discussions, as SVV requested, and responded one day after it received the letter (and within seven days of the date SVV's letter was mailed). Ex. 4 (JTX-002); Tr. 482. Acer specifically asked for "more information such as claim charts" so that it could assess infringement (because Acer, itself, does not make products) and discuss a license. Ex. 4 (JTX-002); Tr. 458-60, 480-82, 521-23. SVV ignored Acer's request to learn the factual basis for SVV's infringement allegations, to engage in discussions, or to seek an amicable resolution. Tr. 481-82. Rather, the next time Acer heard from SVV was when SVV filed its Complaint in June 2022, eighteen months later. Tr. 481-83; ECF No. 1. There is no evidence Acer *knew* it infringed or had a specific intent to infringe before SVV provided more details in its Complaint.

Nor is there any evidence of willful infringement post-Complaint. After Acer received SVV's infringement allegations by way of its Complaint, Acer investigated and formed a good-faith belief that it did not infringe and that the patents were invalid. *E.g.*, ECF No. 9, ¶¶ 38-40, 44-54; *see also id.* at 6. SVV never challenged Acer's good-faith belief by way of a Rule 11 motion. *See* docket. And these defenses were strong enough to reach the jury. As evidenced by Acer's subsequent expert reports and testimony at trial, Acer maintained its good-faith belief of noninfringement and invalidity for each asserted claim of each asserted patent. Tr. 551-750, 811-24. The jury even heard testimony that Acer's legal team investigated the patents after the case was filed and decided a redesign was not necessary. Tr. 469. SVV presented no contrary evidence on Acer's post-Complaint beliefs.

The Federal Circuit's decision in *Provisur* controls in this case.  In *Provisur*, the evidence at trial demonstrated "Weber's knowledge of the asserted patents and their relevance to Weber's business in general," but there was no evidence Weber possessed knowledge of its infringement. 2024 WL 4363502, at *5.  According to the Federal Circuit, "knowledge of the asserted patent and evidence of infringement is necessary, but not sufficient, for a finding of willfulness." *Id.* (citation omitted).  Thus, the Federal Circuit held, the evidence "as a matter of law is not enough to establish deliberate or intentional infringement," and "[t]he district court should have granted Weber's motion for judgment as a matter of law." *Id.* at *4-5 (reversing the district court's denial of Weber's JMOL regarding willfulness).

Here, as in *Provisur*, the jury's finding of willful infringement is not supported by legally sufficient evidence, and a judgment of no willful infringement should be entered.  Tr. 898 (Acer's trial counsel moving for JMOL of no willful infringement).  Here, as in *Provisur*, there is no dispute that Acer had presuit knowledge of the patents and an awareness that they may be relevant to Acer's business.  As in *Provisur*, there is no evidence that Acer knew of its alleged infringement or that it had a specific intent to infringe. *See also* Section IV.  As in *Provisur*, judgment as a matter of law of no willful infringement is warranted.

## IV.    There Is No Evidence of Statutory Infringement by Acer.

At trial, the technical aspects of infringement (i.e., whether the accused products satisfied all limitations) were a primary focus of the presentation to the jury.  This motion does not challenge the sufficiency of that evidence or whether that evidence supports the jury's verdict.  Rather, this motion addresses the nontechnical, statutory aspects of infringement.  The jury found Acer liable for infringement and was instructed on three specific theories: (1) direct infringement for Acer's own actions, (2) vicarious liability for Acer America's alleged direct infringement, and (3) indirect

infringement for its own actions.  The jury lacked sufficient evidence to find any of those theories had been sufficiently proven at trial.

Indeed, SVV presented insufficient evidence that Acer (1) "makes, uses, offers to sell, or sells" the accused products "within the United States" or "imports into the United States" the accused products (35 U.S.C. § 271(a)); (2) is vicariously liable for actions of another who "makes, uses, offers to sell, or sells" the accused products "within the United States" or "imports into the United States" the accused products (*id.*); or (3) "actively" induces infringement (35 U.S.C. § 271(b)).  Regardless of whether Acer's products meet every element of the asserted claims, SVV bore the burden to prove that Acer committed an act of statutory infringement.  SVV failed to present legally sufficient evidence to prevail on these issues, and the Court should grant judgment as a matter of law in Acer's favor on the issue of infringement.  Tr. 898 (Acer's trial counsel moving for JMOL of no statutory liability for Acer).

A.    **There is no evidence that Acer makes, sells, offers to sell, or sells the accused products in the United States or that it imports the accused products in the United States.**

Section 271(a) identifies conduct that constitutes patent infringement: making, using, offering to sell, or selling a patented invention in the United States or importing into the United States a patented invention.  35 U.S.C. § 271(a).  Acer does not perform any of these acts, and the jury's finding of infringement cannot rest upon any act performed by Acer.

Indeed, the jury could not have found that Acer makes or uses the accused products in the United States because none of the accused products are made in the United States.  Tr. 437:8-20. Acer does not make the accused products.  Tr. 515:21-516:5.  And there was no evidence at trial showing that Acer uses the accused products in the United States.

The jury's verdict also cannot be based on a finding that Acer sells the accused products in the United States.  It is undisputed that Acer does not.  Tr. 436:5-12, 526:7-527:10.  Nor could the

jury's verdict be based on a finding that Acer offers to sell the accused products in the United States. While Acer's corporate representative, Ms. Shang, testified that Acer's website offers certain products for sale (Tr. 462:9-19), there was no evidence that Acer's website offered *any of the accused products* specifically for sale in the United States. In fact, when Ms. Shang was asked if Acer offered to sell the accused products in the United States via its website, Ms. Shang did not know. Tr. 462:21-463:3. There was no evidence that Acer ever offered even a single accused product for sale in the United States, and the jury's verdict of infringement cannot be premised upon that theory either.

The jury's verdict cannot be based on a finding that Acer imports the accused products into the United States. The only evidence presented to the jury is that Acer America (not Acer) imports the accused products into the United States. Tr. 440:2-6, 529:9-530:9.

In sum, no evidence suggests that Acer performed any act of direct infringement.

**B.     The jury lacked legally sufficient evidence to find Acer vicariously liable for acts performed by Acer America.**

SVV may contend that the jury found Acer vicariously liable for the acts of its subsidiary, Acer America. SVV alleged that Acer America directly infringes because it imports the accused products into the United States and sells them in the United States. But Congress, when enacting 35 U.S.C. § 271(a), did not intend to violate the "bedrock principle" of "respect for corporate distinctions" absent veil piercing. *See United States v. Bestfoods*, 524 U.S. 51, 62-64 (1998) (citations omitted) (holding with regard to a different federal statute that "when (but only when) the corporate veil may be pierced[] may a parent corporation be charged with derivative . . . liability for its subsidiary's actions" (footnote omitted)). "Acts of a subsidiary company are not imputed to a parent company unless evidence supports 'piercing the [corporate] veil.'" *Smith v. Garlock Equip. Co.*, 658 F. App'x 1017, 1027 (Fed. Cir. 2016) (alteration in original) (citing

*Bestfoods*, 524 U.S. at 62).   And here, there is legally insufficient evidence under any of the vicarious-liability theories presented at trial to hold Acer vicariously liable for the acts of its subsidiary.

> **1.     The jury lacked legally sufficient evidence to find that Acer directed or controlled Acer America to sell, offer for sale, or import the accused products.**

The direction or control standard is a legal test developed by the Federal Circuit for determining when to "hold an entity responsible for others' performance of *method* steps."  *Akamai Techs. v Limelight Networks*, 797 F.3d 1020, 1022 (Fed. Cir. 2015) (en banc) (emphasis added). By contrast, every claim found infringed by the jury in this case is an apparatus claim.  *See, e.g.*, ECF No. 158 at 4.  The direction or control standard thus has no relevance here.

The jury's verdict cannot be based on a finding that Acer directs and controls Acer America to sell, offer for sale, or import the accused products into the United States.

As for sales and offers for sale in the United States, Mr. Marc Ho, responsible for product management at Acer, testified that Acer is not "involved in Acer America's sales to its customers." Tr. 527.  The "Supply Agreement" between Acer and Acer America (Ex. 5 (JTX-015)) does not obligate Acer America to sell anything.  Rather, it is a "Supply Agreement," not a "Sales Agreement," and simply provides a contract whereby Acer America (as Buyer) can purchase products from Acer (as Supplier).  *Id.* at 2 ("[Acer] wishes to contract with [Acer America] and sell to [Acer America] the Products (as hereinafter defined).").   According to the Supply Agreement, Acer America has to place orders with Acer, not the other way around.  *Id.* at 4 (¶ 5.1); Tr. 527-28.  Nothing in this contract obligates Acer America to purchase products from Acer or to sell Acer's products, let alone to sell the accused products in a specific jurisdiction such as the United States.  Ex. 5 (JTX-015) at 3-4 ("2. Obligations of Buyer").

As for importation of Acer's products into the United States, Mr. Ho testified that Acer is not involved in the shipment of products after they have been manufactured, and that Acer America is the one who arranges for importation into the United States, including all customs requirements. Tr. 529-30. Ms. Shang, Acer's corporate representative, similarly testified that "Acer Inc. is not an importer," and instead that "Acer America is the importer." Tr. 440. The Supply Agreement also specifies that Acer America, not Acer, directs and controls the shipment of the products. Ex. 5 (JTX-015) at 4 (¶ 5.3) (providing that the products will be shipped "to the place and date designated" on Acer America's orders). The Supply Agreement states that Acer America "shall act as the importer of record," and that it must bear all charges incurred as a result of any importation. *Id.* at 5 (¶ 5.4). Finally, the Supply Agreement expressly provides that "[i]n all matters relating to the Order, [Acer] shall be acting as an independent contractor." *Id.* at 8 (¶ 13.4). Nothing in the Supply Agreement obligates Acer America to import the products into the United States.

There was no legally sufficient evidence presented at trial that Acer directs or controls Acer America to sell, offer for sale, or import the accused products in the United States.

> **2. The jury lacked legally sufficient evidence to find that Acer America acted as Acer's agent for selling, offering for sale, or importing the accused products.**

The jury's verdict cannot be based on a finding that Acer America acted as Acer's agent to sell, offer for sale, or import the accused products into the United States.

Acer never authorized Acer America to act as its agent because the Supply Agreement expressly provides to the contrary. The jury heard testimony from Acer's corporate representative, Ms. Shang, that the Supply Agreement "talks about the supply between the two companies." Tr. 450. While the Supply Agreement provides a list of products that Acer America can "market, sell[,] and distribute" "on behalf of" Acer (Ex. 5 (JTX-015) at 10 (Ex. A)), the Supply Agreement

expressly states that "[n]either party shall have any authority to assume or create any obligation, express or implied, on behalf of the other party, *nor shall either party have the authority to represent itself as an agent or employee of the other party*" (*id.* at 8 (¶ 13.4, "Independent Contractor") (emphasis added)).

There was no legally sufficient evidence presented at trial that Acer authorized Acer America to serve as its agent to sell, offer for sale, or import the accused products in the United States.

> **3.     The jury lacked legally sufficient evidence to pierce the corporate veil and find Acer America to be Acer's alter ego.**

The jury's verdict cannot be based on a finding that Acer America and Acer operate as alter egos and the corporate veil should be pierced.

"It is a general principle of corporate law deeply 'ingrained in our economic and legal systems' that a parent corporation (so-called because of control through ownership of another corporation's stock) is not liable for the acts of its subsidiaries." *Bestfoods*, 524 U.S. at 61 (citation omitted).   To pierce the corporate veil and hold that a parent and its subsidiary are not really separate entities requires showing that (1) there is such unity between the parent and its subsidiary that the separateness of the two corporations has ceased, and (2) holding only the subsidiary liable would result in fraud or injustice.  *Id.* at 62; *Gardemal v. Westin Hotel Co.*, 186 F.3d 588, 593-94 (5th Cir. 1999).  The jury lacked legally sufficient evidence to pierce the corporate veil and find Acer America to be Acer's alter ego.

Here, Acer America is an indirect, wholly owned subsidiary of Acer.  Ex. 6 (JTX-014) at 74, 83-84.  Acer's corporate representative testified and agreed that Acer operates control over Acer America in the way that a parent would operate control over a subsidiary.  *See, e.g.*, Tr. 441, 446-52.  She also testified that, as a corporate parent and shareholder, Acer ultimately bears

13

responsibility for the actions of Acer America, its subsidiary.  Tr. 437, 440, 448, 453-54.  But that much is true for any shareholder of any corporation and for any corporate parent of its subsidiary. The value of a shareholder's shares in a corporation varies based on the value of that corporation. And the value of a corporation fluctuates depending on the assets and liabilities of that corporation. The control necessary to pierce the corporate veil "is not mere majority or complete stock control but such domination of finances, policies[,] and practices that the controlled corporation has, so to speak, no separate mind, will[,] or existence of its own and is but a business conduit for its principal."  *Gardemal*, 186 F.3d at 593-94 (citation omitted).  A typical corporate relationship between a parent and a subsidiary is insufficient to pierce the corporate veil.

And there was no evidence that Acer exercises such dominant control over Acer America that it can be said that Acer America has "no separate mind, will[,] or existence of its own."  *See id.* (citation omitted).  Acer America maintains separate property (Tr. 441-42), pays the salaries of its own employees (Tr. 442-43), and has officers which are not in common with Acer (*see* Tr. 448). The companies also maintain clear dividing lines between their operations.  Acer is headquartered in Taiwan, designs the look and feel of computer display products, contracts with manufacturers to have these products manufactured, and sells those products to its subsidiaries.  Tr. 513-22, 526. Acer America, on the other hand, purchases products from Acer outside the United States, arranges for their shipment to the United States, handles importation and customs requirements, and resells them to consumers.  Tr. 479-80, 526-30.  Acer America performs these activities on its own with no involvement from Acer.  Tr. 526-30.  And each acts independently in its own decisions.  Ex. 5 (JTX-015) at 8 (¶ 13.4, "Independent Contractor").

Nor is there any evidence that Acer America operates with grossly inadequate capital, that Acer uses Acer America's property as its own, that the daily operations of the two are not kept

separate, or that Acer exercises such pervasive control over Acer America that it dictates every facet of Acer America's business from broad policy decisions to routine matters of day-to-day operation.  *See Gardemal*, 186 F.3d at 593-94.  At best, the jury heard that Acer owns (indirectly) 100% of Acer America, there are a few overlapping directors, and Acer reports consolidated financial statements.  Tr. 443-444, 448; Ex. 6 (JTX-014) at 74, 83-84.  But, as the jury was instructed, "100 percent ownership and shared management personnel are not alone enough to establish the required level of control."  Tr. 929.  And these facts presented at trial reveal nothing more than a typical corporate relationship, which is insufficient to pierce the corporate veil. *Gardemal*, 186 F.3d at 593 (holding that corporate veil had not been pierced when the record "reveals nothing more than a typical corporate relationship between a parent and subsidiary"). "We disregard the corporate fiction . . . when the corporate form has been used as part of a basically unfair device to achieve an inequitable result."  *Id.* at 594 (citation omitted).  And there is no indication that SVV could not recover by suing Acer America directly, as it is a California corporation, and there has been no evidence presented that it is undercapitalized or underinsured. *Id.*

There was no legally sufficient evidence presented at trial to support piercing the corporate veil and holding Acer America as the alter ego of Acer such that Acer is liable for the actions of Acer America.

### 4.    The jury lacked legally sufficient evidence to find Acer liable for any act of direct infringement.

Even assuming the accused products met every element of the asserted claims, there was legally insufficient evidence to support a finding that an act of statutory direct infringement was performed by, or attributable to, Acer.  More specifically, there was legally insufficient evidence presented to the jury to support a finding that Acer made, sold, offered for sale, or used the accused

15

products in the United States or that Acer imported them into the United States.  Nor was legally sufficient evidence presented to the jury showing that Acer would be vicariously liable for the actions of Acer America in importing the accused products into, and selling them in, the United States.

### C.     There is no evidence that Acer induced infringement of the asserted claims because the jury lacked legally sufficient evidence to find that Acer possessed the specific intent to encourage another's infringement.

To prove induced infringement under 35 U.S.C. § 271(b), SVV must show that Acer possessed specific intent to encourage another's infringement.  *Roche*, 30 F.4th 1109.  "In some respects, the intent standard for inducement is akin to the one for willfulness, as both rest on the subjective intent of the accused infringer."  *Id.* at 1119.  As explained in Section III, Acer lacked specific intent to encourage another's infringement of the asserted claims and, instead, had a good-faith belief of noninfringement.  *Id.* (reversing district court's denial of JMOL for no induced infringement as irreconcilable with its decisions granting JMOL of no willfulness).

There was no evidence presented at trial that Acer knew that the accused products imported into the United States, and sold here, by Acer America infringed SVV's patents.  None.  Thus, the only remaining theory to support a finding of induced infringement would be "willful blindness." *Id.* at 1118.  Willful blindness has "two basic requirements: (1) The defendant must subjectively believe that there is a high probability that a fact exists[,] and (2) the defendant must take deliberate actions to avoid learning of that fact."  *Id.* (citation omitted).  The jury lacked legally sufficient evidence to support a finding of willful blindness under either requirement.

As to the first, at no time did the jury hear evidence that Acer subjectively believed there was a high probability that its accused products infringe.  Instead, Acer's trial counsel presented reasonable noninfringement defenses in good faith supported by expert testimony.  Tr. 551-750, 811-24.  The jury also heard that Acer's legal team investigated the patents and concluded not to

16

design around the asserted claims.  Tr. 469.  At no time did the jury hear any testimony that Acer believed it probably infringed SVV's patents.

Nor did the jury hear evidence that Acer took deliberate actions to avoid learning whether it infringed.  In fact, the record reveals the opposite.  Within a day of receiving SVV's presuit letter hurling allegations of infringement and asking to engage in discussions with Acer, Acer responded. Tr. 452-53, 480-83; Ex. 3 (JTX-001); Ex. 4 (JTX-002).  Acer accepted SVV's offer to engage in discussions and asked SVV for evidence that Acer was infringing so that Acer could investigate. Ex. 4 (JTX-002).  The asserted claims, after all, cover a component of Acer's products that Acer does not design, does not specify, and does not even assemble into the accused products.  Tr. 515-16, 518-23.  SVV did not engage in discussions, as it told Acer it was willing to do, and Acer was met with nothing but silence and the passage of time before SVV filed this litigation.  Tr. 481-83. If anything, this evidence shows that Acer took deliberate steps to ascertain whether it infringed by asking the patentee—who claimed to have performed an investigation and believed Acer infringed—to share that evidence with Acer so it could learn whether it infringed.  *Id.*; Ex. 4 (JTX-002).

Thus, the jury's verdict of infringement could not stand based on induced infringement at least because the jury lacked legally sufficient evidence to find that Acer had the mental state required to establish induced infringement regardless of whether the jury ultimately determined that the accused products satisfied every limitation of the asserted claims.

**D.    The jury's infringement verdict cannot stand because the jury lacked sufficient evidence that Acer performed any act of infringement, was vicariously liable for any act of infringement, or possessed the required mental state to induce infringement.**

The jury's finding of infringement could only be based on a determination: (1) that Acer, itself, made, sold, offered for sale, used, or imported the accused products in the United States;

(2) that Acer is vicariously liable for Acer America's import and sale of the accused products in the United States; and/or (3) that Acer induced Acer America to infringe SVV's patents. But the jury lacked sufficient evidence to support any one of those discrete theories.

Acer itself performs no actions at all in the United States, and the undisputed evidence is that Acer does not import the accused products into the United States, nor does it sell or offer them for sale in the United States. Nor, as a matter of law, does Acer exert such domination and control over its indirect, corporate subsidiary, Acer America, that warrant holding Acer vicariously liable for Acer America's import and sale of the accused products in the United States. Finally, the jury heard no evidence that Acer possessed the belief that the accused products infringe or evidence that Acer took any single deliberate step to avoid learning of that purported infringement. The jury's finding of infringement cannot be supported.

## V.      Conclusion

After hearing three days of evidence, the bulk of which was devoted to highly technical matters about how light travels through the components of a computer display, the jury lacked sufficient evidence to find any infringement (let alone willful infringement) by Acer. *E.g.*, Tr. 50-168 (Dr. Vasylyev), 168-317 (SVV's technical expert), 551-825 (Acer's technical expert). Acer simply has not performed any act under 35 U.S.C. § 271 that would expose it to liability here. And the jury's per-unit royalty structured as a lump-sum award of over $10M cannot stand under long-standing Federal Circuit precedent on patent damages. Acer respectfully requests this Court enter judgment of noninfringement or, at a minimum, remit the damages to no more than $767,000, the maximum lump-sum award supported by the evidence at trial.

DATED: October 22, 2024

/s/ Jacob A. Schroeder

Jacob A. Schroeder (*pro hac vice*)
FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER, LLP
Stanford Research Park, 3300 Hillview Avenue,
2nd Floor
Palo Alto, CA 94304
(650) 849-6600
jacob.schroeder@finnegan.com

Sydney Kestle (*pro hac vice*)
FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER, LLP
901 New York Avenue, NW
Washington, DC 20001-4413
(202) 408-4000
sydney.kestle@finnegan.com

Benjamin Saidman (*pro hac vice*)
FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER, LLP
271 17th Street, NW
Suite 1400
Atlanta, GA 30363-6209
(404) 653-6400
benjamin.saidman@finnegan.com

Kaiwen Tseng (CA Bar No. 193756)
Craig Kaufman (CA Bar No. 159458)
Jerry Chen (CA Bar No. 229318)
TECHKNOWLEDGE LAW GROUP LLP
20660 Stevens Creek Blvd., Suite 381
Cupertino, CA 95014
Tel: (650) 517-5200
Fax: (650) 562-8054
ktseng@tklg-llp.com
ckaufman@tklg-llp.com
jchen@tklg-llp.com

Eric H. Findlay
State Bar No. 00789886
Brian Craft
State Bar No. 04972020
FINDLAY CRAFT, PC.
7270 Crosswater Avenue, Suite B

Tyler, TX 75703
Tel: (903) 534-1100
Fax: (903) 534-1137
efindlay@findlaycraft.com
bcraft@findlaycraft.com

*Attorneys for Defendant Acer Inc.*

**CERTIFICATE OF CONFERENCE**

The undersigned hereby certifies that counsel for Defendant met and conferred with

counsel for Plaintiff. Counsel for Plaintiff indicated that Plaintiff opposes this motion, and the

parties were not able to reach agreement on this matter.

DATED: October 22, 2024

/s/ *Jacob A. Schroeder*
Jacob A. Schroeder

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that Defendant's Rule 50(b) Renewed Motion for Judgment as a Matter of Law and supporting documents were served via electronic mail to all counsel of record who have appeared in this case per Local Rule CV-5 on October 22, 2024.  The undersigned hereby further certifies that the proposed order was served via electronic mail to all counsel of record who have appeared in this case per Local Rule CV-5 on October 22, 2024.

/s/ *Jacob A. Schroeder*
Jacob A. Schroeder